**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ABDULKADR ABDULKHALIK DAD, | Case No. |
|     Detainee, | |
|     Guantánamo Bay Naval Station | |
|     Guantánamo Bay, Cuba | **PETITION FOR** |
| | **WRIT OF HABEAS CORPUS** |
|         Petitioner/Plaintiff, | |
| | |
|     - against - | |
| | |
| GEORGE W. BUSH, | |
|     President of the United States | |
|     The White House | |
|     1600 Pennsylvania Ave., N.W. | |
|     WASHINGTON, D.C. 20500; | |
| | |
| DONALD RUMSFELD, | |
|     Secretary, United States | |
|     Department of Defense | |
|     1000 Defense Pentagon | |
|     WASHINGTON, D.C. 20301-1000; | |
| | |
| ARMY BRIG. GEN. JAY HOOD, | |
|     Commander, Joint Task Force - GTMO | |
|     JTF-GTMO | |
|     APO AE 09360; and | |
| | |
| ARMY COL. MIKE BUMGARNER, | |
|     Commander, Joint Detention | |
|      Operations Group - JTF-GTMO, | |
|     JTF-GTMO | |
|     APO AE 09360, | |
| | |
|         Respondents/Defendants. | |

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Abdulkadr Abdulkhalik Dad ("Petitioner") seeks the Great Writ. Petitioner is a

citizen of Afghanistan. He is a civilian wrongly classified as an "enemy combatant" by the

President of the United States, and is being held virtually *incommunicado* in military custody at

United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo") without basis, without charge, without access to counsel and without being afforded any fair process by which he might challenge his detention. Petitioner is being held by color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner or to establish in this Court a lawful basis for Petitioner's detention. This Court also should order injunctive and declaratory relief.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, and his authority under the Executive Order of November 13, 2001, Respondents George W. Bush, President of the United States, Donald H. Rumsfeld, U.S. Secretary of Defense, Army Brigadier General Jay Hood, Commander of Joint Task Force-GTMO, and Army Colonel Mike Bumgarner, Commander, Joint Detention Operations Group, Joint Task Force-GTMO, are either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of Petitioner at Guantánamo.

## I.
## JURISDICTION

1.      Petitioner brings this action under 28 U.S.C. §§ 2241(c)(1) and (c)(3) and 2242. Petitioner further invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; U.S. Const. art. I and II; U.S. Const. amend V, VI and VIII. Because they seek declaratory relief, Petitioner also relies on Fed. R. Civ. P. 57.

2.      This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus, and to entertain the Petition filed by Manatt, Phelps & Phillips, LLP on Petitioner's behalf under 28 U.S.C. § 2242. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce

declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

## II.
## PARTIES

3.     Abdulkadr Abdulkhalik Dad ("Petitioner") seeks a Writ of Habeas Corpus. Petitioner is an Afghan citizen who is presently incarcerated in Respondents' unlawful custody at Guantánamo. He acts on his own behalf in seeking legal representation and access to the courts of the United States. See attached Declaration of Clive Stafford Smith, dated October 6, 2005 (detailing Petitioner's authorization of counsel to act to secure his legal rights).

4.     Upon information and belief, Petitioner's family has tried to speak to Afghan and United States authorities about his condition and unlawful custody. They have not been able to speak with Petitioner or to verify his health, condition or well-being.

5.     Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States Military. Petitioner is being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Executive Order of November 13, 2001 on the Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, Exec. Order, 66 Fed. Reg. 57, 833 (November 13, 2001). President Bush is responsible for Petitioner's unlawful detention and is sued in his official capacity.

6.     Respondent Donald Rumsfeld is the Secretary of the United States Department of Defense. Pursuant to the President's authority as Commander-in-Chief, under the laws and usages of war or, alternatively pursuant to the Executive Order, Respondent Rumsfeld has been charged with the responsibility of maintaining the custody and control of Petitioner. He is sued in his official capacity.

