# EXHIBIT H



# Afghanistan

Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Afghanistan oversaw the ratification of a new Constitution on January 4. Hamid Karzai was elected President in the country's first presidential election held on October 9, which was deemed acceptable by the majority of its citizens. Although a few major provincial centers remained under the effective control of regional commanders for most of the year, the Government made progress in asserting its authority, and the commanders acknowledged the central government's legitimacy. Karzai dismissed and appointed new governors to many of the 34 provinces. Judicial power rested with the Supreme Court. Under the new Government, the rule of law applied throughout the country; however, in practice, recognition of the rule of law, particularly outside of Kabul, was limited. The nominally independent judiciary was accused by some of corruption and being subject to political pressure from officials and commanders, especially at the provincial and local levels. The judicial system operated on an intermittent basis during the year, while the Government and the international community trained judges and lawyers and reconstructed courthouses.

Police, under the Ministry of Interior, had primary responsibility for internal order; however, civilian authorities did not always maintain effective control of security forces. Some local and regional commanders maintained considerable power, as the Government was not in a position to exercise effective control nationwide. NATO retained command of the International Security Assistance Force (ISAF) in Kabul; its U.N. Security Council mandate was extended to October 13, 2005. Some members of security forces committed serious human rights abuses.

The economy, based primarily on agriculture and animal husbandry, is market based. A July estimate found the population to be approximately 28.5 million, and the International Monetary Fund (IMF) estimated the economic growth rate at 7.5 percent for the year. Wages kept pace with inflation. Persistent drought, low literacy, and slow recovery from over two decades of war were a strain on the economy. The country remained heavily dependent on foreign assistance, and approximately 50 percent of the Government's operating budget came from external donor support. According to the World Food Program (WFP), some 1.4 million citizens have been affected by continued drought and crop failures, and the United Nations Office on Drugs and Crime (UNODC) reported in November that opium cultivation increased by two-thirds and spread to all 32 provinces of the country. According to the UNODC report, narcotics became the main factor of economic growth, involving 10 percent of the population.

The Government's human rights record remained poor; although there were some improvements in a few areas, serious problems remained. There were instances where local security forces and police committed extrajudicial killings, and officials used torture in prisons. Efforts to bring to justice serious human rights offenders were often ineffective; impunity from the law remained a serious concern. Punishment of officials usually took the form of administrative actions rather than prosecution. Prolonged pretrial detention and poor prison conditions led to deteriorating health conditions and death among some prisoners. The Government generally provided for freedom of speech, the press, assembly, association, religion, and movement; however, problems remained. Violence-including rape and kidnapping-and societal discrimination against women and minorities continued. Trafficking of persons was a problem. There was widespread disregard for, and abuse of, internationally recognized worker rights. Child labor continued to be a problem.

Terrorist attacks and severe violence continued during the year. Taliban, local commanders, and other antigovernment forces threatened, robbed, attacked, and occasionally killed local villagers, political opponents, and prisoners. Some areas outside Kabul were not under the Government's control. Increased Taliban, al-Qa'ida, and other antigovernment groups' activity, particularly in the south and southeast, added to security concerns. U.N. agencies and nongovernmental organization (NGOs) temporarily cancelled or curtailed their activities in these and other areas at various times during the year.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were reports of politically motivated or extrajudicial killings by the Government or its agents. For example, on August 14, 17 bodies were discovered at the Shindand market place with evidence that 6 of the 17 individuals, including a 60-year-old man, were tortured and beheaded. An investigation was launched and remained open at year's end.

On January 2, officials hanged four bandits in the central bazaar of Farah when they were arrested after a gunfight with government forces. In March and April, while in police custody, four detainees in Herat were killed as the result of torture, according to the Afghan Independent Human Rights Commission (AIHRC).

During the year, no trial date was set for police officers arrested for killing two demonstrators in Kabul in 2002.

There were no known politically motivated killings by the Government or its agents; however, factional forces killed civilians during the fight against Taliban supporters.

The Government and government-allied coalition forces carried out raids and attacks on alleged militant settlements that resulted in the deaths of civilians. On September 17, government-allied coalition troops accidentally killed one Afghan youth and injured another during a clash with militants in Uruzgan Province (see Section 1.g.).

The International Committee of the Red Cross (ICRC) reported that landmines and unexploded ordnance killed or wounded 847 persons during the year (see Section 1.g.).

Rebel forces, including Taliban, al-Qa'ida, and Hizb-e-Islami Gulbuddin, killed numerous civilians during their attacks. There were reports that the Taliban and its allies summarily executed NGO workers and other persons. Attacks on international organizations, on international aid workers and their local counterparts, and on foreign interests and nationals increased significantly (see Sections 1.g. and 4).

In many areas, the lack of an effective police force, poor infrastructure and communications, instability, and insecurity made it difficult to investigate unlawful killings, bombings, or civilian deaths, and there were no reliable estimates of the numbers involved.

On June 29, authorities announced that one man was sentenced to death for the 2002 assassination of Vice President and Public Works Minister Haji Abdul Qadir; two other accomplices were given jail sentences. There were no developments in other 2002 cases.

The Government made few efforts to bring to justice those persons responsible for the most serious abuses committed during the past 24 years (see Section 4).

b. Disappearance

Abductions and disappearances occurred during the year. On October 28, armed militants abducted three U.N. workers. The three were released in Kabul in November, and in December, Pakistani security forces arrested Haji Fazal Karim, chief of the militant group Jaish-al Muslimeen, in Karachi, for the kidnapping. The case remained open at year's end.