7. Respondent Brigadier Gen. Jay Hood is the Commander of Joint Task Force-Guantánamo ("JTF-GTMO"), the task force running the detention operation at Guantánamo Bay. He has supervisory responsibility for Petitioner and is sued in his official capacity.

8. Respondent Army Col. Mike Bumgarner is the Commander of the Joint Detention Operations Group and the JTF-GTMO detention camps, including the U.S. facility where Petitioner is presently held. He is the immediate custodian responsible for Petitioner's detention and is sued in his official capacity.

9. Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or of agents or employees of private contractors with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents or employees or private contractor employees.

## III.
## STATEMENT OF FACTS

10. Upon information and belief, Petitioner is not an enemy alien and has never been an unlawful belligerent or combatant of any kind.

11. Upon information and belief, Petitioner is not and never has been an enemy combatant. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S Ct. 2633, 2639 (2004). He has never been part of, or supported, forces hostile to the United States or its coalition partners in Afghanistan. He has never engaged in armed conflict against Coalition Forces or attempted to cause any harm to Coalition Forces personnel or property.

12. Upon information and belief, on dates unknown to counsel for Petitioner, but known to Respondents, Coalition Forces took custody of Petitioner.

13.    Upon information and belief, after Petitioner was taken into custody, Coalition Forces transferred him to Guantánamo. Petitioner has been held at Guantánamo since that time, with little or no outside contact.

14.    Upon information and belief, Petitioner has not been afforded any procedures that satisfy the most fundamental common law notions of due process, the Constitution, laws and treaties of the United States, or customary international law.

15.    Upon information and belief, Petitioner seeks enforce his right to a judicial determination as to whether there is any lawful basis for his continuing detention by Respondents.

### The Joint Resolution

16.    In the wake of the September 11, 2001 terrorist attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001).

17.    Pursuant to the Joint Resolution, in or around October 2001, a coalition of forces led by the United States military ("Coalition Forces") defeated Taliban forces and deposed the Taliban government.

18.    Upon information and belief, as Petitioner did not participate in the armed conflict at any point in time, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or under the Joint Resolution.

19.    Upon information and belief, Petitioner is not, and has never been, a member of Al Qaeda or any other terrorist group. Prior to his detention, he did not commit any violent act against any American person or espouse any violent act against any American person or property. He had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaeda or any other terrorist group. He is not properly subject to the detention order issued by President Bush. As he did not participate in the armed conflict at any point in time, he is not properly subject to President Bush's authority as Commander-in-Chief or under the laws and usages of war.

### The Executive Order

20.    On November 13, 2001, Respondent Bush issued an Executive Order authorizing Respondent Rumsfeld to detain indefinitely anyone Respondent Bush has "reason to believe":

i.    is or was a member of the organization known as Al Qaeda;

ii.    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

iii.    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order at §2. President Bush must make this determination in writing. The Executive Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution of September 18, 2001.

21.    The Executive Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Executive Order contains no provision for that person to be notified of the charges he may face. The Executive Order

authorizes detainees to be confined indefinitely without charge. It contains no provision for a detainee to be notified of his rights under domestic and international law, and provides neither the right to counsel, nor the rights to notice of consular protection or to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the legality of a detainee's continued detention and contains no provision for recourse to an Article III court. In fact, the Executive Order expressly bars review by any court. The Executive Order authorizes indefinite and unreviewable detention, based on nothing more than the President Bush's written determination that an individual is subject to its terms.

22.    The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate Petitioner was made by Respondents in the United States and in this judicial district, the decision to detain Petitioner at Guantánamo was made in the United States and in this judicial district, and the decision to continue detaining Petitioner was, and is, being made by Respondents in the United States and in this judicial district.

23.    Upon information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Petitioner is subject to the Executive Order. Consequently, Petitioner is not properly subject to the Executive Order.