The whereabouts of most of the women and girls who were kidnapped or abducted by the Taliban between 1998 and 2001, and of those persons arrested by the Taliban for political reasons, remained unknown at year's end.

In January, the Governor of Herat and the AIHRC claimed that three policemen taken from the Herat central police district and held without charge for several months in July 2003 were released. The AIHRC alleged that the three were beaten while in custody. There was no judicial follow up. Local Shindand district commander Amanullah Khan denied any responsibility in the December 2003 abduction of a commander of Herat's 21st Division, based in Shindand.

There continued to be reports of abduction by Taliban, allied militias, and unknown gunmen. The whereabouts of an international NGO driver abducted by the Taliban on January 5 remained unknown. The driver for a mine-clearance agency who was abducted by gunmen in Ghazni in November 2003 was released to his family. There were numerous reports of kidnapped-and possibly trafficked-children during the year (see Section 5, Trafficking).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits such practices; however, there were reports of some abuses. For example, there were continued reports that some local police authorities in Herat and other locations routinely employed torture on detainees (see Section 1.a.). There was no followup to the 2002 incident in which Herat Governor Ismail Khan's security forces arrested journalist Mohammad Rafiq Shahir and reportedly beat him severely.

In March, Human Rights Watch (HRW) claimed that coalition forces operating in the country arbitrarily detained civilians and committed cruel, inhumane, and degrading acts against detainees.

Security forces reportedly used excessive force during their fight against Taliban and al-Qa'ida remnants, including looting, beating, and torturing of civilians. Violence and instability hampered relief and reconstruction efforts in different parts of the country and led to numerous human rights abuses.

Prison conditions remained poor, and there were reportedly many other secret or informal detention centers in the country (see Section 1.d.). Prisoners lived in overcrowded, unsanitary conditions in collective cells and were not sheltered adequately from severe winter conditions. Prisoners reportedly were beaten, tortured, or denied adequate food. The Justice Ministry's assumption of prison management from the Interior Ministry in March 2003 improved conditions marginally. The humanitarian NGO Emergency reported in January that infectious diseases were common among prisoners.

A number of regional leaders, particularly Ismail Khan in Herat and General Dostum in Sheberghan, maintained secret or unofficial prisons that most likely held political detainees (see Section 1.d.). In May, following a prison riot and hunger strike, most of the approximately 900 Taliban and Pakistani prisoners at Sheberghan Prison were moved to Pul-e-Charkhi Prison in Kabul. In September, President Karzai ordered from this group the release of 416 ex-combatants, mainly Taliban, as well as 433 Pakistanis.

According to the AIHRC, six prisoners died in prison during the year, two from illness, and four others from injuries received during fights.

Approximately 4,500 convicts were held in 32 government-run prisons across the country. There were 15 correctional centers for juveniles, and approximately 8 women's detention centers. Men and women were housed in separate facilities. Living conditions of all prisons did not meet international standards, and conditions in women's facilities were worse than in men's facilities. Children under 12 years were incarcerated with their mothers. Juveniles (under 18 years) were detained in juvenile correctional facilities; however, juveniles charged with murder were detained in adult facilities but were assigned to a separate area within the facilities. There were no pretrial detention facilities.

The Government permitted the International Committee of the Red Cross (ICRC) to visit all prisons that the Government controlled, and the ICRC conducted such visits during the year; however, the ICRC alleged that it lacked full and transparent access to some prisoners. The AIHRC monitored prison conditions regularly during the year, and independently of the Ministry of Justice.

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest or detention; however, arbitrary arrest and detention were serious problems. Legal and law enforcement institutions operated unevenly throughout the country, and justice was administered on an intermittent basis according to a mixture of codified law, Shari'a law, and local custom.

Human rights groups reported that local police authorities extorted bribes from civilians in return for their release from prison or to avoid arrest. The Afghan National Police (ANP) had approximately 26,000 trained policemen and women at year's end, roughly half of the Government's target of 62,000 ANP. Judicial and police procedures and practices for taking persons into custody and bringing them to justice followed no established code and varied depending on the area and local authorities. Some areas had a more formal judicial structure than others. Limits on lengths of pretrial detention were not respected. The AIHRC received several hundred reports of pretrial detention during the year. According to the laws, police can detain suspects for up to 24 hours, primary and secondary courts can detain for up to 2 months, and the final court can detain for up to 5

months.

Private prisons were a problem. The country's intelligence agency ran at least two prisons, and there were unconfirmed reports of private detention facilities around Kabul and in northern regions of the country. Representatives of international agencies and the AIHRC were unable to gain access to these prisons during the year. The AIHRC reported numerous cases of arbitrary arrest and detention. For example, in Ghazni Province, Governor Asadulah arbitrarily arrested seven suspects in December and did not allow anyone to visit these detainees. No charges were filed, and these detainees remained incarcerated at year's end. During the year, the Governor of Helmand arbitrarily arrested a suspect and detained him for 4 months. At year's end, no charges were filed against the suspect, and the suspect remained in prison at year's end.

The Constitution provides for access to legal counsel (see Section 1.e.). The country's law limited pretrial detention to 9 months; however, there were documented cases where suspects were held for longer periods. There were credible reports that some detainees were tortured to elicit confessions while awaiting trial.