24.    Petitioner has not been, and is not being, detained lawfully either pursuant to the Executive Order, President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

### Guantánamo Bay Naval Station

25.    On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba. In April 2002, all prisoners were transferred to Camp Delta, a more

permanent prison facility at Guantánamo. Currently, prisoners are housed in Camp Delta and Camp Five, an additional maximum-security interrogation and detention center.

26.    Prisoners incarcerated at Guantánamo are entitled to test the legality of their detention in the federal courts. *Rasul v. Bush*, 542 U.S. 466, 124 S.Ct. 2686, 2698 (June 28, 2004).

27.    On a date unknown to counsel, but known to Respondents, the United States military transferred Petitioner to Guantánamo, where he has been held ever since, in the custody and control of Respondents.

### The Conditions of Detention at Guantánamo

28.    Since gaining control of Petitioner, the United States military has held him virtually *incommunicado*.

29.    Upon information and belief, Petitioner has been or will be interrogated repeatedly by agents of the United States Departments of Defense and Justice, and the Central Intelligence Agency, although he has not been charged with an offense and has not been notified of any pending or contemplated charges. He has not appeared before a lawful military or civilian tribunal, and has not been provided access to counsel or the means to contact and secure counsel. He has not been adequately informed of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Conventions, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. Indeed, Respondents have taken the position that Petitioner should not be informed of these rights. As a result, Petitioner lacks any ability to protect or to vindicate his rights under domestic and international law.

30.    Upon information and belief, Petitioner has been forced to provide involuntary statements to Respondents' agents at Guantánamo.

8

31. Upon information and belief, Petitioner has been held under conditions that violate his constitutional and international rights to dignity and freedom from torture and from cruel, inhuman and degrading treatment or punishment. *See, e.g.*:

a. Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power,* at 83-115, Ch. 12-13, AMR 51/063/2005 (May 13, 2005);

b. Human Rights Watch, *Getting Away with Torture?  Command Responsibility for the U.S. Abuse of Detainees*, at 14-15 (April 2005), *available at* http://www.hrw.org/reports/2005/us0405/ and *The Road to Abu Ghraib*, at 13-19 (June 2004), *available at* http://www.hrw.org/reports/2004/usa0604/;

c. Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by U.S. Forces,* Ch.3 (May, 2005);

d. Press Release, United Nations, United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees,( Feb. 4, 2005);

e. Press Release, International Committee of the Red Cross, The ICRC's Work at Guantánamo Bay, (Nov. 30, 2004);

f. International Committee of the Red Cross, Operational Update, "US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC," July 26, 2004;

g. Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the 'War on Terror'*, at 22 (Oct. 27, 2004) *available at* http://web.amnesty.org/library/Index/ENGAMR 511452004; and

      h. Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of
Criminal Defense Lawyers Champion, at 4-5 (Nov. 2004).

32.      The General Counsel of the Department of Defense approved the use of these
unlawful interrogation techniques – including isolation for up to 30 days, 28-hour interrogations,
extreme and prolonged stress positions, sleep deprivation, sensory assaults, removal of clothing,
hooding, and the use of dogs to create anxiety and terror – at Guantánamo. *See* Action
Memorandum from William J. Haynes II, General Counsel, DOD, to Secretary of Defense (Nov.
27, 2002); *Pentagon Working Group Report on Detainee Interrogations in the Global War on
Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations*, at 62-65
(Apr. 4, 2003).[1]

33.      In a confidential report to the United States government, the International
Committee of the Red Cross ("ICRC") charged the U.S. military with intentional use during
interrogations at Guantánamo of psychological and physical coercion on prisoners at
Guantánamo that is "tantamount to torture." *See* Neil A. Lewis, *Red Cross Finds Detainee
Abuse in Guantánamo*, N.Y. TIMES, Nov. 30, 2004, at A1. The report includes claims that
doctors and other medical workers at Guantánamo participated in planning for interrogations. *Id.*
*See also* M. Gregg Bloche and Jonathan H. Marks, *When Doctors Go to War,* NEW ENG. J. MED,
Jan. 6, 2005, at 3-4, *and* Jane Mayer, *The Experiment*, THE NEW YORKER, July 11 & 18, 2005, at
60-71.