The AIHRC confirmed cases of troops loyal to Commander Ismatullah in Laghman Province looting and forcing women into marriages; however, allegations of rape were not substantiated (see Section 5).

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary, and the Government generally respected this right in practice. The Government, in accordance with Islamic principle and international standards, assigned the Government to reorganize and reform its judiciary system, and the Government, with assistance from the international community, continued to work on reestablishing a functioning nationwide judicial system. Many municipal and provincial authorities relied on some interpretation of Islamic law and traditional tribal codes of justice. The mandate of the Judicial Reform Commission expired during the year, and its responsibilities shifted to the Ministry of Justice.

In the cities, courts decided criminal and civil cases. The Supreme Court was located in Kabul. There was a National Security Court that tried terrorist and other cases, although it was unclear how the new National Security Courts functioned in practice. In cases involving murder and rape, convicted prisoners generally were sentenced to execution, although relatives of the victim could instead choose to accept other restitution or could enforce the verdict themselves. Decisions of the courts could be appealed. The courts reportedly heard cases in sessions that lasted only a few minutes.

In rural areas, local elders and shuras (community councils) were the primary means of settling criminal matters and civil disputes and sometimes allegedly levied unsanctioned punishments, including flogging or death by stoning, as well as ordering, in murder cases, the defendant to provide young girls in marriage to the victims' family. In such proceedings, the accused typically had no right to legal representation, bail, or appeal.

The courts' procedures did not meet internationally accepted standards for fair trials. The administration and implementation of justice varied from area to area, as many judges were uneducated or poorly trained and based their judgments on a combination of their personal understanding of Islamic law and tribal codes of honor. Low pay was a factor in reports of widespread corruption. Insecurity and pressure from public officials and the family of the accused also threatened judicial impartiality.

During the year, codification and harmonization of laws started; however, the Judicial Reform Commission (JRC) and Ministry of Justice lacked the capacity to handle the large volume of new and amended legislation.

Defendants had the right to an attorney under the law, but this right was inconsistently applied. Citizens' lack of awareness of their constitutional rights was a problem, and there was no functioning public defender system. Juries were not used, and defendants were not allowed to confront or question witnesses.

A number of regional leaders were suspected of holding political prisoners, but there were no reliable estimates of the numbers involved.

On April 20, Abdullah Shah, convicted of mass murder, was executed. Human rights groups criticized Shah's execution because they considered his trial and appeals process seriously flawed, and they held that Shah was a material witness to abuses committed by other prominent Afghans, including some members of the current Government.

f. Arbitrary Interference With Privacy, Family, Home, or Correspondence

The Constitution prohibits such action; however, armed groups of police officials forcibly invaded and looted the homes and businesses of civilians with impunity, due to the absence of a responsive and strong police force or legal protection for victims. On April 10, troops from the Junbesh and Jamiat parties' military wings looted houses during fighting east of Mazar-e-Sharif.

Police authorities often placed women under detention in prison at the request of family members for defying the family's wishes on the choice of a spouse, or for other moral offenses. An unknown number of women were imprisoned for these reasons. Some women were in detention centers because they were runaways from home.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal and External Conflicts

During the year, continued internal conflict resulted in instances of the use of excessive force that caused the deaths of civilians, property damage, and the displacement of residents.

Interfactional fighting between regional commanders, persistent Taliban and al-Qa'ida activity, and criminal activity contributed to continued reports of unlawful depravations of life. Militants targeted foreigners and local employees of NGOs for unlawful killings. Civilians also were killed during fighting between coalition and rebel forces.

During the year, battles between rival tribes and local commanders resulted in numerous civilian casualties. For example, on February 25, five employees of an indigenous NGO were killed near Kabul. In April, two suspects in the case were arrested. At year's end, the case remained ongoing. On June 2, three foreign and two local staff members of Doctors Without Borders (MSF) were killed in an ambush in the provincial capital of Badghis Province when a car carrying the five workers reportedly was hit by gunfire and attacked with grenades. On June 10, 11 Chinese construction workers were killed in northern parts of the country. Security officials said they arrested 10 militants linked to Hizb-e-Islami-Gulbuddin and the Taliban for the killings.

Militants also targeted civilians and elections officials in a campaign to derail national elections. Taliban spokesmen declared that all presidential candidates were high priority targets. During the year, six election workers were killed and at least seven others wounded. On June 27, Taliban fighters stopped a bus carrying 17 passengers in Uruzgan Province and killed 14 of the 17 passengers for possessing voter registration cards.

Sporadic fighting between forces loyal to General Dostum and General Atta continued during the year. On August 14, commander Amanullah Khan, and other rivals of Herat Governor Ismail Khan, launched an offensive against Ismail Khan's troops. In southern Herat alone, at least 21 men, and perhaps dozens more, were killed in the initial fighting. Coalition and government forces intervened to halt the fighting.

There were numerous bombings during the year. For example, on June 26, two female election workers were killed in a bomb blast in Jalalabad carried out by the Taliban. On August 28, another bomb blast killed nine children and an adult at a school in Paktia Province.

The Ministry of Interior stated that, of 2 individuals arrested for the July 2003 mosque bombing in which 17 persons were injured in Kandahar, 1 was released by court order and the other escaped from jail in October 2003.