---

[1] Additional details of the cruel and degrading conditions suffered by detainees at Guantánamo
are set out at length in a statement by numerous released British detainees. *See* Shafiq Rasul,
Asif Iqbal & Rhuhel Ahmed, *Composite Statement: Detention in Afghanistan and Guantanamo
Bay*,   300,   *at*   http://www.ccr-ny.org/v2/reports/docs/Gitmo-compositestatementFINAL23
july04.pdf. The Department of Defense also informed the Associated Press that a number of
interrogators at Guantánamo have been demoted or reprimanded after investigations into
accusations of abuse at the facility. *See Report Details Guantanamo Abuses*, ASSOC. PRESS,
Nov. 4, 2004.

34.    Since details of the ICRC's report emerged, new revelations of abuse and torture at Guantánamo have appeared, including FBI memos detailing torture and "highly aggressive interrogation techniques" such as 24-plus hour interrogations involving beatings, temperature extremes, dogs, prolonged isolation and loud music. *See, e.g.*:

  a.  Carol D. Leonnig, *Guantánamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land*, WASH. POST, Aug. 13, 2005, at A18;

  b.  Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantánamo*, N.Y. TIMES, Jan. 1, 2005, at A11;

  c.  Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, WASH. POST, Dec. 26, 2004, at A1;

  d.  Neil A. Lewis and David Johnston, *New F.B.I. Memos Describe Abuses of Iraq Inmates*, N.Y. TIMES, Dec. 21, 2004, at A1;

  e.  Dan Eggen and R. Jeffrey Smith, *FBI Agents Allege Abuse of Detainees at Guantánamo Bay*, WASH. POST, Dec. 21, 2004, at A1; and

  f.  Neil A. Lewis, *F.B.I. Memos Criticized Practices at Guantánamo*, N.Y. TIMES, Dec. 7, 2004, at A19.

35.    In addition, the Associated Press has reported allegations that female Guantánamo interrogators have used sexual taunting, including smearing fake menstrual blood on a detainee's face, to try to break Muslim detainees. *Gitmo Soldier Details Sexual Tactics*, ASSOC. PRESS, Jan. 27, 2005. *See also* Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 89-90, Ch. 12, AMR 51/063/2005 (May 13, 2005) *and* Jane Mayer, *The Experiment*, THE NEW YORKER, July 11 & 18, 2005, at 60.

36.    In fact, some of the well-publicized and egregious interrogation techniques used in the Abu Ghraib torture debacle —such as aggressive use of dogs, sexual humiliation, stress positions and sense deprivation—were pioneered at Guantánamo. *See* Josh White, *Abu Ghraib Dog Tactics Came From Guantánamo; Testimony Further Links Procedures at Two Facilities,* WASH. POST, July 27, 2005, at A14; *and* Josh White, Abu Ghraib *Tactics Were First Used at Guantanamo,* WASH. POST, July 14, 2005 at A1. *See also* Human Rights Watch, *The Road to Abu Ghraib*, at 13-19 (June 2004), *available at* http://www.hrw.org/reports/2004/usa0604/.

37.    The unlawful and unconstitutional interrogation techniques used by Respondents at Guantánamo include not only physical and psychological abuse but also other impermissible conduct contrary to due process requirements, including, upon information and belief, having agents of the Government present themselves as lawyers for the detainees during meetings with the detainees, for the purpose of extracting information from the detainees. *See Sam Hannel, Lawyers Describe Guantánamo Detainees,* SEATTLE POST-INTELLIGENCER, Jan. 19, 2005.

38.    Additionally, military defense lawyers have been instructed to materially limit their representation to their detainee clients in violation of due process. *See* David Johnston and Neil Lewis, *Lawyer Says Military Tried To Coerce Detainee's Plea,* N.Y. TIMES, June 16, 2005 at A25 (Late Ed.).