Police arrested three foreign nationals in July for allegedly running a private prison in Kabul and jailing and torturing at least eight Afghans as part of a private war on terror. On September 15, a court in Kabul handed the group 8- to 10-year prison sentences; their four local accomplices received between 1- and 5-year prison sentences.

Intimidation or violence directed at NGO workers increased during the year. During the year, suspected Taliban killed at least 31 aid workers, compared to approximately 13 during 2003. For example, the Taliban claimed responsibility for the June 2 killing of five employees of MSF, including three Europeans, in Badghis Province. On June 9, police announced they had arrested 10 suspects.

The status of two suspects arrested by security forces for the killing of two local aid workers in September 2003 was unknown at year's end. The two suspects arrested for the November 2003 killing of Bettina Goislard, a French United Nations High Commission on Refugees (UNHCR) worker in Ghazni Province, were sentenced to death. It was believed that the attackers acted with the assistance of Taliban remnants and al-Qa'ida terrorists (see Section 1.a.).

Violence and instability hampered relief and reconstruction efforts in different parts of the country, and there were reports by NGOs that some local commanders were charging them for the relief supplies they were bringing into the country. The delivery of assistance was also limited by the difficulties in moving relief goods overland to remote areas.

There was no further significant displacement of Pashtuns and others from Faryab, Jawzjan, and Badghis Provinces; however, continued harassment and insecurity limited the return of Pashtun families to their villages in northern areas. On the border of Nangarhar and Logar provinces, an unknown number of persons were killed during heavy fighting between rival tribes over natural resources. Sporadic fighting and lawlessness remained a hindrance to assistance efforts in the north and northwest through much of the year.

There were no developments in the 2002 investigation of bodies of Taliban prisoners in Dasht-i Leili, where international experts found evidence of summary execution and death by suffocation.

Estimates of the remaining number of landmines planted during and after the Soviet occupation ranged from 450,000, according to the Halo Trust, to 7 million, according to the U.N. The most heavily mined areas were the provinces bordering Iran and Pakistan. The landmines and unexploded ordnance caused deaths and injuries, restricted areas available for cultivation, and impeded the return of refugees to mine-affected regions. During the year, the ICRC recorded 847 new victims of mines and other explosive remnants of war. Including unreported incidents, the ICRC estimated there were approximately 100 incidents per month taking place in the country.

With funding from international donors, the U.N. organized and trained mine detection and clearance teams, which operated throughout the country. More than 1.5 million refugees and internally displaces persons (IDPs) returned to areas cleared of mines and unexploded ordnance. U.N. agencies and NGOs conducted a number of educational programs and mine awareness campaigns for women and children in various parts of the country.

Continued warfare, as well as prolonged and severe drought, also resulted in the involuntary displacement of civilians.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

Article 34 of the Constitution provides for freedom of speech and of the press; however, some senior officials, particularly at the local level, attempted to intimidate journalists and influence their reporting. The 2002 Press Law contained an injunction against information that "could mean insult to the sacred religion of Islam and other religions." The ambiguity about offensive material offered the potential for abuse of this clause in order to restrict press freedom. On April 1, President Karzai signed an amended Press Law following its review by the Ministry of Information and Culture. The new law retains the broad and vague content restriction on "subjects that are contrary to principles of Islam and offensive to other religions and sects," but excludes any reference to Shari'a and created a government commission with powers to decide whether journalists accused of violating the law should face court prosecution or an administrative punishment, such as a fine.

The independent media were active and publicly reflected differing political views, although this varied from region to region. The Government owned at least 35 publications and most of the electronic news media. Many other newspapers were published only sporadically, and many were affiliated with different provincial authorities. Factional authorities tightly controlled media in some parts of the country, and the degree of freedom of expression varied significantly between regions. The foreign media was covered under the freedom of speech law; however, they were prohibited from commenting negatively on the Islamic religion and from publishing materials that were considered a threat to the President.

During the year, some government departments were predisposed to crack down on journalists, and members of the intelligence service reportedly intimidated and threatened journalists. General unspecified threats against media organizations were also a common occurrence.

While some independent journalists and writers published magazines and newsletters, according to Reporters Without Borders, circulation largely was confined to Kabul, and many publications were self-censored. In practice, many persons listened to the dozen international stations that broadcast in Dari or Pashto. The BBC, Voice of America, Radio Liberty, and Radio Free Afghanistan were available throughout the country. In the countryside, some radio and television stations were under the control of local authorities. There were approximately 300 publications, 40 radio stations, and several television stations in the country. Mazar-e-Sharif

alone had an estimated 50 publications. On September 12, the first independent radio station established entirely by private sector funds was inaugurated in Ghazni Province.

Journalists were subjected to harassment, intimidation, and violence during the year. In June, authorities in Herat interfered in the functioning of an independent women's community radio station, Radio Sahar. The situation was resolved through negotiation and dialogue with the authorities, according to Internews. In August, the Ministry of Information and Culture announced the creation of a commission of religious clergy to monitor the media, but its authority in practice to censor content was not specified.

In June 2003, police briefly arrested the editors of the weekly newspaper Aftaab and shut down the newspaper for allegedly contravening the old press law's injunction against anti-Islamic content. The charges were eventually dropped; however, the newspaper never resumed publication.

On August 5, authorities announced the arrest of a man suspected of involvement in the killing of four journalists in 2001. The case remained open at year's end. In April 2003, five other suspects were arrested-two of whom confessed, according to authorities-for suspected involvement in the killing. Their status was unknown at year's end.