39.    Respondents, acting individually or through their agents, have stated that the limitations applicable to coercive interrogation techniques used by U.S. military officials, *do not apply* to interrogations conducted by agents of the CIA or other entities operating under the authority of the Executive. *See, e.g.*:

> a. Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power,* at 27-43, Ch. 5, AMR 51/063/2005 (May 13, 2005).

12

b. Eric Lichtblau, *Gonzales Says '02 Policy on Detainees Doesn't Bind CIA,* N.Y. TIMES, Jan. 19, 2005, at A17;

c. Dan Eggen and Charles Babington, *Torture by U.S. Personnel Illegal, Gonzales Tells Senate,* WASH. POST, Jan. 18, 2005, at A4.

40. Respondents also have acknowledged that although the significant majority of detainees no longer have valuable intelligence, the United States will continue to detain them indefinitely. *See* Josh White and Robin Wright, *Afghanistan Agrees to Accept Detainees,* WASH. POST, August 5, 2005 ("In a military fact sheet about 'the future' of Guantánamo, developed in early July, defense officials indicated that the operational priority of the facility is to shift from intelligence gathering to long-term detention.").

41. Counsel for Respondents also have consistently maintained that the United States may hold detainees under their current conditions indefinitely. *In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK), *et al.*, (D.D.C.), Tr. of Dec. 1, 2004 Oral Argument on Motion to Dismiss at 22-24, statements of Principle Deputy Associate Attorney Gen. Brian Boyle; *see also* Dana Priest, *Long-Term Plan Sought for Terror Suspects,* WASH. POST, Jan. 2, 2005, at A1.

42. In fact, the Government has failed to release detainees even after they have been designated "No Longer Enemy Combatants." *See* Ben Fox, *U.S. to Ease Conditions for Some Detainees,* CHI. TRIBUNE, Aug. 11, 2005 at C4, *and* Robin Wright, *Chinese Detainees Are Men Without a Country; 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo With Nowhere to Go,* WASH. POST, Aug. 24, 2005, at A1 (Final Ed.).

43. The Government has recently acknowledged plans to begin constructing a new, more permanent facility at Guantánamo. Christopher Cooper, *In Guantánamo, Prisoners*

13

*Languish in a Sea of Red Tape,* WALL ST. J., Jan. 26, 2005, at A1; *Guantánamo Takes on the Look of Permanency,* ASSOC. PRESS, Jan. 9, 2005.

### Extraordinary Rendition

44.    During interrogations, detainees have been threatened with rendition or transfer to countries that permit indefinite detention without charge or trial and/or routinely practice torture. Upon information and belief, the United States has secretly transferred detainees to such countries without complying with the applicable legal requirements for extradition.    This practice, known as "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture. *See* Jane Mayer, *Outsourcing Torture: The Secret History of American's 'Extraordinary Rendition' Program,* THE NEW YORKER, Feb. 14, 2005, at 106.

45.    "Extraordinary rendition" is the transfer of an individual, with the involvement of the United States or its agents, to a foreign state in circumstances that make it more likely than not that the individual will be subjected to torture or cruel, inhuman, or degrading treatment. *See* Association of the Bar of the City of N.Y. & Center for Human Rights and Global Justice, *Torture by Proxy: International and Domestic Law Applicable to "Extraordinary Renditions"* (N.Y.: ABCNY & NYU School of Law, 2004) at 4. In assessing whether it is "more likely than not" that an applicant would be tortured if removed to the proposed state, all evidence relevant to the possibility of future torture is required to be considered, including, *inter alia*, (i) evidence of past torture inflicted upon the applicant; (ii) a pattern or practice of gross human rights violations within the proposed state of removal; and (iii) other relevant information regarding conditions in the state of removal. *Id.* at 52, citing 8 C.F.R. § 208.16(c)(2).