There were a few reports that government forces prohibited music, movies, and television on religious grounds. For example, in January, the Supreme Court briefly stopped a television station from airing female singers. The Government lifted the ban in late January, saying female singers on television were permitted under the new Constitution. In April, officials in Nangarhar Province briefly banned the performance of female singers on television and radio; however, this decision was reversed a few days later. The central Government has not banned any form of media, although there was a brief ban on cable television in early 2003. Cable operators provided a wide variety of channels, including Western movie and music channels. The Government did not restrict the ownership of satellite dishes by private citizens.

The Government did not limit or block Internet access during the year.

The Government did not restrict academic freedom.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly, association, and the right to form political parties without prior permission; however, this right was restricted in practice. Insecurity and interference from local authorities inhibited freedom of assembly and association in some areas outside Kabul. Political parties based on ethnicity, language, Islamic school of thought, and region were not allowed; however, political parties generally were able to conduct activities throughout the country without opposition or hindrance, except in regions where antigovernment violence affected overall security (see Section 3). The October 2003 Political Parties Law obliges parties to register with the Ministry of Justice and requires political parties to pursue objectives that are consistent with the principles of Islam. There was a report that Noorulhaq Olomi's Afghanistan National United Party was denied the right to registration, allegedly because Noorulhaq was a communist, despite meeting all legal requirements (see Section 3).

In Herat Province, party activists did not conduct political activities openly because of Governor Ismail Khan's intolerance of political activities. On June 18, police in Kabul allegedly disrupted and threatened a meeting of party activists; however, the police denied this incident. On September 12, Afghan security forces killed seven demonstrators in Herat. In September, demonstrators protesting the removal of Ismail Khan as Governor allegedly attacked U.N. offices and government-allied forces.

c. Freedom of Religion

The new Constitution proclaims that Islam is the "religion of the state," but provides that non-Muslim citizens are free to perform their rituals within the limits determined by laws for public decency and public peace; however, there was some harassment of foreign missionaries and others. The Constitution also declares that no law can be contrary to the beliefs and provisions of the sacred religion of Islam. The new Constitution does not grant preferential status to the Hanafi school of Islamic jurisprudence associated with the Sunnis, and makes no reference to Shari'a law. The Government continued a policy of religious tolerance during the year; however, custom and law required all citizens to profess a religious affiliation.

Historically, the minority Shi'a community faced discrimination from the majority Sunni population. The authorities did not require licensing and registration of religious groups in any part of the country. There were no laws forbidding proselytizing, although proselytizing was viewed as contrary to the beliefs of Islam.

Blasphemy and apostasy were in theory punishable by death under the current, unreformed penal code. In early September, the Supreme Court ruled that presidential candidate Latif Pedram be disqualified for making allegedly un-Islamic remarks in public. After some government offices, the AIHRC, and the international community questioned the constitutionality of this ruling, Pedram was allowed to remain in the race.

Public school curriculums included religious subjects, but religious leaders conducted detailed religious study. Non-Muslims were not required to study Islam, and there was no restriction on parental religious teaching.

The Shi'a religious affiliation of the Hazaras was historically a significant factor leading to their repression, and there was continued social discrimination against Hazaras.

Militants sometimes harassed foreign missionaries and other religiously oriented organizations. There was an unconfirmed report that the Taliban killed a former Muslim cleric on June 30, allegedly for preaching Christianity. There were unconfirmed allegations that converts to Christianity faced societal discrimination and threats.

Sikhs and Hindus returning to the country faced difficulties in obtaining housing and land in Kabul and other provinces. Both communities did not receive land on which to cremate their dead; however, unlike in previous years, the Hindu and Sikh communities reportedly did not face any acts of discrimination.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for these rights; however, certain laws limited citizens' movement. The passport law requires women to obtain permission from a male family member before having a passport application processed. In some areas of the country, women were forbidden by local custom or tradition to leave the home except in the company of a male relative. The law also prohibits women from traveling alone outside the country without a male relative, and male relatives must accompany women participating in Hajj. Additionally, sporadic fighting, brigandage and landmines hampered travel within the country. Despite these obstacles, many men and women continued to travel relatively freely, with buses using routes in most parts of the country.

Taxi, truck, and bus drivers complained that militia and police personnel operated illegal checkpoints and extorted them for money and goods; however, the number of such checkpoints decreased during the year. In March, local militants shot and injured a police chief at an illegal checkpoint in Mazar-e-Sharif.

The Constitution prohibits forced exile, and the Government did not use either forced internal or external exile in practice.

There were estimates that up to 165,000 persons were displaced internally. However, during the year, over 750,000 refugees and a modest number of IDPs were resettled. Since 2002, over 3 million citizens have returned to the country. Women and children constituted 75 percent of the refugee population. Refugee returnees settled primarily in urban areas and placed additional strain on the cities' already overburdened infrastructures. There were further population movements from rural to urban areas due to drought, insecurity, and inadequate assistance in rural areas.

Sporadic fighting and related security concerns, as well as the drought, discouraged some refugees from returning to the country. For example, in mid-August, refugees returning from Iran were stranded for several days due to fighting between different provincial governors and warlords in and around Herat Province (see Section 1.a.).