46.    The U.S. government's practice of extraordinary rendition has been well-documented by major American and international news organizations, including, *inter alia*, *The*

14

*Washington Post*, *The Los Angeles Times*, and the *British Broadcasting Corporation* (the

"BBC"). According to news accounts:

> Since September 11, the U.S. government has secretly transported dozens
> of people suspected of links to terrorists to countries other than the United
> States bypassing extradition procedures and legal formalities, according to
> Western diplomats and intelligence source. The suspects have been taken
> to countries . . . whose intelligence services have close ties to the CIA and
> where they can be subjected to interrogation tactics -- including torture
> and threats to families -- that are illegal in the United States, the sources
> said. In some cases, U.S. intelligence agents remain closely involved in
> the interrogations, the sources said.

Rajiv Chandrasekaran and Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects,* WASH.

POST, Mar. 11, 2002, at A1; *see also* Dana Priest, *Long Term Plan Sought for Terror Suspects,*

WASH. POST, Jan. 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements

between the United States and other countries, such as Egypt ... that agree to have local security

services hold certain suspects in their facilities for interrogation by CIA and foreign liaison

officers.").

47.    In fact, the Government has recently announced its intention to render many

Guantánamo detainees to countries with records of human rights abuses and torture. *See, e.g.,*:

   a.  Matthew Waxman, *Beyond Guantánamo,* WASH. TIMES, Aug. 20, 2005, at A17;

   b.  Josh White and Robin Wright, *Afghanistan Agrees to Accept Detainees,* WASH.
       POST, Aug. 5, 2005, at A13;

   c.  Neil Lewis, *Guantánamo Detention Site Is Being Transformed, U.S. Says,* N.Y.
       TIMES, August 6, 2005, at A8 (Late Ed.); and

   d.  Paul Richter, *U.S. to Repatriate 110 Afghans Jailed at Guantánamo Bay,* L.A.
       TIMES, Aug. 5, 2005, at A18.

48.    Moreover, upon belief and information, the Government is rendering these

detainees on the condition that the home country imprison the detainee, without regard to the

15

detainee's individual factual or legal situation. *See* Robin Wright and Josh White, *U.S. Holding Talks on Return of Detainees; Administration Close to Reaching Agreements With 10 Muslim Governments*, WASH. POST, Aug. 9, 2005, at A13.

49.     The prospect of Petitioner's extraordinary rendition to Afghanistan is especially troubling because it is likely that Afghan detainees will simply be transferred from U.S. custody in Guantánamo to U.S. custody in Afghanistan pending the construction of adequate prison facilities in Afghanistan. *See* Josh White and Robin Wright, *Afghanistan to Accept Detainees*, WASH. POST, Aug. 5, 2005 ("A major obstacle to the transfer of detainees to Afghanistan is infrastructure. US officials have agreed to help Afghanistan build an appropriate prison and to train its guards. One possible interim solution under consideration is that Afghan detainees at Guantánamo could be transferred to Bagram [airbase] until permanent facilities are built.")  At least six detainees have been killed while in U.S. custody in Afghanistan. On March 12, 2005, the *New York Times* reported that two Afghan prisoners died in U.S. custody at the Bagram airbase detention center in December 2002 after being "chained to the ceiling, kicked and beaten by American soldiers in sustained assaults that caused their deaths." Douglas Jehl, *Army Details Scale of Abuse in Afghan Jail*, N.Y. TIMES, Mar. 12, 2005, at A1.

50.     Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to Afghanistan, a country that engages in torture during interrogations and incarceration, or to U.S. custody in Afghanistan, where torture and even killings also have been documented.