Ethnic Hazaras prevented some Kuchi nomads from returning to traditional grazing lands in the central highlands for a number of reasons, including allegations that the Kuchis were pro-Taliban and thus complicit in the massacres perpetrated against Hazaras in the 1990s. Hazaras also found difficulty in returning to the country. In December, a local leader from Karukh district in Herat blocked the return of approximately 200 Hazara refugees from Iran.

According to the U.N., 100,000 Pashtuns, displaced from northern areas after 2001 because their ethnic group was closely associated with the Taliban regime, remained displaced.

The Government has not established a system for providing protection for refugees or those seeking asylum.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right for the first time on October 9, directly electing Hamid Karzai from a slate of 18 candidates. Karzai received 55.4 percent of votes cast in an election that was deemed acceptable to the majority of Afghans.

A Constitutional Loya Jirga (CLJ) approved a new Constitution on January 4, replacing the 1964 Constitution in operation under the 2001 Bonn Agreement. According to HRW, local authorities used fraud and intimidation to get their supporters elected to the CLJ; however, other reports, including those prepared by the U.N., suggested that intimidation was localized and did not significantly affect the outcome of elections.

At the CLJ, there were 502 delegates, 100 women and 402 men. The then-Interim President, Hamid Karzai, appointed 52 of the delegates, while the rest were elected. Of the 52 appointed delegates, 25 were women and 27 were men. Debate was intense during the CLJ, and citizens had the opportunity to question senior leaders; however, some observers criticized the proceedings for alleged vote buying and intimidation. According to HRW, some delegates expressed alarm at the intrusive presence of agents from the Government's intelligence service. Also participating in the CLJ were representatives of refugees, IDPs, Kuchis, Hindus and Sikhs, and persons with disabilities.

The Government did not ban any political parties, other than the Taliban; however, the Supreme Court banned communists from forming a political party because it alleged that communists were atheists. The Ministry of Justice courted claims of selective discrimination because it avoided registering the National Unity Party, whose leaders were former communists, although the party met all legal requirements for registration. During the year, approximately 40 accredited political parties registered with the Ministry of Justice and began preparing for national elections.

Political parties generally were able to conduct activities throughout the country without opposition or hindrance, except in regions where antigovernment violence affected overall security. Joint reports by UNAMA and AIHRC revealed that officials sometimes interfered with political parties, mainly due to a lack of awareness of citizens' political rights. Political parties also exercised significant self-censorship. Political activities were visibly discouraged or curtailed in some parts of the country. For example, the Republican Party's activities were restricted in provinces that were controlled by Ismail Khan and General Rashid Dostum. However, UNAMA and AIHRC's conclusions were that political freedom improved substantially and steadily during the year.

There was widespread public perception of corruption in the executive branch of government, including the involvement of officials up to the ministerial level in the illegal narcotics trade. However, no visible actions were taken to combat corruption beyond public statements by government officials.

Article 50 of the Constitution provides citizens the right to access government information, except where this right might violate the rights of others. The national Government generally provided such access in practice, but officials at the local level were less cooperative.

The Constitution reserves 2 seats from each province in the lower house of Parliament specifically for women, for a total of 68. There were two women in President Karzai's ethnically inclusive Cabinet. The chairperson of the AIHRC was also a woman. There were two women on the 6-member Interim Electoral Commission. The CLJ included 100 female delegates. The Constitution requires that 2 seats in each province must be filled by women in Parliament, 3 seats by religious scholars, 11 seats by refugees in Iran, 13 seats by refugees in Pakistan, 9 seats by Kuchis, and 6 seats by IDPs.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were somewhat cooperative and responsive to their views. Some of these human rights groups were based in Pakistan, with branches inside the country. The lack of security and instability in some parts of the country severely reduced NGO activities in these areas. In the first half of the year, suspected Taliban members fired on NGO vehicles, attacked NGO offices, and killed at least 31 aid workers (see Sections 1.a. and 1.g.). During rioting in Herat to protest Governor Ismail Khan's removal, protestors burned U.N. agencies' offices and the provincial office of the AIHRC. MSF suspended its activities after five of its employees were killed on June 2, claiming government inaction on security and apprehending the killers. Police later arrested several suspects in the case (see Section 1.g.).

NGOs accused Minister of Planning Ramazan Bashardost of indirectly contributing to violent attacks on NGOs through his repeated critical public remarks about their activities and functioning.

Local employees ran several international NGOs, including Global Rights (formerly International Human Rights Law Group) and HRW, which monitored the situation inside the country.

The AIHRC, created by Article 58 of the Constitution, continued its role in addressing human rights problems within the country. The 11-member appointed commission generally acted independently of the Government, often voicing strong criticism of government institutions and actions, and accepting and investigating complaints of human rights abuses. During the year, the AIHRC established three field offices outside Kabul. The ICRC visited some of the AIHRC field offices and collaborated with AIHRC on some human rights abuse cases. During the year, the AIHRC assisted the ICRC in sharing information on detention cases and issues of national prison monitoring.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution provides for the equal rights of men and women; however, some local customs and practices that discriminated against women generally prevailed in much of the country. The severity of discrimination varied from area to area, depending on the local leadership's attitude toward education for girls and employment for women, and on local customs. Historically, the minority Shi'a faced discrimination from the majority Sunni population.

Women

Women in urban areas regained some measure of access to public life, education, health care, and employment; however, the lack of education perpetuated during the Taliban years, and limited employment possibilities, continued to impede the ability of many women to improve their situation. In February, the Government established the first unit of female police, and small numbers of women began to join the police force during the year.