**IV.**
**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
(COMMON LAW DUE PROCESS AND
DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE
CONSTITUTION OF THE UNITED STATES -UNLAWFUL DEPRIVATION OF LIBERTY)

51.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

52.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  President Bush has ordered the prolonged, indefinite, and arbitrary detention of Petitioner, without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice,  Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

53.     To the extent that Petitioner's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

54.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## SECOND CLAIM FOR RELIEF
### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES - UNLAWFUL CONDITIONS OF CONFINEMENT)

55.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

56.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

57.    Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

## THIRD CLAIM FOR RELIEF
### (GENEVA CONVENTIONS - ARBITRARY DENIAL OF DUE PROCESS)

58.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

59.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

60.    Violations of the Geneva Conventions are direct treaty violations and violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241 (c)(3).

61.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired to violate the Geneva Conventions.

62.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## FOURTH CLAIM FOR RELIEF
(INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW - ARBITRARY DENIAL OF DUE PROCESS)

63.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

64.    By the actions described above, Respondents have denied and continue to deny Petitioner the due process accorded to persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

65.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## FIFTH CLAIM FOR RELIEF
(EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION – CRUEL AND UNUSUAL PUNISHMENT)

66.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

67.    Upon information and belief, Respondents have directed, ordered, confirmed, ratified, and/or conspired to bring about acts that deliberately and intentionally have inflicted severe physical and psychological abuse and agony upon Petitioner in order to obtain coerced information or confessions from him, punish or intimidate him, or for other purposes.

68.    Upon information and belief, Petitioner has been held in conditions of isolation; placed in constant vulnerability to repeated interrogation and severe beatings; kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement for minor rule

infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature and deafening noise; subjected to violent behavior or the threat of violence; threatened with extraordinary rendition to countries that practice torture; sexually humiliated; forcibly compelled to violate fundamental tenets of his faith; denied access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

69.     To the extent that Respondents have directed, ordered, confirmed, ratified, and/or conspired to bring about the actions described above, Respondents have violated and continue to violate the prohibition against the infliction of cruel and unusual punishment in the Eighth Amendment to the Constitution of the United States.

70.     Upon information and belief, Petitioner has been forced to suffer severe physical and psychological abuse and agony. He is therefore entitled to habeas, declaratory, and injunctive relief and other relief to be determined at trial.

### SIXTH CLAIM FOR RELIEF
(ALIEN TORT CLAIMS ACT –
VIOLATIONS OF THE LAW OF NATIONS)

71.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

72.     Upon information and belief, Respondents have directed, ordered, confirmed, ratified, and/or conspired to bring about acts that deliberately and intentionally have inflicted severe physical and psychological abuse and agony upon Petitioner in order to obtain coerced information or confessions from him, punish or intimidate him, or for other purposes.

73.     Upon information and belief, Petitioner has been held in conditions of isolation; placed in constant vulnerability to repeated interrogation and severe beatings; kept in cages with

20

no privacy; shackled with heavy chains and irons; placed in solitary confinement for minor rule infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature and deafening noise; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; forcibly compelled to violate fundamental tenets of his faith; denied access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

74.     The acts described herein constitute (a) torture; (b) war crimes committed in violation of the applicable provisions of the Geneva Conventions; (c) cruel, inhuman or degrading treatment; (d) arbitrary arrest and prolonged arbitrary detention; and (e) enforced disappearance in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350.

75.     To the extent that Respondents have directed, ordered, confirmed, ratified, and/or conspired to bring about the above-described violations of the law of nations, Respondents are liable to Petitioner.

76.     Upon information and belief, Petitioner has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse and agony. He is therefore entitled to habeas, declaratory, and injunctive relief and such other relief as the Court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF
### (ARTICLE II OF THE UNITED STATES CONSTITUTION- UNLAWFUL DETENTION)

77.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

21

78.     Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind. The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S.Ct. 2633, 2642 n.1 (2004).

79.     By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the U.S. Constitution by authorizing, ordering and directing that military officials seize Petitioner and transfer him to military detention, and by authorizing and ordering their continued military detention at Guantánamo. All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner.