Violence against women persisted, including beatings, rapes, forced marriages, and kidnappings. Such incidents generally went unreported, and most information was anecdotal. The Ministry of Women's Affairs estimated that more than 50 percent of marriages involved women under 16, the legal minimum age of marriage for women. It was difficult to document rapes, in view of the social stigma that surrounded them. Information on domestic violence and rape was limited. In the climate of secrecy and impunity, domestic violence against women and rape remained a serious problem.

Women composed 7 out of the 35 members of the Constitutional Commission set up before the CLJ. Women also participated actively in the CLJ proceedings (see Section 3); however, some women delegates denounced their colleagues in the CLJ for attempting to shut them out of leadership positions. One woman served as Deputy Chairwoman of the CLJ and chaired several sessions of the CLJ, and others held positions of responsibility in the working groups. Women were able to question leaders openly and discussed inter-gender issues during the CLJ. Massouda Jalal, who challenged and lost to President Karzai in the 2002 race for ELJ president, was one of 18 candidates in the October 9 presidential election. There were also 3 female vice-presidential running mates in the election, and 41 percent of all registered voters were women.

In detention facilities, there were 136 women, many of whom were imprisoned at the request of a family member. Many of the incarcerated opposed the wishes of the family in the choice of a marriage partner, were accused of adultery, or faced bigamy charges from husbands who granted a divorce, only to change their minds when the divorced wife remarried. Other women faced similar charges from husbands who had deserted them and reappeared after the wife had remarried. Some women resided in detention facilities because they had run away from home due to domestic violence or the prospect of forced marriage, and there were no shelters for women in this situation. There were approximately eight detention centers for women in the country.

In previous years, women in the north, particularly from Pashtun families, were the targets of sexual violence perpetrated by commanders from other ethnic groups. During the year, there were at least four credible reports of soldiers and commanders loyal to local warlords raping girls, boys, and women in provinces in the eastern, southeastern, and central part of the country. In one of these cases, a perpetrator was arrested and his trial was ongoing at year's end.

There were growing concerns about women committing self-immolation, most often conducted in order to escape from oppressive family circumstances, such as forced marriage. Although comprehensive and accurate

statistics were not available, hospital doctors reported that self-immolations were increasingly common among young women in the western part of the country. Self-immolation was also reported to be particularly high in Farah Province. The AIHRC investigated 300 cases by year's end. Reports of suicide among women were often related to forced marriages. In September 2003, a fatwa was issued that allowed a woman to marry again if her husband was missing more than 4 years. There were reports of death threats against women activists.

Discrimination against women in some areas was particularly harsh. Some local authorities excluded women from all employment outside the home, apart from the traditional work of women in agriculture; in some areas, women were forbidden to leave the home except in the company of a male relative (see Section 2.d.). According to the Institute for Media, Policy and Civil Society (IMPACS), women in Logar were prohibited from traveling to the area of town where a community radio station was based, and male journalists often were not allowed to interview women for their reports.

Many women continued to wear the burqa because of conservative traditions and fear of harassment or violence; however, this varied greatly among regions. Cases of local authorities policing aspects of women's appearance, to conform to a conservative interpretation of Islam and local customs, appeared to have diminished. Government-owned media allowed female singers on television over the objectives of religious conservatives, effectively ending a ban dating to 1992 (see Section 2.a.). In February, authorities in Herat closed a driving school for women.

A report released by the International Organization for Migration in 2003 claimed that trafficking was an increasing problem. Human rights violations related to trafficking take the form of forced labor, forced prostitution, and sexual exploitation of children (see Section 5, Trafficking).

Government regulations prohibited married women from attending high school classes; however, during the year this regulation was changed, and married women are allowed to attend high school classes.

Women continued to be denied access to adequate medical facilities. According to the AIHRC, nearly 40 percent of the 756 basic primary-health facilities in 2002 had no female workers, a major deterrent for women because societal barriers discouraged them from seeking care from male health workers.

Children

The Constitution makes education to the intermediate level mandatory, and provides for free education to the college, or bachelor's degree level. Local administrative bodies and international assistance organizations took action to ensure children's welfare to the extent possible; however, the situation of children was very poor. A back-to-school campaign launched by the Ministry of Education and coalition supporters increased school enrollment from 4.2 million children in 2003 to over 4.8 million during the year.

UNICEF reported that 34 percent of children enrolled in school were girls, although this figure hid large disparities from province to province, with enrollment as low as 15 percent in some, and an estimated 1.5 million school-age girls not yet enrolled in classes. Since 2002, the number of girls attending school had increased by over 30 percent. Southern provinces also showed a net increase of about 30 percent, despite higher levels of insecurity and conflict.

Nevertheless, lack of teachers and materials as well as security concerns remained deterrents to girls' education. In some parts of the country, access to education was further impeded by violence in which schools, teachers, and students were threatened or physically attacked. For example, two girls' schools were partially destroyed in attacks in Badakhshan and Farah on February 19 and March 2, respectively. Similar attacks on schools in general took place throughout the year. There were approximately 40 attacks on girls' schools during 2003.

While most girls throughout the country were able to attend school, a climate of insecurity persisted in some areas. On April 28, suspected Taliban burned and destroyed two primary schools in Kandahar Province. Girls' schools also continued to be the target of attacks by Taliban and other extremists (see Section 6.a.). The Government and international donors built more than 2,000 schools during the year.