80.     The military seizure and detention of Petitioner by the Respondents is *ultra vires* and illegal because it violates Article II of the U.S. Constitution. To the extent that the Executive asserts that Petitioner's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner.

81.     To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the U.S. Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

82.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT)

83.     Petitioner incorporates by reference all preceding paragraphs as if fully set forth herein.

84.     Respondents have incarcerated Petitioner in violation of Army Regulation 190-8, which prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See* Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

85.     Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2), by (a) arbitrarily and capriciously holding Petitioner in military custody in the manner described above; (b) denying Petitioner the process afforded to persons seized and detained by the United States Military in times of armed conflict pursuant to Army Regulation 190-8; and (c) directing, ordering, conforming, ratifying, or conspiring unlawfully to torture Petitioner in violation of Army Regulation 190-8.

86.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## NINTH CLAIM FOR RELIEF
### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION - VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

87.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

88.     Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner's right to consult with counsel by conditioning

counsel's access to Petitioner on unreasonable terms, including classification/declassification procedures, all in violation of Petitioner's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

89.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## TENTH CLAIM FOR RELIEF
### (DUE PROCESS CLAUSE – EXTRAORDINARY RENDITION)

90.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

91.     Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

92.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF
### (CONVENTION AGAINST TORTURE AND CONVENTION RELATING TO THE STATUS OF REFUGEES – EXTRAORDINARY RENDITION)

93.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

94.     Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a direct violation of Petitioner's rights under the Covenant Against Torture

and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

95.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### TWELFTH CLAIM FOR RELIEF
### (ALIEN TORT CLAIMS ACT- RENDITION)

96.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

97.     Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under customary international law, which may be vindicated under the Alien Tort Claims Act.

98.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### V.
### PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for relief as follows:

1.     Grant the Writ of Habeas Corpus and order Respondent to release Petitioner from his current unlawful detention;

2.     Order that Petitioner be brought before the Court or before a Magistrate Judge assigned by the Court to conduct proceedings under the supervision of the Court to vindicate his rights;

3.    Order that pending final judgment in this action, Petitioner cannot be transferred to any other country without the specific written agreement of Petitioner and Petitioner's counsel;

4.    Order that Petitioner cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioner will be subject to torture

5.    Order that Respondents allow counsel to meet and confer with Petitioner in private and unmonitored attorney-client conversations;

6.    Order that pending final judgment in this action, Respondents cease all interrogations of Petitioner, direct or indirect;

7.    Order that Respondents cease all acts of torture and cruel, inhuman and degrading treatment of Petitioner Dad;

8.    Order and declare that the Executive Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, the treaties of the United States and customary international law;

9.    Order and declare that the prolonged, indefinite and restrictive detention of Petitioner without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international humanitarian law; and

26

10.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutory law, and international law.


Dated:  October 14, 2005                          Respectfully submitted,

                                                  Counsel for Petitioner:

                                                  Ronald G. Blum
                                                  Cristina M. Posa
                                                  MANATT, PHELPS & PHILLIPS, LLP
                                                  7 Times Square
                                                  New York, New York 10036
                                                  Tel: (212) 790-4500
                                                  Fax: (212) 790-4545

                                                  Barbara Olshansky
                                                  Tina Monshipour Foster
                                                  Gitanjali S. Gutierrez (GG 1234)
                                                  CENTER FOR CONSTITUTIONAL RIGHTS
                                                  666 Broadway, 7th Floor
                                                  New York, New York  10012
                                                  Tel: (212) 614-6439
                                                  Fax: (212) 614-6499

## **CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION**

Counsel for Petitioner certify, pursuant to L. Cv. R. 83.2(g), that they are representing

Petitioner without compensation.

Dated: October 14, 2005

> Ronald G. Blum
> Cristina M. Posa
> MANATT, PHELPS & PHILLIPS, LLP
> 7 Times Square
> New York, New York 10036
> Tel: (212) 790-4500
> Fax: (212) 790-4545