Child abuse was endemic throughout the country. Abuses ranged from general neglect, physical abuses, abandonment, and confinement to work in order to pay off families' debts. There were no child labor laws or other legislation to protect child abuse victims (see Section 6.d.).

Children did not have adequate access to health care, and only one children's hospital existed in the country; however, it was not accessible to citizens in distant provincial districts outside Kabul.

Child trafficking was widespread and continued to be a problem during the year (see Section 5, Trafficking).

Police were investigating 85 cases of children reportedly kidnapped and killed for their organs.

In May 2003, President Karzai issued a decree that prohibited the recruitment of children and young persons under the age of 22 to the Afghan National Army. UNICEF initiated a program that demobilized and reintegrated approximately 5,000 of an estimated 8,000 former child soldiers. Afghan militias, including the Taliban and Northern Alliance, used child soldiers in past years (see Section 6.d.).

c. Trafficking in Persons

The law does not prohibit trafficking in persons; however, traffickers were prosecuted under other legislation. The country was a source and transit point for trafficked persons. An International Organization for Migration (IOM) report released in late 2003 reported qualitative and anecdotal evidence of increased trafficking in girls and children to Pakistan, Iran, and the Gulf States; however, the lack of systematic monitoring and crime statistics in general prevented a quantitative assessment of the scale of the problem. The few quantitative data available suggested that trafficking in children, mainly boys, was the predominant form of trafficking, at least across borders. An IOM report released during the year confirmed that the buying and selling of women and girls continued.

Some girls reportedly were kept in brothels. There were continued reports of poor families promising young girls in marriage to satisfy family debts. There were a number of reports that children, particularly from the south and southeast, were trafficked to Pakistan to work in factories. UNICEF cited unconfirmed reports of the abduction of women and children in the southern part of the country. Although prosecutions of traffickers increased, and the Government devoted greater attention to trafficking in persons during the year, prosecution of perpetrators continued to be inconsistent. During the year, the AIHRC received 198 reports of child trafficking, and there were approximately 20 arrests and 7 convictions of child traffickers. The Ministry of Interior reported 198 cases of kidnapping in 2003, but it was unclear how many of these cases had a trafficking element. President Karzai issued a decree mandating the death penalty for child traffickers convicted of murder, and lengthened prison terms. Trafficking victims, especially those trafficked for sexual exploitation, faced societal discrimination, particularly in their home villages, and the risk of contracting sexually transmitted diseases.

At year's end, according to the AIHRC, approximately 314 children were repatriated after having been allegedly trafficked to Saudi Arabia, Pakistan, Zambia, and Oman. The Ministry of Labor and Social Affairs, with the assistance of UNICEF, set up a transit center to assist with these returns, and other agencies such as the AIHRC helped with the children's reunification and reintegration.

Persons with Disabilities

The Constitution commits the State to assist persons with disabilities and protect their rights; however, the Government took no measures to mandate accessibility for persons with disabilities

An estimated 800,000 persons suffered from disabilities requiring at least some form of assistance. Although community-based health and rehabilitation committees provided services to approximately 100,000 persons, their activities were restricted to 60 out of 330 districts, and they were able to assist only a small number of those in need. During the year, the Disabled Sports Federation was established, with approximately 1,000 members across the country. The first center for children with cerebral palsy was inaugurated in Kabul on May 17, offering physiotherapy, counseling, and training courses.

National/Racial/Ethnic Minorities

During the year, social discrimination against Hazaras and other Shi'as continued. Pashtuns in Herat Province accused Governor Ismail Khan, a Tajik, of discrimination and abuses against their ethnic group. The nomadic Kuchis expressed concern that the voter registration process underrepresented their population; however, the Government and the Joint Electoral Management Body (JEMB) worked with this group to address their concerns.

Other Societal Abuses and Discrimination

The law criminalizes homosexual activity, and this was enforced in practice. In August, a foreign national was arrested in Kabul, initially on the charge of homosexual rape; however, the charges were later dropped.

Section 6 Worker Rights

a. The Right of Association

The Constitution and a mixture of labor laws from earlier periods provide broad provisions for protection of workers; however, little was known about their enforcement or practices. Labor rights were not understood outside of the Ministry of Labor, and workers were not aware of their rights. There was no effective central authority to enforce them. The only large employers in Kabul were the minimally functioning ministries and local and international NGOs.

b. The Right to Organize and Bargain Collectively

The law does not provide for the right to strike; however, the country lacks a tradition of genuine labor-management bargaining. There were no known labor courts or other mechanisms for resolving labor disputes. Wages were determined by market forces, or, in the case of government workers, dictated by the Government.

There were no reports of labor rallies or strikes.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The Constitution prohibits forced or compulsory labor, including by children; however, little information was available.

d. Prohibition of Child Labor and Minimum Age For Employment

The Constitution prohibits children under the age of 15 from working more than 30 hours per week; however, there was no evidence that authorities in any part of the country enforced labor laws relating to the employment of children. Children from the age of 6 often worked to help support their families by herding animals, collecting paper, scrape metal and firewood, shining shoes, and begging. Some of these practices exposed children to the danger of landmines.

e. Acceptable Conditions of Work

There was no available information regarding a statutory minimum wage or maximum workweek, or the enforcement of safe labor practices. Many workers were allotted time off regularly for prayers and observance of religious holidays.