# EXHIBIT I

Human Rights Watch                                         March 2004 Vol. 16, No. 3(C)

# "Enduring Freedom"
## Abuses by U.S. Forces in Afghanistan

I. Summary .................................................................................................... 1

II. Background: "Operation Enduring Freedom" ........................................................ 8

III. Violations by U.S. Forces ............................................................................ 10
    Indiscriminate and Excessive Force Used During Arrests............................................ 11
    Arbitrary or Mistaken Arrests and Indefinite Detention ............................................. 24
    Mistreatment in Detention ............................................................................. 34
        Bagram airbase .......................................................................................34
        Mistreatment in other facilities .....................................................................37
        Detainees held by Afghan forces ...................................................................42
        Deaths in U.S. custody................................................................................43

IV. International Legal Context.............................................................................. 47

V. Conclusions ............................................................................................... 49

VI. Recommendations ...................................................................................... 51

Appendix: U.S. Criticisms of Mistreatment and Torture Practices ........................... 54

Acknowledgments........................................................................................... 59

## I. Summary

Following the September 11, 2001 attacks, the United States went to war in Afghanistan in the name of national security and the protection of fundamental rights and freedoms, and with a stated secondary aim of liberating the people of Afghanistan from the cruel and capricious rule of the Taliban.

Yet today, on Afghan soil, the United States is maintaining a system of arrests and detention as part of its ongoing military and intelligence operations that violates international human rights law and international humanitarian law (the laws of war). In doing so, the United States is endangering the lives of Afghan civilians, undermining efforts to restore the rule of law in Afghanistan, and calling into question its commitment to upholding basic rights.

This report, based on research conducted in southeast and eastern Afghanistan in 2003 and early 2004, focuses on how U.S. forces arrest and detain persons in Afghanistan.[1] It details numerous abuses by U.S. personnel, including cases of excessive force during arrests; arbitrary and indefinite detention; and mistreatment of detainees. The report also details the overall legal deficiencies of the U.S.-administered detention system in Afghanistan, which, as shown here, operates almost entirely outside of the rule of law.

In Afghanistan, United States and coalition forces, allied with local Afghan forces, are fighting armed groups comprised of members of the Taliban, the mujahidin group Hezb-e Islami, and a relatively small number of non-Afghan fighters, some of whom are associated with al-Qaeda. For their part, these groups have shown little willingness to abide by international humanitarian law or human rights standards: they have carried out abductions and attacks against civilians and humanitarian aid workers and detonated bombs in bazaars and other civilian areas. Those responsible for these violations, including the leaders of these groups, should, if captured, be investigated and prosecuted for violations of Afghan law and the laws of war.

---

[1] For the purposes of this report, the term "U.S. forces" refers to U.S. personnel in the Department of Defense and Central Intelligence Agency ("CIA") and all other military personnel under the overall command of the President of the United States. The U.S.-led coalition force in Afghanistan is made up predominately of U.S. personnel, although there are approximately two thousand troops from other nations in the force. Approximately 6,000 troops from various nations are also stationed in Kabul and Kunduz city as part of the U.N.-mandated International Security Assistance Force (ISAF).

But the activities of these groups are no excuse for U.S. violations. The Geneva Conventions do not require reciprocity to be applicable. Abuses by one party to a conflict, no matter how egregious, do not justify violations by the other side. This is a fundamental principle of international humanitarian law.

*    *    *    *    *

From 2002 to the present, Human Rights Watch estimates that at least one thousand Afghans and other nationals have been arrested and detained by U.S.-led forces in Afghanistan.    Some of those apprehended have been picked up during military operations while taking direct part in hostilities, but others taken into custody have been civilians with no apparent connection to ongoing hostilities. (This latter category may include persons wanted for criminal offenses, but such arrests are not carried out in compliance with Afghan or international legal standards.)

There are numerous reports that U.S. forces have used excessive or indiscriminate force when conducting arrests in residential areas in Afghanistan. As shown in this report, U.S. military forces have repeatedly used deadly force from helicopter gunships and small and heavy arms fire, including undirected suppressing fire, during what are essentially law-enforcement operations to arrest persons in uncontested locales. The use of these tactics has resulted in avoidable civilian deaths and injuries, and in individual cases may amount to violations of international humanitarian law.

Human Rights Watch has also documented that Afghan soldiers deployed alongside U.S. forces have beaten and otherwise mistreated people during arrest operations and looted homes or seized the land of those being detained. These violations should be a matter of concern to the United States. The Afghan government remains responsible for violations by Afghan forces that are under their control, and individual Afghan military commanders are culpable for abuses by their troops. But where Afghan forces have been put under the de facto control or command of U.S. forces during operations, U.S. personnel have a responsibility to prevent ongoing abuses by Afghan troops, and may be criminally culpable if they fail to do so.

Many of those arrested by U.S. forces are detained for indefinite periods at U.S. military bases or outposts. While held, these detainees have no contact with relatives or others, although some detainees receive visits from the International Committee of the Red Cross (ICRC). Detainees have no opportunity to challenge the basis for their detention, and are sometimes subjected to mistreatment or torture. Some detainees have been sent to the U.S. detention center at Guantanamo Bay Naval Base in Cuba, while others have

been kept in Afghanistan.[2]  Many have ultimately been released; but some detainees in Afghanistan have been held for over two years.

The U.S. military maintains its main detention facility in Afghanistan at the Bagram airbase, north of the capital Kabul.  There are an unknown number of additional U.S. detention facilities in the country, including at bases in Kandahar, Jalalabad, and Asadabad.  The U.S. Central Intelligence Agency (CIA) is also holding an unknown number of detainees, both at Bagram airbase and at other locations in Afghanistan, including in Kabul.  Furthermore, the United States has encouraged local Afghan authorities to detain hundreds of persons taken into custody during joint U.S.-Afghan operations.  These persons are held without charge and in poor conditions, and some have been subjected to torture and other mistreatment.  In the northern city of Shiberghan, approximately one thousand detainees—alleged Taliban combatants and foreign fighters allied and captured with them—are being held at a facility under the control of Afghan General Abdul Rashid Dostum, a member of the Karzai government and the commander of a predominately Uzbek militia, Junbish-e Melli.  CIA and U.S. military interrogators are believed to have access to these detainees and others held by Afghan forces.  The United States has opposed efforts by the Afghan and Pakistani governments to screen such detainees for release.

Human Rights Watch is also concerned about mistreatment of detainees in custody.  Human Rights Watch has had access only to detainees *released* from U.S. custody.[3] Human Rights Watch researchers therefore have only been able to interview detainees whom U.S. authorities did not consider to be a security risk or indictable for criminal offenses.  From these detainees, however, Human Rights Watch has received credible allegations of mistreatment in U.S. custody.  These allegations are consistent with other allegations received by the Afghan Independent Human Rights Commission, the United Nations Assistance Mission in Afghanistan (UNAMA), and numerous international journalists.

---

[2] The Guantanamo Bay Naval Base in Cuba, where the United States is holding approximately 660 detainees, most of whom were taken into custody in Afghanistan, is not the subject of this report.

[3] Human Rights Watch sent written requests in 2003 to Defense Secretary Donald Rumsfeld and General John Abizaid, the commander of Central Command (CENTCOM), for permission to visit U.S. detention facilities in Afghanistan and discuss our concerns about alleged abuses by U.S. forces with officials in the Department of Defense.  To date we have not received any response.  Officials in the public affairs offices of the Pentagon and CENTCOM told Human Rights Watch in October 2003 and again in January 2004 that such requests would not be granted.  Human Rights Watch has also made written requests to George Tenet, the Director of Central Intelligence, regarding concerns about CIA operations in Afghanistan; a response from the General Counsel of the CIA indicated that CIA officials would not be available to discuss operations in Afghanistan.

Afghans detained at Bagram airbase in 2002 have described being held in detention for weeks, continuously shackled, intentionally kept awake for extended periods of time, and forced to kneel or stand in painful positions for extended periods. Some say they were kicked and beaten when arrested, or later as part of efforts to keep them awake. Some say they were doused with freezing water in the winter. Similar allegations have been made about treatment in 2002 and 2003 at U.S. military bases in Kandahar and in U.S. detention facilities in the eastern cities of Jalalabad and Asadabad.

In December 2002 two Afghan detainees died at Bagram. Both of their deaths were ruled homicides by U.S. military doctors who performed autopsies. Department of Defense officials claim to have launched an investigation into the deaths in March 2003. In June 2003, another Afghan died at a detention site near Asadabad, in Kunar province. The Department of Defense has yet to explain adequately the circumstances of any of these deaths. Human Rights Watch is concerned that the results of any investigations may never be publicized, and that appropriate criminal and disciplinary action may never take place.

Concerns about conditions at Bagram persist. The Afghan Independent Human Rights Commission has collected complaints alleging torture and mistreatment made by recently released detainees and families of persons still detained.

Human Rights Watch is also deeply concerned about the lack of legal process for detainees. The United States has set up a system in Afghanistan that does not provide detainees a process whereby they can contest their detention and obtain their release. Ordinary civilians caught up in military operations and arrested are left in a hopeless situation. Once in custody, they have no way of challenging the legal basis for their detention or obtaining a hearing before an adjudicative body. They have no access to legal counsel. Their release is wholly dependent on decisions of the U.S. military command, with little apparent regard for the requirements of international law—whether the treatment of civilians under international humanitarian law or the due process requirements of human rights law.

Not a single person detained in Afghanistan since the start of U.S. operations in 2001 has been afforded prisoner-of-war status or other legal status under the 1949 Geneva Conventions.[4] No one held by the United States since the start of hostilities to the

---

[4] Belligerents captured during the international armed conflict between the United States and the Taliban should have been afforded the status of prisoners of war under the Third Geneva Convention unless and until a "competent tribunal" under article 5 determined otherwise. The U.S. did not

present has been charged or tried for any crime (with the single exception of John Walker Lindh, a U.S. citizen) nor has the United States or the present Afghan government set up any tribunals or other legal mechanisms to process detainees captured in connection with military operations. The United States continues to treat *all* detainees it has captured in Afghanistan as "unlawful combatants" it considers not entitled to the full protections of the Geneva Conventions or of human rights law.

The Afghan government also has obligations to protect the rights of persons within its borders. President Hamid Karzai has complained to U.S. authorities on occasion about abuses by U.S. troops. The Afghan government and the Afghan Ministry of Defense have limited influence over U.S. military strategies and policies, but they can do more to insist that U.S. forces operating in Afghanistan uphold international humanitarian law and human rights law.

*    *    *    *    *

The violations of detainees' rights documented in this report are exacerbated by the almost complete opacity maintained by U.S. officials about the Bagram facility and other detention facilities in Afghanistan. The United States refuses to allow access to detainees' families, lawyers, or advocates, or to journalists or representatives of non-governmental organizations (other than the ICRC). And it is not evident that the detention system maintained by the United States in Afghanistan is conducive to the security of U.S. forces. The routine arrests and indefinite detention of persons who have no genuine connection to armed opposition groups has angered many Afghan communities and lessened their willingness to cooperate with U.S forces.

Almost nothing is known about U.S. investigations or prosecutions of U.S. military personnel for alleged violations of international humanitarian law. (This is in sharp contrast with Iraq, where a number of cases involving U.S. soldiers have been publicly reported.) Simply put, the United States operates its detention facilities in Afghanistan in a climate of almost total impunity. As noted, the Department of Defense has not even released the results of its investigations into the deaths of Afghan detainees at Bagram and Asadabad and has yet to explain adequately the circumstances of these deaths. Nor have U.S. officials adequately responded to inquiries about alleged

---

convene a single article 5 tribunal in Afghanistan, though it has held hundreds during the 2003 Iraq war and in previous conflicts. Afghan nationals found not to be prisoners of war would be entitled to "protected person" status under the Fourth Geneva Convention.

mistreatment and torture by U.S. forces in Afghanistan made by human rights groups and members of the U.S. Congress.[5]

There is little doubt that U.S. policies on the detention of terrorism suspects—both in Afghanistan and elsewhere—have harmed public opinion of the United States around the world, and have damaged some of its efforts in building a coalition to combat international terrorism.

These policies are also making it more difficult for the United States to criticize other governments for violating international human rights and humanitarian law standards in maintaining detention facilities. Every year, the U.S. State Department publishes "Country Reports on Human Rights Practices," which contain criticisms of abuses similar to those documented in this report, such as beatings, use of sleep deprivation, continuous shackling, and long-term isolation.[6] The United States is undermining the effectiveness of these reports by committing the same abuses it has rightly criticized elsewhere.

The U.S. detention policy in Afghanistan serves as a poor example for other nations around the world, and for Afghanistan itself. Afghan warlords whose troops are deployed alongside U.S. forces in Afghanistan have done little to improve their horrific records with regard to the treatment of detained persons. Instead of setting a positive example for them, the behavior of the United States sends the message that the U.S. operates on a set of double standards. And worldwide, it is now all too easy for governments to justify their failures to uphold human rights by pointing to U.S. violations in Afghanistan.

It doesn't have to be this way. Human Rights Watch believes that the protections provided under international humanitarian and human rights law do not conflict with the security of states. The U.S. and Afghan governments have both a duty and a responsibility to provide for the security of their populations and to take appropriate actions against those who threaten state security or violate the law. But in Afghanistan, the United States appears to have allowed its single-minded pursuit of security to obscure the obligation to protect individual rights, rights deeply ingrained in U.S.

---

[5] See, e.g., Letter from Senator Patrick Leahy to National Security Advisor Condoleeza Rice, June 2, 2003, available at http://www.hrw.org/press/2003/06/letter-to-rice.pdf; Response to Senator Leahy from Department of Defense General Counsel William Haynes, June 25, 2003, available at http://www.hrw.org/press/2003/06/letter-to-leahy.pdf.

[6] See Appendix.

constitutional law and reflected in international law (as well as in the former and current Afghan constitutions). This course of action is shortsighted and damaging to the rule of law, not only in Afghanistan but across the world.

A list of recommendations to the United States, the Afghan government, and other countries involved in Afghanistan begins on page 51.

## II. Background: "Operation Enduring Freedom"

The ongoing U.S.-led military operations in Afghanistan discussed in this report fall under a larger campaign referred to by the United States and its coalition partners in Afghanistan as "Operation Enduring Freedom."

Operation Enduring Freedom as originally planned was a response to the September 11, 2001 attacks on the United States. It was, in its first manifestation, a military operation against the Taliban government of Afghanistan and the network of foreign groups, including al-Qaeda, believed responsible for the September 11 attacks.[7]

The U.S.-led coalition's initial military operations in Afghanistan, from September through December 2001, were directed at the Taliban forces and their foreign allies. In late September, CIA forces entered Afghanistan to organize existing Afghan anti-Taliban forces (primarily the loose coalition of groups called the Northern Alliance) and assist covert U.S. Army and Air Force units to transport equipment into the country. Throughout the first phase of the conflict, millions of dollars in cash and significant amounts of weapons, communications equipment, and other military supplies were ferried into Afghanistan and given to anti-Taliban forces. As the war progressed, the U.S. advance teams were joined by Army Special Forces and Special Forces units from the Navy and Air Force, and ultimately, regular army ground troops and units from coalition partners such as the United Kingdom and Australia. Over the next two months, the U.S.-led coalition carried out an extensive air campaign against the Taliban and its allies. Anti-Taliban forces on the ground initially assisted in identifying targets for the air campaign and later advanced and seized areas held by Taliban and al-Qaeda forces.

Since December 2001, the U.S.-led coalition's primary military focus has been on locating remnants of the Taliban and al-Qaeda which did not surrender and fled into remote areas of the country.

However, there was and is more to Operation Enduring Freedom than military operations against Taliban and al-Qaeda remnants. Coalition operations have included

---

[7] For more information on the diverse characteristics and composition of non-Afghan armed groups operating in Afghanistan before and after the U.S.-led attack in 2001, including al-Qaeda, see Jason Burke, *Al-Qaeda: Casting a Shadow of Terror*, (B. Tauris : September 2003). See also Ahmed Rashid, *Taliban: Militant Islam, Oil & Fundamentalism in Central Asia* (New Haven: Yale University Press, 2000).

investigative and intelligence-gathering components aimed at locating or uncovering threats to the United States and other coalition members, and disrupting or eliminating those threats. Operations have also included efforts to capture terrorist suspects and gather intelligence in Afghanistan as part of the global campaign to disrupt the worldwide operations of al-Qaeda.

U.S. and Coalition forces have also increasingly broadened the scope of their activities in Afghanistan to include peacekeeping and peacebuilding efforts, delivery of humanitarian aid, counter-narcotics work, and general intelligence gathering. As in other post-conflict situations where the United States has taken the leadership role, it has deployed significant numbers of personnel from the CIA and other intelligence services,[8] the State Department, and the U.S. Agency for International Development, in addition to the armed forces.

Since the fall of the Taliban government in late 2001, U.S. and coalition military operations under Operation Enduring Freedom have largely consisted of small- and medium-scale operations whose overall aim is to destroy or disrupt the remaining Taliban, al-Qaeda, and other hostile forces in the country. Some of these operations have focused on fixed Taliban or al-Qaeda military positions, such as caves, bunkers, and other fortified positions, usually in remote rural areas. Others have been directed at residential compounds, usually in small villages, in which anti-coalition suspects are thought to be hiding. These operations can be divided into those where the primary intent appears to be to destroy the target, such as through bombing raids and other direct attacks, and those where the intention is to take into custody particular individuals and collect intelligence information, either from local residents or seized materials.

---

[8] The office of the Director of Central Intelligence officially oversees not only the CIA but also the "U.S. Intelligence Community," which consists of at least fourteen different government agencies, including Department of Defense intelligence offices and several non-military agencies.

### III. Violations by U.S. Forces

This chapter is divided into three sections addressing, respectively, use of excessive force by U.S. forces during arrests; arbitrary arrests and indefinite detention; and mistreatment in detention.

As the cases in the first section show, U.S. forces repeatedly have used military means and methods during arrest operations in residential areas where law enforcement tactics were more appropriate. This has resulted in unnecessary civilian casualties and in some cases may have involved indiscriminate or disproportionate force in violation of international humanitarian law.

Cases in the second section of this chapter raise serious questions about the intelligence gathering and processing that leads to coalition arrests. Members of the U.S. armed forces have arrested many civilians not directly participating in hostilities and persons whom U.S. authorities have no legal basis for taking into custody. The cases in the second section also make clear that persons detained by U.S. forces in Afghanistan are held without regard to the requirements of international humanitarian or human rights law and are not provided reasons for their arrest or detention. Detainees are held virtually incommunicado without any legal basis for challenging their detention or seeking their release.

The final set of cases presented here raise serious concerns regarding the treatment of detainees at U.S. detention facilities in Afghanistan, particularly in light of the failure of the United States to investigate and publicly report on several unexplained deaths in detention. There is credible evidence of beatings and other physical assaults on detainees, as well as evidence that the United States has used shackling, exposure to cold, and sleep deprivation amounting to torture or other mistreatment in violation of international law. To date neither the Department of Defense nor the CIA has adequately responded to allegations of mistreatment.

### Indiscriminate and Excessive Force Used During Arrests

As this section shows, U.S. forces routinely use military force when carrying out arrests
in Afghanistan, sometimes with insufficient regard to the requirements of applicable
international humanitarian and human rights law. U.S. military Rules of Engagement
designed for combat situations seem to be applied where law enforcement protocols are
required.[9] In addition, it appears that faulty and inadequate intelligence has resulted in
targeting of civilians who were not taking a part in the hostilities, unnecessary civilian
deaths and injuries during arrest operations, and needless destruction of civilian homes
and property.[10] There are also credible reports that U.S. forces have beaten and abused
persons during arrest operations, and that Afghan troops accompanying U.S. forces have
abused local residents and looted the homes of those detained.

According to U.N. officials in Kabul, numerous complaints have been made to their
offices about U.S.-led operations in southern, southeastern, and eastern areas of
Afghanistan alleging excessive use of force by coalition troops.[11] Complaints often state
that U.S. forces have been manipulated by local Afghan forces, including local Afghan
"fixers" and interpreters; that U.S. military forces have unwittingly been used as proxies
in local rivalries; and that the presence of U.S. forces has been the backdrop for Afghans
to extort money from local residents or intimidate opponents.

Government officials in the Karzai government, along with local government officials,
have also repeatedly raised concerns with U.S. officials about excessive military force
being used during operations.[12]

One U.N. official who collected complaints about U.S. operations in 2002 said many of
the complaints concerned the "use of cowboy-like excessive force" against residents

---

[9] The Department of Defense was unwilling to provide Human Rights Watch with copies of current
Rules of Engagement (ROE) Cards for their personnel in Afghanistan, or a copy of Afghanistan-
specific ROE.

[10] The consequences of mistaken attacks on Afghan civilians and civilian objects during air strikes is a
large issue of concern but is not discussed in this report. Human Rights Watch has raised this issue
elsewhere. See, e.g., Human Rights Watch, "Afghanistan: U.S. Military Should Investigate Civilian
Deaths," press release, December 13, 2003.

[11] Human Rights Watch interviews with U.N. officials, Kabul, December 16, 2003. Human Rights
Watch telephone interviews with a former senior U.N. official, December 5, 2003 and February 6,
2004.

[12] Paul Watson, "Afghan Leader Told U.S. About Abuses, Aide Says," October 31, 2003; Patrick
Quinn, "U.S. raids, cultural problems lead to rising resentment in southern Afghanistan," Associated
Press, June 24, 2002.

"who generally turn out to be law abiding citizens." The official noted cases of U.S. forces "blowing doors open with grenades, rather than knocking," and roughly treating women and children.[13]

Human Rights Watch is particularly concerned about the use of suppressing fire during arrest operations—that is, the indiscriminate firing of weapons to immobilize possible enemy forces. As noted below, Human Rights Watch believes that the use of suppressing fire in the first resort (not in response to enemy fire) is inappropriate during arrest operations in residential areas where no combat is taking place or underway.

### The case of Ahmed Khan and his sons

On a night in late July 2002, U.S. forces raided the home of Ahmed Khan, a resident of Zurmat district in Paktia province. Zurmat district, while not completely stable, is firmly under the control of Afghan forces allied with the United States and was under such control in July 2002. During the raid, Ahmed Khan was arrested along with his two sons, aged 17 and 18 years.[14]   A local farmer died from gunfire during the arrest operation, and a woman in a neighboring house was wounded.  Human Rights Watch spoke with several neighbors and other witnesses to the raid.  Ahmed Khan described the attack:

> It was around harvest time. The farmers were sleeping by the harvests. .
> . . It was about nine at night. We were lying in bed, but we were not yet
> asleep. . . .  Suddenly, there was a lot of noise. Some helicopters were
> flying over. Then there were large explosions. The house shook; the

---

[13] Human Rights Watch e-mail exchange with former U.N. official in Afghanistan, February 2004.

[14] There were conflicting reports by reporters who visited the site of the attack about what the target of the raid was and whether other men in the area were taken into custody during the raid. One news report about the incident suggested that five other persons were arrested on the same night. "US troops kill Afghan, take away six in raid; False report misled soldiers: governor," Agence France Presse, August 1, 2002. Another report suggests that the arrest was aimed at a man called Haji Uddin, who was alleged to have given shelter to anti-U.S. forces in the area. Liz Sly, "U.S. grabs at shadows in hunt for Al-Qaeda," *Chicago Tribune*, September 3, 2002. The same report stated that five persons were arrested during the raid: two relatives of Haji Uddin, including a 14-year-old boy, and three farm workers. But Human Rights Watch interviews with residents and local officials in Zurmat shed no light on the reason for the U.S. forces raid on Ahmed Khan's home. The governor of Paktia, Raz Mohammad Dalili, who was familiar with the incident, could not explain why the attack took place. Human Rights Watch interview with Raz Mohammad Dalili, governor of Paktia, March 9, 2003. See also Pamela Constable, *Frustrated hunt for Bin Laden; al-Qaeda leader elusive, but U.S. sees success in Afghan raids*, Washington Post, September 11, 2002.

> towers [corners of the house] had been hit. . . . The operations started.
> Some helicopters came, we could hear them circling and firing machine
> guns. It was a lot of noise. There were also explosions. They rocketed
> one of the towers, and they rocketed a hole through the wall.[15]

During the shooting, Ahmed Khan said he and his family hid on the floor in their
bedroom on the second floor of the house. Gunfire shattered their windows and
doors.[16] Neighbors said they saw helicopters shooting at the house and at areas around
it.[17] Ahmed Khan described how U.S. forces entered his house, firing their weapons:

> I looked out the broken windows here, and saw that there were many
> soldiers in the compound. They shot at the door [front door of the
> house], and opened it, and came up these stairs. They came through the
> windows. . . . They entered the house, through the windows, which had
> been broken by the shooting and the explosions. They came up to our
> room, and they kicked the door open and entered with torches and
> machine guns. They signaled for us to put up our hands, there were no
> Afghans with them, no Pashto speakers, although later [we saw]
> interpreters in the yard. . . . Then they fastened the men's hands and
> told the women to go into the yard. And they took us into the yard
> too.[18]

Troops, including Afghan soldiers, then searched the house, occasionally using gunfire
to open locks.

> They [U.S. soldiers] made the women go to the other house [across the
> yard]. Then they searched the house. They broke all the windows, and

---

[15] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003. A neighbor of
Ahmed Khan's described the attack in similar terms: "I heard a lot of noise, which came from
helicopters. So I got up, and I crept up to my roof. I looked around. There were helicopters circling
his [Ahmed Khan's] house. There was a lot of shooting and it was difficult to look thoroughly at
what has happening. There were many, many helicopters. We did not dare to go near that house."
Human Rights Watch interview with H.M., Zurmat, Paktia, March 10, 2003.

[16] "There were a lot of bullets. The glass broke in all the windows . . . ." Human Rights Watch
interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

[17] Human Rights Watch interview with H.M., Zurmat, Paktia, March 10, 2003, Human Rights Watch
interview with brother of Niaz Mohammad, Zurmat, Paktia, March 10, 2003.

[18] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

> tore the doors off cupboards, and shot open the boxes, and turned them over. . . .  [Later,] they put hoods over our heads, and walked us out. We were lifted up, into a helicopter.  I could hear the rotors.  We were in the helicopter for a long time. . . .  I don't know how long.  Later I learned I was in Bagram.[19]

The body of a local laborer and farmer, Niaz Mohammad, was found after the raid.  A neighbor told Human Rights Watch:

> [Later, we] found the corpse of the man who was killed.  It was Niaz Mohammad.  He had a bullet in his foot, and a bullet in his back.  It had entered in his back, and come out right where his heart is.  He was found near to the mill.[20]

Ahmed Khan and his neighbors told Human Rights Watch that Niaz Mohammad had been sleeping outside, near piles of harvested wheat, in order to keep watch so that no one would steal the grain.[21]

According to neighbors, a local woman was also wounded in the attack.  She received a bullet wound that was not considered to be serious.  The homes in the vicinity of Ahmed Khan's house received considerable damage from bullets and other weapons, indicating that the U.S. forces used considerable firepower even though there was no evidence of any armed opposition.  A U.N. local staff person visited the site the day after the attack: "There were bullet shells all around the house, everywhere, many shells. There was a big hole in the wall and bullet holes in the windows; the glass was all broken and had fallen into the yard.  Household items were scattered all about—all around the compound."[22]  Human Rights Watch visited Ahmed Khan's compound in March 2003

---

[19] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

[20] Human Rights Watch interview with H.M., Zurmat, Paktia, March 10, 2003.

[21] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

[22] Human Rights Watch interview with H.M., Zurmat, Paktia, March 10, 2003.  Human Rights Watch interview with G.A.U., local U.N. staff, Gardez, Paktia, March 10, 2003.  One of the neighbors described the house after the attack: "After all the noise ended and the helicopters left, I went to the house to see what happened.  I went with some neighbors.  We went inside.  The first thing is that the women were very scared.  Boxes from the house were thrown around the yard, and there were possessions scattered about. . . .  About ten minutes later, we walked outside.  We were walking around to ask people what happened."  Human Rights Watch interview with H.M., Zurmat, Paktia, March 10, 2003.

and observed scores of bullet holes in the window frames and doors of the house, bullet slugs, and destroyed farm equipment.[23]

Ahmed Khan's family said they lost many of their most valuable possessions on the night of the raid. U.S. forces confiscated some books and four automatic weapons, which they later returned to Ahmed Khan, when he and his teenage sons were released. But the family said that other possessions were missing. Said Ahmed Khan:

> They stole all my possessions. . . . I don't know who it was. The Americans returned some things to us, but a lot of jewelry disappeared. The women were in the other room. They didn't see anything. . . . The Americans may have taken the jewelry, or the Afghans. I don't know. I lost a lot of property. I don't know what was lost that night. A lot of jewelry was taken.[24]

Ahmed Khan's frustration was manifest months later:

> They killed a farmer, Niaz Mohammed. He was just guarding his harvest and was killed. He had four children, two boys and two girls. What will I do for these children? I take care of them now. We will forgive America when they pay for his life, at least to help me with these children.[25]

---

[23] Human Rights Watch researchers also saw that newly laid mud and brick had been used to fill in a large hole in the compound's wall, approximately three meters in diameter, where a rocket was said to have hit. Scores of bullet holes in the house's walls and window frames indicated that gunfire had come from two directions: the hole in the wall, and the door of the compound. Bullets in the window frames were embedded in two trajectories: some were clearly driven in perpendicularly (at 90 degrees), coming from the direction of the hole in the wall; others were driven in much more obliquely (less than 10 degrees off the surfaces flush with the house) starting from the direction of the house's door.

[24] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

[25] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

*Other cases*

Human Rights Watch documented a case in February 2003 in the southern province of Uruzgon in which U.S. troops assaulted two children during a raid on a civilian house.[26] The owner of the house, a low-level military commander in Uruzgon province, cooperated with U.S. forces during coalition attacks on Taliban forces in southern Afghanistan in late 2001 and early 2002. But one night in February 2003, U.S. forces raided the man's home, entering by force and tying up him and one of his older sons. Through local interpreters and Afghan soldiers accompanying them, the U.S. troops accused the man of holding weapons and cooperating with the Taliban. A Farsi-speaker, the man was baffled why the soldiers believed he was cooperating with the Pashtun-speaking Taliban.

According to the man, the soldiers pushed him and his older son against a wall, and seized the man's young son and nephew:

> In front of my eyes, two Americans laid down both the boys on the ground and pressed their boots into the children's backs. And they were yelling: "Where is the ammunition? Where is the ammunition?"

> These boys were aged only eleven and thirteen. The children were shrieking and shouting. I was saying, "Look over all my house – I have nothing!" But they kept asking this, as the children screamed.[27]

The soldiers subsequently searched the house, but only found two weapons, both of them registered with the authorities. Still, the man was arrested by the local Afghan forces and taken to a neighboring province. He was released a few days later.

On December 5, 2003, U.S. forces conducted an operation in the village of Kosween, in Sayed Karam district of Paktia, near Gardez in southeast Afghanistan.[28] According to U.S. military officials, the aim of the operation was to arrest a man named Mullah Jalani, alleged to be a Hezb-e Islami leader involved in anti-U.S. military operations. As a result of the operation, a couple and their six children were killed: Ikhtari Gul, 35 (a farmer),

---

[26] Information about this incident is taken from a Human Rights Watch interview with man from Uruzgon, Kabul, March 2003.

[27] Human Rights Watch interview with man from Uruzgon, Kabul, March 2003.

[28] Information about this case is based on interviews in December 2003 and January 2004 with several journalists who visited the site of the raid in the weeks after it occurred.

and his wife, Khela; their four daughters, Khela, Daulat Zai, Anara and Kadran; and two sons, Asif and Nematullah.[29] The use of military methods and tactics during the operation may have violated international legal obligations to minimize harm to civilians and prohibitions against disproportionate attacks.

The U.S. military gave inconsistent accounts of the operation after it occurred. On December 6, Lieutenant Colonel Bryan Hilferty told several reporters at Bagram airbase that U.S. forces the previous night had raided the home of Mullah Jalani in Sayed Karam.[30] He said that U.S. forces had detained "several persons" during the raid, but had not captured Jalani.[31] The village was sealed off in the week after the raid: several journalists who attempted to visit the site of the operation during the week of December 7 - 12 were turned back by Afghan forces cooperating with a Special Forces unit in the village.[32]

On December 10, Hilferty admitted that the Sayed Karam raid had involved close air support and bombing, and said that on December 7 U.S. forces found eight civilians who had died during the operations.[33] Hilferty indicated that the dead civilians were in another compound than the one attacked and were buried by a wall that collapsed because of "secondary and tertiary explosions" from stored ammunition in Jalani's compound.[34] He suggested that U.S. forces were not "completely responsible" for the deaths because the civilians (presumably including the children) had "surrounded

---

[29] Ikhtari's brother, Naser, told a reporter that the children's ages ranged from one to twelve. Pamela Constable, "Deadly U.S. Raid Leaves Some Afghans Bewildered; Villagers Say Target Was Not a Terrorist," Washington Post, December 12, 2003.

[30] "Troops In Afghanistan Raid Insurgent Base, Destroy Weapons," Associated Press, December 6, 2003.

[31] Ibid. The next day, December 7, the military announced that nine children had been killed in a separate incident—an air attack on a building in Ghazni, Afghanistan. Aijaz Rahi, "Afghan Village Angry After Gunship Attack," Associated Press, December 8, 2003. For more information about these two attacks, see also Human Rights Watch, "Afghanistan: U.S. Military Should Investigate Civilian Deaths," press release, December 13, 2003. There was no indication that the Ghazni incident was an arrest operation.

[32] Human Rights Watch telephone interview with an international journalist who attempted to visit Sayed Karam, February 6, 2004.

[33] Paul Watson, "Civilian Toll Not U.S. Fault, Afghans Say," Los Angeles Times, December 11, 2003. U.S. Secretary of Defense Donald Rumsfeld gave a press briefing in Washington on December 9 but did not reveal the civilian deaths in Gardez. Why this information was withheld by the military for three days was not explained.

[34] Watson, "Civilian Toll Not U.S. Fault, Afghans Say."

themselves" with weapons and ordinance—a puzzling claim, since the dead civilians were not in Jalani's compound.[35]  A foreign correspondent visiting the village the same week found a large concave crater at the compound where the civilians were killed, suggesting that an errant bomb had hit the compound.[36]

Hilferty said that the aim of the operation had been to arrest Mullah Jalani, whom he described as a suspected associate of Gulbuddin Hekmatyar, the leader of Hezb-e Islami: "We try very hard not to kill anyone. We would prefer to capture the terrorists rather than kill them."[37]  But he gave no adequate explanation as to why U.S. forces on the ground ultimately used bombs in an operation in a residential area.

There are conflicting reports from different sources as to how many people were arrested in the operation, varying from five to fourteen.[38]  A reporter from the *Washington Post* visited the village a week after the attack and was told by villagers that Jalani was a local military leader who had cooperated with Taliban forces during the Taliban era, but who had changed sides and cooperated with U.S. forces at times and sat on a local governmental council.[39]  Villagers said that Jalani had been involved in several tribal disputes in the area and was living openly in the village before the attack, but had left before it took place.

Human Rights Watch received a complaint from government officials in Paktia about an operation in Zurmat district in February 2003 in which Abdul Gehafouz Akhundzada, a cleric, was arrested in his home after a firefight. (Akhundzada's detention is discussed in more detail in the section on arbitrary arrests and detention below).  Among other

---

[35] Ibid.

[36] Human Rights Watch interview with a journalist who wished to remain anonymous, Kabul, December 12, 2003.

[37] Watson, "Civilian Toll Not U.S. Fault, Afghans Say."

[38] Officials in the Afghan Independent Human Rights Commission told Human Rights Watch that eleven persons were arrested during the operation, and had not been released. Human Rights Watch interview with AIHRC official, Kabul, December 16, 2003. A local Afghan governmental official in Paktia, Faiz Mohammed Zalan, told a reporter: "There were five people arrested during the whole operation, but they were innocent, so they were released the next day." See Watson, "Civilian Toll Not U.S. Fault, Afghans Say." The Washington Post reporter who visited the village was told by residents that possibly as many as fourteen people had been arrested during the raid.

[39] Pamela Constable, "Deadly U.S. Raid Leaves Some Afghans Bewildered; Villagers Say Target Was Not a Terrorist," Washington Post, December 12, 2003. U.S. Special Forces in the village refused to talk to the reporter.

things, officials complained of U.S. forces coming for Akhundzada in the middle of the night, a course of action which they believe set off a dangerous firefight.

According to Akhundzada's family and neighbors, the arrest took place on or around February 20, 2003. Afghan and U.S. soldiers gathered outside his home late at night and knocked on his door.[40]  Akhundzada reportedly thought they were Afghan troops who had come to rob him—a common occurrence in Zurmat district.[41]  He fired a weapon from his rooftop, either in the air or directed at the troops. The troops outside returned fire, and soon thereafter, U.S. helicopters flew toward the house, reportedly firing weapons. According to his family and neighbors, Akhundzada then realized that the Afghan troops were working with U.S. forces, and surrendered. Before this happened, however, U.S. and Afghan forces fired hundreds of rounds of ammunition into Akhundzada's home, where there were two women—Akhundzada's mother and wife—and his two children. The women and children told Human Rights Watch that they lay on the floor of the home during the attack, and were not wounded.

After Akhundzada was arrested, U.S. troops entered the home and searched it, shooting open steel trunks with their weapons and breaking doors and windows.[42]  Human Rights Watch researchers inspected the house in March and saw hundreds of bullet holes in the compound's external and internal walls. Two bullet slugs dug out of the compound's internal walls appeared to be from an M-60 machine gun, a more powerful weapon than the standard assault rifles carried by U.S. and Afghan troops (M-16s and Russian AK-47s).

Local officials maintained that Akhundzada was a civilian, living openly in Zurmat, who could have been peacefully approached and taken into custody during the day.

Kandahar officials also complained to U.S. forces in 2002 about a raid involving U.S. Army and Special Forces troops that took place on May 24, 2002, in the village of Band

[40] Information about this case is based on interviews in Zurmat with family members of Abdul Gehafouz Akhundzada, March 10, 2003; interviews with villagers in Zurmat district on March 10, 2003; and interviews with governmental officials in Gardez on March 9, 2003.

[41] Human Rights Watch documented in 2003 that home robberies by Afghan soldiers and police were common in southeastern Afghanistan in 2002 and 2003, including in Paktia province and Zurmat district in particular. See Human Rights Watch, "Killing You Is a Very Easy Thing For Us: Human Rights Abuses in Southeast Afghanistan," *A Human Rights Watch Short Report*, vol. 15, no. 5(c), July 2003, available at http://www.hrw.org/reports/2003/afghanistan0703/.

[42] Sometime during the operation, the family's copy of the Koran was shot through with a bullet, a fact which later and understandably caused anger in the local community.

Taimore, in Kandahar province. Accounts of the operation are not clear, but according to journalists who interviewed villagers, a tribal leader in his 80s was shot dead in a mosque and a 3-year-old girl drowned after she fell into a well trying to run away from U.S. forces.[43]

\*  \*  \*  \*  \*

Through 2003, the Afghan Independent Human Rights Commission office in Gardez city has received numerous complaints from the Gardez area, including allegations that U.S. forces or Afghan forces working with them used excessive force and destroyed property during operations. According to the complaints:

- November 9, 2003, Central Gardez: G.K.[44] claims he "was arrested without cause and his house was damaged by coalition forces. Women and children were kept in the yard in the cold weather and the locks of the women's boxes were broken, money and jewels were taken."

- November 8, 2003, Gardez, Shekar Kheil village: H.M.K. complains that "house was damaged by the coalition forces and the named person was taken along with property deeds and other things."

- August 22, 2003, Central Gardez, Khajeh village: Dr. B, Dr. J, Engineer T.B claim that "In the middle of the night, their house was damaged and coalition forces entered the women's rooms without permission. Due to fear and terror one woman lost her fetus [spontaneously aborted]. [Dr. B] was taken, along with some money and jewelry."

- July 28, 2003, Central Gardez: N.G. claims he "was arrested by coalition forces without cause in the middle of the night from his house, and money and jewels were taken."

- July 13, 2003, Central Gardez, Shaykhan village: J.M.M. complains that: "Coalition forces arrested, beat, harassed and insulted him."

---

[43] See Michael Ware, "'We Were Better Off Under the Russians,'" Time Magazine, June 10, 2002; Patrick Quinn, "U.S. raids, cultural problems lead to rising resentment in southern Afghanistan," Associated Press, June 24, 2002.

[44] Names have been replaced with initials to protect the confidentiality of the complainants.

- May 2003, Khost province, Lelamy Koli district: H.I.K. complains that "compound bombed by coalition forces: two killed, four injured, four others were taken [arrested] by coalition forces."

UNAMA local offices and UNAMA headquarters in Kabul have also received numerous complaints over 2002 and 2003 about U.S. forces using excessive or "culturally insensitive" force during operations in the south and southeast of the country.[45] (Complaints about culturally insensitive force usually refer to allegations of male troops touching or looking at women during searches, which in some areas violate local norms even if there is no sexual intent. Local leaders have requested, among other things, that the U.S. military use more women soldiers during search operations.)

### Abuses by Afghan forces

Afghan forces deployed alongside U.S. forces have been implicated in abuses during military operations. As noted elsewhere in this report, persons arrested by U.S. forces routinely complain about local Afghan forces looting their homes in the wake of U.S. military operations.

An Afghan journalist in Kandahar city told Human Rights Watch in November 2003 that he received several complaints in 2003 from residents in Zabul and Helmand about local forces operating with U.S. troops extorting money from villagers by threatening to tell U.S. forces that local residents are "with the Taliban," claiming that the villagers will be targeted for arrest by the United States if they fail to pay certain sums of money— typically around 10,000 Pakistani rupees (approximately U.S.$175).[46]

In October 2003, a reporter from the *Los Angeles Times* documented that local troops from Kandahar, working as guides for U.S. forces, looted homes and beat and tortured civilians during a week-long military operation in Zabul province, which lies directly to the east of Kandahar.[47] Residents showed the journalist two young men who had been

---

[45] Human Rights Watch interview with U.N. officials, Kabul, December 13 and 16, 2003. Human Rights Watch telephone interview with former U.N. official, February 6, 2004.

[46] Human Rights Watch interviews with A.G.S., Afghan journalist, October 5 and 9, 2003.

[47] Paul Watson, "Afghans Tell of Torture During Security Sweep," Los Angeles Times, October 30, 2003; Paul Watson, "Afghan Leader Told U.S. About Abuses, Aide Says," October 31, 2003. See also transcript of interview with Paul Watson by Los Angeles Times Online editor, on documenting abuses and interviewing witnesses, available at: http://www.latimes.com/

beaten by the troops; one described being severely beaten and blacking out, the other was still unconscious days after the attack. According to other residents, U.S. forces did not witness the abuses, but the Afghan troops allegedly stole "cash, jewelry, watches, radios, three motorcycles—even the mud-brick school's windows and doors" before leaving when U.S. and Afghan troops moved on to other areas. Said one elder: "These people are robbing us, torturing us and beating us . . . . They are also taking innocent people to jail."

In late October 2003, a spokesman for President Hamid Karzai said publicly that Karzai's office had been receiving information about similar abuses by local troops for more than a year; that Karzai had told U.S. military commanders in Kabul that Afghan militias accompanying U.S. troops were committing abuses; that Karzai had suggested to U.S. commanders they not use Afghan militias in non-combat situations; and that the U.S. actions with local militias were undermining the overall effort to combat terrorism in Afghanistan.[48]

### Legal standards applicable to use of force during arrest operations

International humanitarian law seeks to protect civilians from unnecessary harm during armed conflict. Central to this protection is the imperative that military forces differentiate between combatants and civilians during military operations and when they take persons into custody.

Rules applicable to the current conflict in Afghanistan[49] require a military force to "take all feasible precautions in the choice of means and methods of attack with a view to avoiding, and in any event minimizing, incidental loss of civilian life, injury to civilians and damage to civilian objects."[50] Attackers must refrain from an attack that may be expected to cause disproportionate civilian casualties and damage.[51] Also prohibited are indiscriminate attacks, which include those not directed at a specific military objective

---

[48] Watson, "Afghan Leader Told U.S. About Abuses, Aide Says," October 31, 2003.

[49] See section on "International Legal Context," below.

[50] Protocol I (1977) Additional to the Geneva Conventions of 1949 ("Protocol I"), art. 57(2)(a)(ii). Many of the provisions of Protocol I of the Geneva Conventions, including those applying to methods and means of attack, are accepted as customary international law applicable to international and non-international armed conflict. See section on "International Legal Context," below.

[51] Protocol I, art. 57(2)(a)(iii).

and consequently of a nature to strike military objectives and civilians or civilian objects without distinction.[52]

In situations where forces are conducting essentially law enforcement operations—for instance, arrests of civilians wanted for questioning—basic rules of international human rights law also apply, including standards applicable to the use of force by law enforcement personnel.    Applicable law enforcement standards are typically more stringent than those under international humanitarian law, and narrowly prescribe the contexts in which deadly force and firearms may be used.

Human Rights Watch believes that the use of military tactics and military rules of engagement in operations that otherwise bear the characteristics of civilian law enforcement, particularly the arrest of suspects in residential areas, raises legal concerns and in Afghanistan likely has led to avoidable casualties and destruction of civilian property.    The United States has an obligation to investigate such incidents, take disciplinary or other legal action as appropriate, scrutinize its arrest methods and rules of engagement, and adopt necessary policy changes to prevent further unnecessary loss of life and property.

---

[52] Protocol I, art. 51(4). Among indiscriminate attacks are those expected to cause incidental loss of civilian life and property that would be excessive in relation to the concrete and direct military advantage anticipated. Id. art. 51(5).

## Arbitrary or Mistaken Arrests and Indefinite Detention

U.S. forces in Afghanistan regularly capture combatants and civilians who have taken up arms against U.S., Afghan, and coalition forces, during both combat and search and arrest operations. However, as shown here, U.S. forces also routinely arrest civilians taking no direct part in hostilities, sometimes in contexts in which the arrests seem arbitrary or based on poor or faulty intelligence.

As shown in this section, U.S. forces sometimes take into custody all men of military age found within the vicinity of an operation. Other times, it seems persons are targeted for arrest because U.S. officials have determined they are a security risk or are useful for intelligence purposes—for instance, clerics or local tribal leaders who might be politically involved with the Taliban, or civilians spotted near the site of a recent attack. Human Rights Watch has interviewed many Afghans who were arrested for simply being at the wrong place at the wrong time.

For many of these men, arrest is the start of an ordeal in which they may be beaten or otherwise mistreated during arrest or detention, repeatedly and seemingly randomly interrogated, held for weeks or months without family visits, and eventually released only to find that their homes were looted by Afghan troops. (Allegations of beatings and mistreatment are not discussed here but in the "Mistreatment in Detention" section below.)

In late May 2002, U.S. forces raided two homes in the village of Kirmati, near Gardez city, and arrested five Afghan men, all of whom were later released and returned to Gardez. During the raid, U.S. forces reportedly used helicopters and airplanes to patrol the area and lay down suppressing fire. The raid took place in an entirely residential area, and there is no evidence that U.S. forces met any resistance. Kirmati is firmly under the control of Afghan forces allied with the United States and was so at the time of this attack.

U.S. forces took five people into custody: Mohammad Naim and his brother Sherbat, Ahmaddullah and his brother Amanullah, and Khoja Mohammad. Mohammad Naim described the raid as follows:

> It was late at night. It was after midnight. Suddenly, there were a lot of noises, very loud, confusing . . . . I went into the yard. Suddenly, there was someone in my house with a gun on me. So I surrendered.[53]

---

[53] Human Rights Watch interview with Mohammad Naim, Gardez, Paktia, March 10, 2003.

Mohammad Naim's brother told a similar story.[54] Ahmaddullah and Amanullah, who are brothers, were arrested in a house nearby. Another villager, Khoja Mohammad, was arrested when he came out of his house to investigate what was happening in the other houses.[55] Amanullah described the arrests as follows:

> I awoke, there were helicopters all around the house. And I looked out and there were people in my house [in the compound]. There was a man I could see, I thought he was a thief. He had a gun. But he spoke English, and I realized he was an American. I don't speak much English, but I said, "How are you?" But then he said, "shut up" in Pashto – "Chopsha."

> My brother was there too, and he was arrested. They tied his hands, and they were pointing their guns at me all the time. Then they arrested me too, and tied my hands.[56]

The five men were taken to Bagram. Mohammad Naim described what happened after they landed:

> They threw us in a room, face down. We were there for a while. Then they stood me up and led me somewhere, and then they took off my blindfold. I saw that I was alone. I saw that there were some other people in the room, but I was the only prisoner.

> I was on the ground, and a man stood over me, and he had a foot on my back. An interpreter was there at this point. He asked me, "What is your name?" and I told them.

> They made me take off my clothes, so that I was naked. They took pictures of us, naked. And then they gave us new clothes, which were dark blue.

---

[54] Human Rights Watch interview with Sherbat, Gardez, Paktia, March 10, 2003.

[55] Human Rights Watch interview with Khoja Mohammad, Gardez, Paktia, March 10, 2003.

[56] Human Rights Watch interview with Amanullah, Gardez, Paktia, March 10, 2003.

> A man came, and he had some plastic bag, and he ran his hands through
> my hair, shaking my hair. And then he pulled out some of my hair,
> some hair from my beard, and he put it in a bag. . . . The most awful
> thing about the whole experience was how they were taking our pictures,
> and we were completely naked. Completely naked. It was completely
> humiliating.[57]

According to Mohammad Naim and Sherbat, the questioning at Bagram over the next
few days was exceedingly general, and indicated that the U.S. investigators had no idea
who the brothers were:

> In the interrogations they asked us, "Who are you? What do you do?" I
> told them, "I am butcher. I am just a butcher with a shop in the
> village." They showed me Khoja Mohammad's picture [one of the other
> villagers arrested] and asked me if I knew him. "Obviously I know
> him—he is my neighbor," I said.[58]

U.S. forces also asked very general questions of Ahmaddullah, Amanullah, and Khoja
Mohammad, suggesting the U.S. knew very little about them as well. Amanullah
described his interrogation at Bagram as follows:

> During the interrogations, they were asking me, "Do you know
> Jalaludid? [A suspected Taliban commander.] Do you know Mullah
> Omar?" And they were asking about some other Taliban ministers. But
> I was telling them, "I am only a laborer." But then they would ask me
> [again]: "Do you know Ali Jan, Jalaludin's deputy?"

> There was one Afghan translator, one American, and two others
> [nationalities unknown].[59]

Khoja Mohammad, meanwhile, was asked about Sherbat, one of the brothers arrested in
another house. "During the interrogations, they showed me Sherbat's picture, and they
asked me if I knew him. I said, laughing, 'Of course I know him: he is a butcher in my
village. I buy my meat from him.'"

---

[57] Human Rights Watch interview with Mohammad Naim, Gardez, Paktia, March 10, 2003.

[58] Human Rights Watch interview with Sherbat (last name withheld), Gardez, Paktia, March 10, 2003.

[59] Ibid.

After sixteen days of detention, including six days of interrogations, the U.S. released the five men. Said Sherbat:

> When they released us, an American came and said, through the translator, "We apologize to you. We apologize on behalf of America and even on behalf of President Bush. We apologize." They said that they would help us by giving us compensation for what they did. They said we would receive assistance. But we never did.
>
> They covered our heads again, and put us in the helicopter, and took us to Gardez. We landed in Gardez, and they took us in truck. We told them to stop before we got to our village, and that we would walk. The interpreter gave us about thirty-thousand [old] Afghanis each [approximately 70 cents U.S.], so that at least we could get some tea.[60]

The five men returned home to find that their houses had been looted and most of their possessions of value gone. Said Mohammad Naim: "I think that night [of the raid] my house was looted. . . . After that, no one helped us, no government, no NGO, no one."[61] The brothers said that they were told later that the Afghan forces working with the Americans had searched and looted their houses.

Ahmaddullah says he suffered mental health difficulties after the arrest:

> When we were there [to Bagram], I was so afraid they were going to kill me. Even now, having come back, I worry they will come and kill me. We are innocent people, we have nothing. We were punished by the Taliban: we were Persian speakers [i.e., not native Pashtuns like the Taliban.] We thought they [the U.S. forces at Bagram] would kill us for sure. I have to take medication now just to sleep. . . . Afghanistan has had so many governments in the last thirty years, and under all of these governments I have suffered. Under all of them I have been mistreated. They all ask for forgiveness. What's the good of forgiveness if they don't give you anything?[62]

---

[60] Human Rights Watch interview with Sherbat, Gardez, Paktia, March 10, 2003.

[61] Human Rights Watch interview with Mohammad Naim, Gardez, Paktia, March 10, 2003.

[62] Human Rights Watch interview with Ahmaddullah, Gardez, Paktia, March 10, 2003.

Human Rights Watch received information about various other persons detained for extended periods by U.S. forces after being taken into custody.

Human Rights Watch interviewed two civilian men who were arrested in Paktia in early 2002 and held at Bagram for over a month before being flown to Guantanamo Bay Naval Base in Cuba.[63] Both were released in May 2003. The fact that the two were released from Guantanamo and were not held by Afghan authorities after their release makes it clear that insufficient evidence existed that they committed any crime. Neither of them had any idea why they were arrested. One of the detainees said that a close friend of his was still in custody, either in Bagram or Guantanamo. The detainee's family and residents of his village told the detainee that his friend was arrested when he (the friend) approached a U.S. military base near Khost asking for information about him.

Human Rights Watch received a report about two persons in Khost city, Paktia, arrested by U.S. forces in August 2003.[64] The two men were arrested after their brother was killed in an explosion that local authorities believed was the result of a premature detonation of a car bomb. According to the two men, who spoke with local journalists in Khost, they were taken to Bagram airbase and interrogated by U.S. forces there. They said they were released after two months, when U.S. forces determined that they were not involved in the explosion or affiliated with anti-Coalition forces. During this whole time, their family was unable to receive news of them. The two said they received compensation from the United States and were flown back to Khost.

In Jalalabad in May 2003, four persons were taken into custody by U.S. forces operating out of Jalalabad airport.[65] After interrogation, the men were then turned over to Afghan authorities. The detainees, who according to some residents were merely civilians, had no criminal charges pending against them, and were being held seemingly at the request

[63] The information here is gathered from interviews by Human Rights Watch with the two detainees in July 2003 and several interviews with a journalist who interviewed these detainees earlier. For security reasons, the names of the detainees are withheld. The two detainees were severely mistreated by U.S. forces while at Bagram; their case is discussed in more detail in the Mistreatment in Detention section, below.

[64] Information about this case is based on a Human Rights Watch telephone interview with a local journalist, Paktia province, November 4, 2003.

[65] The information about this case is based on a Human Rights Watch interview with AIHRC official, Jalalabad, May 7, 2003.

of the U.S. forces. They were released a few weeks later after AIHRC officials pressured the local authorities.

One case discussed above involved the February 2003 arrest of Abdul Gehafouz Akhundzada, a cleric from Zurmat district. After the arrest, described earlier, Akhundzada was taken away in a helicopter, presumably to Bagram airbase, but his family was not informed of the location or reason for his arrest over the following months. As of late 2003, there was no response to appeals made through local government officials to both the U.S. and the Afghan authorities for an explanation as to his whereabouts. According to local residents, the U.S. government released no information as to the reasons for Akhundzada's arrest to his family or made such information public. Local U.N. staff in Paktia suggested that coalition forces focused operations in Zurmat district in 2003 in part because several senior Taliban officials were born there.[66] It is possible U.S. forces arrested Akhundzada in order to question him, believing that since he is a cleric he might have information about the location of Taliban officials. U.N. staff, however (as well as local officials), do not believe that Akhundzada had any meaningful or high-level connections with the Taliban.[67]

Ahmed Khan and his two sons (discussed above) also told Human Rights Watch that they were arrested in Zurmat and taken to Bagram airbase after their arrest. They said they were questioned about their identities, and whether they knew certain people— various names were given, people whom they did not know.[68] They were held for over two weeks, and then flown back to Zurmat. Ahmed Khan told Human Rights Watch that U.S. officials at Bagram Air Base apologized to him before releasing him, and asked him "for forgiveness."

Naim Kuchi, an elder and tribal leader of nomads from Paktika province, was arrested in late December 2002, while traveling on a road outside of Kabul.[69] U.S. personnel in civilian vehicles, accompanied by Afghan forces, reportedly took him into custody.

---

[66] Human Rights Watch interviews with local U.N. staff, Gardez, March 11, 2003.

[67] Human Rights Watch interviews with local U.N. staff, Gardez, March 11, 2003. Human Rights Watch interview with Raz Mohammad Dalili, governor of Paktia, and other government officials, Gardez, March 9, 2003.

[68] Human Rights Watch interview with Ahmed Khan and his sons, Zurmat, Paktia, March 10, 2003.

[69] Information about this case is based on Human Rights Watch interviews with Naim Kuchi's brother, Kabul, March 8 and 29, 2003. See also Marc Kaufman, "Afghans Protest Clan Leader's Detention," Washington Post, January 12, 2003; Marc Kaufman, "Afghan Figure Sent to U.S. Facility in Cuba," Washington Post, March 29, 2003.

Kuchi's family told Human Rights Watch that Kuchi had no involvement with anti-Coalition activities and said they had received no information about the basis for his arrest, nor were they able to meet with him after his arrest. In March 2003, Kuchi was transferred to the Guantanamo Bay detention facility, where he remains. A former U.N. official told Human Rights Watch that Kuchi was allied with the Taliban and with the former mujahidin government in Kabul from 1992-1996, and that he had represented the Ahmadzai nomad tribe in meetings with the Karzai government and the United Nations in 2002.[70] In April 2003, U.S. Department of Defense officials told Human Rights Watch that Kuchi was a former Taliban official and a "scumbag" involved in smuggling arms over the Pakistani border.[71] Whatever the case, Kuchi remains detained without charge or trial.

Rohullah Wakil, a local leader from Kunar province who was elected to the 2002 loya jirga in Kabul, was arrested in a raid in Kunar in August 2002 and remains in custody—possibly at Bagram. Local representatives from Kunar have made repeated pleas to the United States and U.N. in Kabul, complaining that Wakil should either be tried for a crime or released. No charges have been filed against him.

Human Rights Watch estimates that at least 1,000 persons have been detained in the course of coalition operations in Afghanistan from early 2002 to the present, most of whom have been released within days or weeks of their capture. This estimate is based on the average number of weekly new detainees who arrive at Bagram—approximately ten—according to journalists and human rights monitors who have been following the Bagram process. The number of new detainees obviously fluctuates: In December 2003, according to a U.S. military spokesman in Kabul, U.S. forces detained over 100 people.[72]

## CIA Detention Facilities

As noted above, CIA agents have operated throughout Afghanistan since soon after September 11, 2001, conducting military and intelligence operations. The CIA maintains a large heavily guarded compound in Kabul, in the Ariana Chowk neighborhood, surrounded by forty foot walls, razor wire, and guard towers. The CIA also controls a separate detention and interrogation facility at Bagram airbase, though this has never

---

[70] E-mail correspondence with former U.N. official, February 2004.

[71] Human Rights Watch meeting with U.S. Department of Defense officials, Washington D.C., April 24, 2003.

[72] Stephen Graham, "U.S. Kills 10, Arrests 100 in Afghanistan," Associated Press, December 30, 2003.

been officially acknowledged by the United States. Little is known about who is detained there, for how long, conditions of detention, or grounds for release or transfer to other U.S.-controlled facilities.

Human Rights Watch interviewed one former detainee, a former high-level Taliban official, who was held in an unknown facility near Kabul for eight months, guarded by Afghan troops but interrogated by U.S. personnel in plainclothes.[73] Since all U.S. military personnel are under orders to wear uniforms in Afghanistan, it is possible that the government personnel in question were from the CIA. The former official said that there were other detainees held in the same facility: he heard their voices and heard guards discussing other prisoners in the hallway outside his cell. He said he cooperated with the U.S. personnel and was not mistreated. He believes he was held in an Afghan detention center in the Shashdarak area of Kabul or at the Ariana Chowk CIA facility.

There is also some evidence that the United States detains people in Afghanistan who have been captured outside of the country. Pakistani officials told a reporter with *Time* that Khalid Shaikh Mohammed, an alleged al-Qaeda leader, was taken to Bagram air base after his arrest in Pakistan in March 2003.[74] Saifullah Paracha, a Pakistani man who was alleged to have connections to Shaikh Mohammed, was also taken to Afghanistan after he was arrested in Pakistan in July 2003, according to his wife, who received a letter from him delivered by the International Committee of the Red Cross.[75] (His son was also arrested by authorities in the United States.[76]) Part of the letter from Saifullah read:

> I am in Kabul with U.S. authorities. My health is OK. My blood pressure and sugar is controlled. Tell relatives about my welfare. . . . The Red Cross people do visit me [every] seven to 10 days. Reply me soon. You can send me fax. Get the number from Internet or ICRC.[77]

Saifullah reportedly remains in custody without charge.

---

[73] The information presented here is based on a Human Rights Watch interview with a former detainee on July 18, 2003, in Kabul. For security reasons, the person's name is withheld here.

[74] See "The Biggest Fish of Them All," Time Magazine, March 17, 2003.

[75] Zarar Khan, "Missing businessman in U.S. custody, wife says," Associated Press, September 4, 2003.

[76] Ibid.

[77] Ibid.

*Legal standards applicable to detention of civilians and combatants in Afghanistan*

International humanitarian law and human rights law provide protections to all persons taken into custody during situations of armed conflict. As discussed in the section "International Legal Context" below, since the establishment of the Karzai government, the ongoing fighting in Afghanistan is considered to be a non-international (internal) armed conflict under the Geneva Conventions. Persons arrested and detained during internal armed conflicts must be treated in accordance with Article 3 common to the 1949 Geneva Conventions, customary international humanitarian law, and the due process requirements of human rights law.

During an internal conflict, persons apprehended for taking part in armed conflict may be prosecuted for taking up arms against the government. This is different from the situation of an international armed conflict, where soldiers are normally entitled to the "combatant's privilege," which protects them from being prosecuted for taking part in the hostilities. This means that the Afghan government may prosecute persons apprehended during the current fighting for violations of Afghan law. But such prosecutions must be carried out by tribunals that meet international due process standards.[78]

Persons taken into custody who have not taken a direct part in the hostilities must be charged with a criminal offense or released. The protections of human rights law, in particular the rights to be charged with a criminal offense, have access to legal counsel, and be tried before an impartial and independent court, apply.[79] In a declared state of emergency, some due process requirements may be derogated, but such derogations must be "limited to the extent strictly required by the exigencies of the situation."[80] The

---

[78] Common article 3 of the Geneva Conventions provides that criminal sentences may not be imposed except by regularly constituted courts that afford "all the judicial guarantees which are recognized as indispensable by civilized people." Geneva Conventions of 1949, art. 3. Customary international humanitarian law incorporates many of the fair trial protections found in human rights law. Persons must be presumed innocent, be prosecuted by an independent and impartial court, be informed without delay of the charges against them, and they shall have the right and means of defense. See Protocol I, art. 75. See also International Covenant on Civil and Political Rights ("ICCPR"), opened for signature December 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976, and acceded to by Afghanistan January 24, 1983 and ratified by the United States on June 8, 1992), art. 14.

[79] ICCPR, arts. 9 and 14.

[80] The U.N. Human Rights Committee, the body that monitors compliance with the International Covenant on Civil and Political Rights, states in its commentary to article 4 on states of emergency, that limitations to derogation "relates to the duration, geographical coverage and material scope of the state of emergency and any measures of derogation resorted to because of the emergency. . . . [T]he

right to a fair trial by an independent and impartial court, for instance, may never be violated.[81]

Even if the United States maintains that an international armed conflict persists in Afghanistan (see International Legal Context section below), U.S. actions with regard to its detainees would remain contrary to international law. During international armed conflict, civilians may be detained for "imperative reasons of security," but they may not be held indefinitely without review. The Fourth Geneva Convention permits detention "only if the security of the Detaining Power makes it absolutely necessary."[82] Even then, the internee is entitled to have his internment reconsidered "as soon as possible" before an appropriate court or administrative board set up by the Detaining Power for that purpose. Thus, most of the standards applicable to non-international conflict are applicable even to international conflicts. By flaunting these standards, the United States is violating international law.

---

obligation to limit any derogations to those strictly required by the exigencies of the situation reflects the principle of proportionality which is common to derogation and limitation powers. Moreover, the mere fact that a permissible derogation from a specific provision may, of itself, be justified by the exigencies of the situation does not obviate the requirement that specific measures taken pursuant to the derogation must also be shown to be required by the exigencies of the situation." Human Rights Committee, General Comment 29, States of Emergency (art. 4), U.N. Doc. CCPR/C/21/Rev.1/Add.11 (2001), para. 4.

[81] Human Rights Committee, General Comment 29, para. 11.

[82] Fourth Geneva, art. 42.

## Mistreatment in Detention

### Bagram airbase

Human Rights Watch has received credible and consistent information about mistreatment of detainees at the Bagram detention facility. It also appears that during the first months after the United States set up the Bagram facility in late 2001, the treatment of detainees there was especially harsh.

Two detainees held in Bagram in March 2002 (who were later sent to the Guantanamo facility and ultimately released and repatriated) described to Human Rights Watch being held in a cell for several weeks, in a group, stripped to their undershirts and underwear.[83] According to the two men, bright lights were set up outside their cells, shining in, and U.S. military personnel took shifts, keeping the detainees awake by banging on the metal walls of their cells with batons. The detainees said they were terrified and disoriented by sleep deprivation, which they said lasted for several weeks. During interrogations, they said, they were made to stand upright for lengthy periods of time with a bright spotlight shining directly into their eyes. They were told that they would not be questioned until they remained motionless for one hour, and that they were not entitled even to turn their heads. If they did move, the interrogators said the "clock was reset." U.S. personnel, through interpreters, yelled at the detainees from behind the light, asking questions.[84]

Two more detainees held at Bagram in late 2002 told a *New York Times* reporter of being painfully shackled in standing positions, naked, for weeks at a time, forcibly deprived of sleep and occasionally beaten.[85]

A reporter with the *Associated Press* interviewed two detainees who were held in Bagram in late 2002 and early 2003: Saif-ur Rahman and Abdul Qayyum.[86]  Qayyum was

---

[83] The information here is gathered from interviews by Human Rights Watch with the two detainees in July 2003 and several interviews with a journalist who interviewed these detainees earlier. For security reasons, the names of the detainees are withheld.

[84] A journalist with a British Broadcasting Corporation Panorama program interviewed these two detainees in July 2003 about their experiences at Bagram and Guantanamo.   See "Inside Guantanamo," BBC-One program broadcast on October 5, 2003, transcript available at: http://news.bbc.co.uk/nol/shared/spl/hi/programmes/panorama/transcripts/insideguantanamo.txt

[85] See Carlotta Gall, "U.S. Military Investigating Death of Afghan in Custody," New York Times, March 4, 2003.

[86] Information about these cases is based on an article by an Associated Press journalist who interviewed the two in March 2003. See Kathy Gannon, "Prisoners released from Bagram forced to

arrested in August 2002; Rahman in December 2002. Both were held for more than two months. Interviewed separately, they described similar experiences in detention: sleep deprivation, being forced to stand for long periods of time, and humiliating taunts from women soldiers. Rahman said that on his first night of detention he was kept in a freezing cell for part of his detention, stripped naked, and doused with cold water. He believes he was at a military base in Jalalabad at this point. Later, at Bagram, he said U.S. troops made him lie on the ground at one point, naked, and pinned him down with a chair. He also said he was shackled continuously, even when sleeping, and forbidden from talking with other detainees. Qayyum and Rahman were linked with a local commander in Kunar province, Rohullah Wakil, a local and national leader who was elected to the 2002 loya jirga in Kabul, and who was arrested in August 2002 and remains in custody.

According to detainees who have been released, U.S. personnel punish detainees at Bagram when they break rules—for instance, talking to another prisoner or yelling at guards. Detainees are taken, in shackles, and made to hold their arms over their heads; their shackles are then draped over the top of a door, so that they can not lower their arms. They are ordered to stand with their hands up, in this manner, for two-hour intervals. According to one detainee interviewed who was punished in this manner, the punishment caused pain in the arms.[87]

In March 2003, Roger King, a U.S. military spokesman at Bagram, denied that mistreatment had occurred, but admitted the following:

> We do force people to stand for an extended period of time. . . . Disruption of sleep has been reported as an effective way of reducing people's inhibition about talking or their resistance to questioning. . . . They are not allowed to speak to each other. If they do, they can plan together or rely on the comfort of one another. If they're caught speaking out of turn, they can be forced to do things, like stand for a period of time—as payment for speaking out.[88]

---

strip naked, deprived of sleep, ordered to stand for hours," Associated Press, March 14, 2003. Human Rights Watch interviewed Gannon to confirm the accounts given here.

[87] Human Rights Watch interview with Ahmed Khan, Zurmat, Paktia, March 10, 2003.

[88] Gannon, "Prisoners released from Bagram forced to strip naked, deprived of sleep, ordered to stand for hours," March 14, 2003.

King also said that a "common technique" for disrupting sleep was to keep the lights on constantly or to wake detainees every fifteen minutes to disorient them.[89]

Several U.S. officials, speaking anonymously to the media, have admitted that U.S. military and CIA interrogators use sleep deprivation as a technique, and that detainees are sometimes kept standing or kneeling for hours in black hoods or spray-painted goggles, and held in awkward, painful positions.[90]

In March 2003, a U.S. official told a *New York Times* reporter that Omar Faruq, a detainee at Bagram who was allegedly close to Osama bin Laden, was subjected to interrogations at Bagram that were "not quite torture, but about as close as you can get." The official said that Faruq was fed very little and subjected to sleep and light deprivation and prolonged isolation and room temperatures ranging from 100 degrees to 10 degrees Fahrenheit (38 to -12 centigrade).[91]   The same month, U.S. officials told another *New York Times* reporter about interrogations of Abu Zubaydah, allegedly a senior al-Qaeda leader who was arrested in March 2003 and possibly held at Bagram. Abu Zubaydah was shot in the chest, groin, and thigh when he was captured in Pakistan in March, and, according to one official, interrogators later manipulated levels of pain medication for Abu Zubaydah while they were interrogating him.[92]    Military interrogators told the *Wall Street Journal:*

> "Interrogators can also play on their prisoners' phobias, such as fear of rats or dogs, or disguise themselves as interrogators from a country known to use torture or threaten to send the prisoners to such a place. Prisoners can be stripped, forcibly shaved and deprived of religious items and toiletries."[93]

---

[89] Ibid.

[90] See, e.g., Dana Priest and Barton Gellman, "U.S. Decries Abuse but Defends Interrogations; 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities," Washington Post, December 26, 2002.; Eric Lichtblau and Adam Liptak, "Questioning to Be Legal, Humane and Aggressive the White House Says," New York Times, March 4, 2003.

[91] Don Van Natta Jr. "A dark jail for Qaeda suspects; captives are deprived of sleep and sometimes chilled," The New York Times, March 10, 2003.

[92] Erich Lichtblau and Adam Liptak, "Questioning of Accused Expected to Be Humane, Legal and Aggressive," New York Times, March 4, 2003.

[93] Jess Bravin and Gary Fields, "How do Interrogators Make A Captured Terrorist Talk?," *Wall Street Journal*, March 4, 2003.

*Mistreatment in other facilities*

Human Rights Watch interviewed a Pakistani fighter with the Taliban who was held at the Kandahar airport in early 2002 and later taken to Guantanamo. He said he was beaten and kicked by U.S. troops in transport to Kandahar and while there.[94] He was released from Guantanamo in July 2003.

> [On the plane to Kandahar:] We were shackled and our eyes were covered so that we could not see anything. . . . [A]ll the handcuffed prisoners were forced to sit with their legs stretched and hands behind them and the whole body bent onto the legs all the way. [Demonstrates: kneeling but essentially sitting on top of his calves and feet, with torso bent down over the knees.]

> It was very difficult to remain in that position and if we fell to the side or moved, the armed men standing over our heads would beat us mercilessly with their army boots, kicking us in our back and kidneys. We were all beaten, without exception.

The man also said that he and other prisoners were beaten when they arrived in Kandahar:

> Our eyes were closed [blindfolded] while we were getting out of the helicopter at the Kandahar airbase. One man pulled me up by my arm and threw me down the stairs, and then made me to lie down on the ground with my face upward.

> We did not have the right to move, and if we did we were beaten. Other people were beaten. . . .

> When we were in Kandahar, we were not allowed to talk with each other and if we did, we were beaten and we were not allowed to sleep. For instance, if we were sleeping we were waken up or if we were covering our head with our bed cover we were beaten strongly.

---

[94] Human Rights Watch interview with M.S.M. (name withheld), Malakand district, Pakistan, January 3, 2004.

> They would kick and punch us. To tell you precisely they were behaving
> rudely with us.

The man also said that he and other prisoners were occasionally taken outside and
forced to lie on the frozen ground until they were numb with cold.[95]

Another Pakistani man, who was arrested in Pakistan by U.S. forces and taken to
Kandahar in early 2002 (he was later sent to Guantanamo and was released in 2003), said
he was beaten during an interrogation at Kandahar:

> My hands were handcuffed in my back. There I was beaten for the first
> time by the Americans. They made me lie down on a table with my face
> down, while two persons held me, one at my neck and the second at my
> feet. Both pressed me down hard on the table, and two others beat me
> on my back, my thighs and my arms with punches and their elbows.
> The beating lasted five or six minutes. Then the interrogations started
> and lasted for half an hour. I was standing the whole time.[96]

The man said he was beaten again at Kandahar in a holding cell, along with other
prisoners, before being taken to Guantanamo.

Persons taken into custody after a raid in January 2002 provided other details of
mistreatment at the Kandahar airbase. On the night of January 24, 2002, U.S. forces
attacked two government buildings in Khas Uruzgon, a small village in eastern Uruzgon
province, and mistakenly killed several anti-Taliban fighters who were assisting U.S.
forces.[97]   U.S. forces destroyed a school in the attack, killing 19 soldiers and Afghan

---

[95] James Meek, a reporter with the Guardian (U.K.), interviewed this detainee and others held in
Kandahar at the same time. Their stories were consistent, including being beaten and forced to lie on
the frozen earth. See James Meek, "People The Law Forgot," The Guardian, December 3, 2003. See
also Gannon, "Prisoners released from Bagram forced to strip naked, deprived of sleep, ordered to
stand for hours," March 14, 2003 (including allegations by a detainee at Jalalabad who was forced to
lie outside in a puddle of frozen water).

[96] Human Rights Watch interview with A.Z. (name withheld), North West Frontier Province,
Pakistan, February 6, 2004.

[97] The information about this account is based on the following interviews: Human Rights Watch
interview with A.M.S., resident of Khas Uruzgon, Kabul, February 23, 2003. Human Rights Watch
interview with R.H.M., resident of Khas Uruzgon; Kabul, February 23, 2003; Human Rights Watch
telephone interview with an international journalist who visited Uruzgon village on January 27, 2002,
February 20, 2003; Human Rights Watch interview with international journalist who visited Uruzgon

government employees who were with them. U.S. forces took into custody twenty-seven anti-Taliban fighters and government workers and transferred them to Kandahar airbase, where they were held for several days.

Several of these detainees said that they were kicked and punched repeatedly by U.S. forces after they arrived, and suffered broken bones that went untreated. Several were beaten until they were unconscious. Among those beaten was an elderly man, who had his hand broken. Others reported being kicked in their ribs and heads.[98]

At the scene of the attack, local residents found two dead Afghan soldiers with their hands bound with plastic ties similar to those commonly used by U.S. troops. They had apparently died from gunshot wounds to the torso. Residents were unable to determine whether they had been bound before they were killed or whether they were wounded, bound, and then subsequently died. The deaths raise serious issues that the U.S. military should fully investigate. If the men were intentionally killed after their capture, the killing would amount to an extrajudicial execution and violation of the laws of war. If the men received their injuries before being captured, then it may have been unlawful for the U.S. forces to leave them bound without providing them proper medical attention.[99] That the U.S. forces were able to take some two dozen persons into custody suggests that they would have been fully capable of taking the other two for medical treatment.

After the Khas Uruzgon detainees were released, U.S. officials visited Uruzgon and apologized to elders there, and gave out $1,000 to the families of persons who had been killed in the raid. Those who were mistreated by U.S. forces received nothing.[100]

---

village in early February 2002, February 5, 2004. See also Craig Smith, "U.S. Account Of a Battle with Taliban is Disputed," New York Times, January 27, 2002; Eric Schmitt and Thom Shanker, "U.S. Releasing 27 Captured in Raid," New York Times, February 7, 2002.

[98] See preceding note. See also Carlotta Gall, "Released Afghans Tell of Beatings," New York Times, February 11, 2002; Ellen Knickmeyer, "Survivors of raid by U.S. forces say victims were among America's best friends," Associated Press, February 6, 2002; Molly Moore, "Villagers Released by American Troops Say They Were Beaten, Kept in 'Cage,'" Washington Post, February 11, 2002; Eric Slater, "U.S. Forces Beat Afghans After Deadly Assault, Ex-Prisoners Say," Los Angeles Times, February 11, 2002.

[99] See Second Geneva Convention, art 3 ("The wounded . . . shall be collected and cared for"); art. 12 (Wounded belligerents who fall into enemy hands "shall be treated humanely and cared for . . . . Only urgent medical reasons will authorize priority in the order of treatment to be administered").

[100] A CIA spokesman acknowledged to CNN that the agency sent its personnel to Uruzgon to provide payment. See "CIA pays victims of commando raid," February 6, 2002, available at: http://www.cnn.com/2002/US/02/06/ret.detainees.released/

On March 17, 2002, U.S. forces raided a compound in Sangesar, a village near Kandahar, and arrested more than thirty anti-Taliban fighters, apparently by mistake.[101]  The detainees were taken to the Kandahar airport.[102] According to the detainees, hoods were placed over their heads and they were "thrown down," face first, onto rocky ground. Many said they were kicked in the back by U.S. forces.  One witness, with a bruised arm, said he was held by the feet and head and kicked repeatedly in the back.  Another man, who still had a black eye when he was interviewed three days after being released, said, "They picked me up and threw me down on the rocks. It was painful. I couldn't rest on my chest. When I moved they kicked me."[103]  The detainees also said they were punished for talking to each other, by being made to kneel with their hands behind their heads for extended periods, and were kicked when they moved.

A photojournalist who accompanied Special Forces and soldiers from the U.S. 82nd Airborne during operations in eastern Afghanistan in July 2002 told Human Rights Watch that Special Forces referred to the Kandahar airbase as "Camp Slappy," and that U.S. forces would threaten uncooperative persons encountered during raids, suggesting that they might be sent there: "We tell them they can either cooperate or go to Camp Slappy," a Special Forces soldier told the journalist.[104]

Recent complaints received by the Gardez office of the AIHRC about U.S. forces in the Gardez area include the following, from Zurmat district in Paktia province, alleging that

---

[101] Information about this case is based on a telephone interview with a journalist who interviewed the detained men, February 4, 2004, and the news story that journalist filed. See Charles J. Hanley, "Finally freed, Afghans say they were kicked and abused in U.S. hands," Associated Press, March 23, 2002.

[102] This case was discussed in a Department of Defense briefing on March 20, 2002 in Washington D.C.  At that briefing, a military spokesman, Brig. Gen. John W. Rosa Jr., said: "We went to the compound—no shots were fired—found out who these folks were, temporarily detained them. We never processed them and they never became detainees. But no shots were fired, and those folks were released."  This statement was false. Several journalists were told by officials in Afghanistan that the men were still in custody, and were not released until March 21. See Hanley, "Finally freed, Afghans say they were kicked and abused in U.S. hands," March 23, 2002.

[103] See Hanley, "Finally freed, Afghans say they were kicked and abused in U.S. hands," March 23, 2002.

[104] Human Rights Watch telephone interview with Tomas van Houtryve, February 3, 2004.  See also Tomas van Houtryve, "Prisoners of America," International Relations Journal, San Francisco State University, Spring 2003.

five residents there were arrested and tortured by U.S. forces (this case is currently being investigated by the AIHRC):

> November 29, 2003, Ezzat Kheil village: "The compound was bombarded by coalition forces from Bagram at 2 a.m., damaging the compound and terrifying and frightening women and children in the middle of the night . . . . Five residents of the village were arrested and released after six days; they had been subjected to torture and two of them were injured."

Human Rights Watch has learned that U.S. forces routinely hold Afghans at the local airport in the eastern city of Jalalabad. However, former detainees there refused to speak in detail with Human Rights Watch about their experiences in U.S. detention. One told Human Rights Watch:

> We were treated absolutely terribly there. They did terrible things to us, things we'll never forget. It was absolutely awful what they did. . . . We absolutely cannot talk about it. We don't want to talk about it with you. We have made our agreements not to talk, and we won't talk about it.[105]

*     *     *     *     *

The treatment of detainees at Bagram seems to have become more standardized and professional since 2002, though the absence of access to detainees makes it difficult to determine whether conditions have significantly improved. Human Rights Watch interviewed several persons detained at the military facility at Bagram in 2003. According to these accounts, persons arrested are usually blindfolded, hooded, and shackled during the trip to Bagram, which is normally by helicopter.[106] Once at Bagram, detainees are taken to a room, separated from other persons who were detained with them, and then stripped and photographed. Samples of hair and skin flakes are taken, presumably to collect for a DNA database. Detainees are then instructed, through interpreters, about the rules of Bagram, which include restrictions on talking with other detainees. They are then shackled and taken to cells, where they are held during the

---

[105] Human Rights Watch interview with two Afghan men (names withheld), Jalalabad, May 8, 2003.

[106] International law permits security forces to use measures during transportation of arrested persons, such as blindfolds and shackling, that would not normally be permitted once a detainee is at a detention facility. However, these measures can amount to cruel, inhumane or degrading treatment—especially if they are used intentionally to cause pain or suffering.

periods they are not being interrogated. They are given bottles of water and fed in the cells. Except during interrogations, the detainees are shackled, even while sleeping.

Human Rights Watch has not been able to locate or interview anyone who has been held at the Bagram CIA facility. Human Rights Watch researchers spoke with one detainee held in Kabul city who was interrogated by U.S. officials who were likely CIA personnel (as mentioned in the Arbitrary Detention section above).

### Detainees held by Afghan forces

Human Rights Watch is extremely concerned about the treatment of the hundreds of Afghans alleged to be from Taliban, Hezb-e Islami, or other anti-Coalition forces held under the auspices of the Afghan military and intelligence authorities. In past reports Human Rights Watch has documented numerous cases of torture, beatings, and other mistreatment of persons in the custody of local Afghan military officials.[107] Recently, for instance, there have been credible reports from human rights monitors in Kandahar that "Taliban prisoners" are repeatedly and severely beaten by the Afghan soldiers holding them. A monitor who met with some prisoners there said: "We have come across this repeatedly. It is an ordinary thing. We know about this. We visit the prisons."[108]

In the northern city of Shiberghan, approximately one thousand detainees—alleged Taliban combatants and foreign fighters captured with them—are being held at a facility under the control of Afghan General Abdul Rashid Dostum, a member of the Karzai government and the commander of a predominately Uzbek militia, Junbish-e Melli. According to human rights monitors in Kabul, CIA and U.S. military interrogators have access to these detainees and others held by Afghan forces across the country.[109] According to officials in the Pakistan government, the United States has resisted efforts by the Afghan and Pakistani governments to screen the detainees for release.

---

[107] Human Rights Watch, "All Our Hopes are Crushed: Violence and Repression in Western Afghanistan," *A Human Rights Watch Short Report,* vol. 14, no. 7(C), October 2002, available at http://hrw.org/reports/2002/afghan3/herat1002-06.htm#P997_155129, section IV entitled "Torture and Arbitrary Arrests"; Human Rights Watch, "Killing You Is a Very Easy Thing For Us: Human Rights Abuses in Southeast Afghanistan," *A Human Rights Watch Short Report,* vol. 15, no. 5(c), July 2003, available at http://www.hrw.org/reports/2003/afghanistan0703/.

[108] Human Rights Watch telephone interview with human rights monitor in Kandahar, October 15, 2003.

[109] Human Rights Watch interview with a human rights monitor, Kabul, December 17, 2003.

Officials with UNAMA and the Afghan Human Rights Commission have visited Afghan military detention facilities in several provinces and expressed concerns to Human Rights Watch about the treatment of prisoners, including their belief that prisoners have, in some cases, been subjected to torture.[110]  U.S. military and CIA in Afghanistan are aware of these facilities' existence: U.S. forces regularly work with local forces during military operations that result in the arrests of persons who are put in Afghan military custody.

### Deaths in U.S. custody

Two Afghans died while in detention at Bagram airbase in December 2002.[111]  Both deaths were ruled homicides by U.S. military doctors who performed autopsies.

One of the prisoners, Dilawar, aged 22 and from near Khost city in southeastern Afghanistan, died on December 10, 2002 from "blunt force injuries to lower extremities complicating coronary artery disease," according to his death certificate prepared by a military pathologist, which was obtained by the *New York Times*.[112]  The other detainee, Mullah Habibullah, aged approximately 30 years and from the southern province of Oruzgan, died earlier, on December 3, 2002.  A military spokesman at Bagram confirmed to reporters from the *New York Times* that Mullah Habibullah's death was ruled a homicide by a military pathologist, the cause being "pulmonary embolism [blood clot in the lungs] due to blunt force injury to the legs."[113]  Both military pathologists, when contacted by Human Rights Watch in November and December 2003, turned down requests to be interviewed.

---

[110] These concerns have been cited in correspondence and telephone conversations between Human Rights Watch and staff from the United Nations Mission in Afghanistan and the Afghan Independent Human Rights Commission.  For a more detailed description of military detention sites and ordinary criminal jails and prisons in Afghanistan see Human Rights Watch, "Killing You Is a Very Easy Thing For Us," n. 9 and accompanying text.

[111] See Carlotta Gall, "U.S. Military Investigating Death of Afghan in Custody," New York Times, March 4, 2003.  Information about these cases is also based on extensive conversations with journalists who have researched the cases and requested information from U.S. military spokespeople in Kabul during 2003.

[112] The death certificate was signed by a military pathologist named Dr. Elizabeth A. Rouse.  Diliwar's family have insisted to reporters from the BBC and the New York Times that Diliwar was a civilian— a taxi driver and farmer.  See Gall, "U.S. Military Investigating Death of Afghan in Custody," March 4, 2003; and "Inside Guantanamo," BBC-One program, October 5, 2003.

[113] The spokesman told reporters that the military pathologist who performed the autopsy was named Dr. Kathleen Ingwersen.

Military officials at Bagram said in March 2003 that the military had launched an investigation into the deaths. But as of this writing in February 2004, they have not announced any results.

In June 2003, another Afghan died at a detention site near Asadabad, in Kunar province.[114] U.S. military officials in Afghanistan and in the United States have refused to provide any details about this death.

Human Rights Watch has written repeatedly in 2003 and 2004 to officials in the U.S. Central Command (CENTCOM) and the U.S. Army Criminal Investigation Command (which CENTCOM officials have said is responsible for the Bagram investigation) asking for information about all three of the detainee deaths. Officials from both offices have replied and stated that the investigation into the Bagram deaths is ongoing and that no information is available. As for the Asadabad death, both offices have refused to release any information at all—not even a statement that an investigation is ongoing.

### Legal standards applicable to physical treatment of detainees

The prohibition against the ill treatment and torture of detainees is fundamental to both international humanitarian and human rights law. Common article 3 to the 1949 Geneva Conventions prohibits torture, cruel treatment, and "outrages upon personal dignity, in particular humiliating and degrading treatment." The "Fundamental Guarantees" under Protocol I of 1977 to the Geneva Conventions, generally accepted as customary international law in non-international as well as international armed conflicts, likewise prohibit "at any time and in any place whatsoever . . . torture of all kinds, whether physical or mental."[115] Human rights law similarly prohibits torture and other cruel, inhuman, or degrading treatment or punishment.[116] The prohibition against torture and other mistreatment is in effect at all times, and cannot be derogated from during a state of emergency.[117]

---

[114] April Witt, "U.S. Probes Death of Prisoner in Afghanistan," Washington Post, June 24, 2003.

[115] Protocol I (1977) Additional to the Geneva Conventions of 1949 ("Protocol I"), art. 75.

[116] See generally the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention against Torture"), G.A. Res. 39/46, annex, 39, U.N. Doc. A/39/51 (entered into force June 26, 1987; ratified by Afghanistan April 1, 1987 and by the United States on October 21, 1994). See also ICCPR, art. 7.

[117] ICCPR, art. 4(2).

While international law permits the discipline and punishment of prisoners who break reasonable rules, such punishment must be determined by law or imposed by a competent administrative authority, and may not amount to torture or other mistreatment.[118]

There is no clear line separating some types of permissible interrogation techniques from unlawful mistreatment.[119] Each case must be assessed on its own merits. To conform to the letter and spirit of international law, detaining forces should err on the side of caution and constantly evaluate their methods. A practice that is acceptable in one context can be abusive in other circumstances; for instance, allowable day-long questioning of a detainee, when continued overnight and into the following day, can become impermissible sleep deprivation.

Prolonged shackling of detainees violates international law prohibitions against mistreatment, and can amount to torture. The Special Rapporteur on Torture has repeatedly and in various contexts identified shackling for lengthy periods as an example of a torture practice.[120] The U.N. Secretary General has also referred to shackling as an example of a prohibited method of torture.[121]

---

[118] ICCPR, art. 10 ("All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person"); United Nations Standard Minimum Rules for the Treatment of Prisoners, adopted August 30, 1955, by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, U.N. Doc. A/CONF/611, annex I, E.S.C. res. 663C, 24 U.N. ESCOR Supp. (No. 1) at 11, U.N. Doc. E/3048 (1957), amended E.S.C. res. 2076, 62 U.N. ESCOR Supp. (No. 1) at 35, U.N. Doc. E/5988 (1977), paragraphs 28-32

[119] See Nigel Rodley, *The Treatment of Prisoners Under International Law* (Clarendon Press, Oxford: 1999), p. 105 ("[T]he borderline between 'other ill-treatment' and treatment falling outside the prohibition altogether cannot be precisely drawn.").

[120] Report of the Special Rapporteur on Torture, Mr. Nigel S. Rodley, "Question of the Human Rights of All Persons Subjected to Any Form of Detention or Imprisonment, in Particular: Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," U.N. Doc. E/CN.4/1998/38, submitted 24 December 1997 pursuant to Commission on Human Rights resolution 1997/38, (Yemen, para. 200) ("The methods of torture reported included…shackling for lengthy periods…"); Report of the Special Rapporteur on Torture, Mr. Nigel S. Rodley, "Question of the Human Rights of All Persons Subjected to Any Form of Detention or Imprisonment, in Particular: Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," U.N. Doc. E/CN.4/1996/35/Add.1, submitted 16 January 1996 pursuant to Commission on Human Rights Resolution 1995/37, (China, para. 104) ("The methods of… torture reportedly include handcuffing or shackling for long periods…."); Report of the Special Rapporteur on Torture, Mr. Nigel S. Rodley, "Question of the Human Rights of All Persons Subjected to Any Form of Detention or Imprisonment, in Particular: Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," U.N. Doc. E/CN.4/1995/34, submitted 12 January 1995 pursuant to Commission on

Prolonged sleep deprivation and exposure to cold may also violate international law prohibitions against mistreatment, and can amount to torture.    The U.S. State Department, in its "Country Reports on Human Rights Practices," has repeatedly listed prolonged sleep deprivation and exposure to cold as examples of practices amounting to mistreatment and torture.  (See Appendix.)

---

Human Rights Resolution 1992/32, (China, para. 91) ("Among the most common methods of torture reported were… shackling with handcuffs or leg-irons, often tightly and with the victim's body in a painful position.").

[121] See, e.g., United Nations Secretary-General, "Human Rights Questions: Human Rights Situations and Reports of Special Rapporteurs and Representatives, Situation of human rights in Myanmar; Note by the Secretary-General," (1994), A/49/594, para. 13 ("Numerous allegations . . . have been received from various sources alleging that forces of the Myanmar military, intelligence and security services and police continue to torture persons in detention or otherwise subject them to cruel, inhuman or degrading treatments and punishments. . . . Allegations include subjection to . . . shackling. . . .").

## IV. International Legal Context

International humanitarian law binds all of the parties to the military conflict in Afghanistan, including non-state armed groups, Afghan government forces, and the United States and coalition forces. Fundamentally, it imposes upon these warring parties legal obligations to reduce unnecessary suffering and protect civilians and other non-combatants. However, the specific legal context of conflict in Afghanistan and the specific applicable rules of international humanitarian law have changed over time.

The war between the United States and Afghanistan started at least by October 6, 2001, when U.S. air attacks on Afghanistan began. This war was an *international* armed conflict—a conflict between opposing states. The law applicable to international conflicts includes the four Geneva Conventions of 1949, to which Afghanistan and the United States are party,[122] and the Hague Regulations of 1907, which are commonly accepted as customary international law.[123]

On December 22, 2001, power was transferred to an Interim Authority as the sovereign power of Afghanistan, chaired by Hamid Karzai and established by the December 5, 2001 Bonn Agreement, endorsed by U.N. Resolution 1383 (2001).[124] Six months later, Hamid Karzai was elected by an Afghan loya jirga to the presidency of the transitional administration of Afghanistan; he was inaugurated on June 19, 2002.

As of June 19, 2002, and possibly as early as December 22, 2001, the international armed conflict between the United States and Afghanistan concluded. Since the end of the international conflict, hostilities have been part of a *non-international* (also referred to as an

---

[122] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention), 75 U.N.T.S. 31, entered into force Oct. 21, 1950; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (Second Geneva Convention), 75 U.N.T.S. 85, entered into force Oct. 21, 1950; Geneva Convention relative to the Treatment of Prisoners of War (Third Geneva Convention), 75 U.N.T.S. 135, entered into force Oct. 21, 1950; Geneva Convention relative to the Protection of Civilian Persons in Time of War (Third Geneva Convention), 75 U.N.T.S. 287, entered into force Oct. 21, 1950.

[123] Convention (IV) respecting the Laws and Customs of War on Land of 1907 (Hague Regulations), 3 Martens Nouveau Recueil (ser. 3) 461, 187 Consol. T.S. 227, entered into force Jan. 26, 1910.

[124] According to the Bonn Agreement, art. 1: "An Interim Authority shall be established upon the official transfer of power on 22 December 2001. . . ." Art. 3: "Upon the official transfer of power, the Interim Authority shall be the repository of Afghan sovereignty, with immediate effect." See Agreement on Provisional Arrangements in Afghanistan Pending the Re-Establishment of Permanent Government Institutions, Bonn, Germany, signed December 5, 2001.

*internal)* armed conflict. U.S. forces in Afghanistan are now operating in the country with the acquiescence of the Karzai government, and hostilities fall under provisions of the Geneva Conventions applicable to *non-*international armed conflict. The primary law applicable to non-international armed conflicts is article 3 common to the Geneva Conventions. Protocol II to the Geneva Conventions, applicable to non-international conflicts, has not been ratified by Afghanistan or the United States, but most if not all of its provisions are recognized as customary international law and are therefore also applicable.[125] In addition, certain provisions of Protocol I, including many of those concerned with the protection of the civilian population, are also recognized as reflective of customary international law and are also applicable.[126]

During a non-international armed conflict, international humanitarian law as the *lex specialis* (specialized law) takes precedence, but does not replace, human rights law. Persons under the control of a party to an internal armed conflict must be treated in accordance with international humanitarian law. But where that law is absent, vague, or inapplicable, human rights law standards still apply. Human rights law includes, among other things, the International Covenant on Civil and Political Rights[127] and the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment,[128] both of which have been ratified by the United States and Afghanistan.

Human rights standards applicable to military and police forces who are carrying out law enforcement or investigative operations—including arrests and searches—include the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the U.N. Code of Conduct for Law Enforcement Officials.[129] These standards apply to military forces when they are operating in a law enforcement context.[130]

---

[125] Protocol II (1977) Additional to the Geneva Conventions of 1949 ("Protocol II").

[126] Protocol I (1977) Additional to the Geneva Conventions of 1949 ("Protocol I").

[127] International Covenant on Civil and Political Rights (ICCPR), opened for signature December 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976, and acceded to by Afghanistan January 24, 1983 and ratified by the United States on June 8, 1992).

[128] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, annex, 39, U.N. Doc. A/39/51 (entered into force June 26, 1987; ratified by Afghanistan April 1, 1987 and by the United States on October 21, 1994).

[129] U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, U.N. Doc. A/CONF.144/28/Rev.1 (1990); U.N. Code of Conduct for Law Enforcement Officials, G.A. res. 34/169, annex, 34 U.N. GAOR Supp. (No. 46) at 186, U.N. Doc. A/34/46 (1979), adopted by the U.N. General Assembly on December 17, 1979.

[130] Ibid. In accordance with the commentary to article 1 of the Code of Conduct for Law Enforcement Officials, in countries where police powers are exercised by military authorities. whether

## V. Conclusions

This report raises serious concerns regarding the actions of U.S. forces in Afghanistan, specifically with regard to the use of excessive force during arrests; arbitrary or mistaken arrests and indefinite detention; and mistreatment in detention:

- U.S. forces regularly use military means and methods during arrest operations in residential areas where law enforcement techniques would be more appropriate. This has resulted in unnecessary civilian casualties and may in some cases have involved indiscriminate or disproportionate force in violation of international humanitarian law.

- Members of the U.S. armed forces have arrested numerous civilians not directly participating in the hostilities and numerous persons whom U.S. authorities have no legal basis for taking into custody. These cases raise serious questions about the intelligence gathering and processing that leads to arrests and call into question the practice of arresting any and sometimes all Afghan men found in the vicinity of U.S. military operations.

- Persons detained by U.S. forces in Afghanistan are held without regard to the requirements of international humanitarian law or human rights law. They are not provided reasons for their arrest or detention. They are held virtually incommunicado without any legal basis for challenging their detention or seeking their release. They are held at the apparent whim of U.S. authorities, in some cases for more than a year.

- The general lack of due process within the U.S. detention system violates both international humanitarian law and basic standards of human rights law. The United States, as a detaining power in Afghanistan, is essentially applying no legal principles to the persons whom they detain in Afghanistan. Simply put, the United States is acting outside the rule of law. There are no judicial processes restraining their actions in arresting persons in Afghanistan. The only real legal limits on their activities are self-imposed, and there is little evidence that the Department of Defense has seriously investigated allegations of abuses or mistreatment at Bagram, and the department has most certainly not sought on its own to correct the legal deficiencies of its detention regime.

uniformed or not, or by state security forces, the definition of law enforcement officials shall be regarded as including officers of such services.

- There are serious concerns regarding the treatment of detainees at Bagram airbase, particularly in light of the failure of the United States to investigate and publicly report on several unexplained deaths in detention. There is credible evidence of beatings and other physical assaults of detainees, as well as evidence that the United States has used prolonged shackling, exposure to cold, and sleep deprivation amounting to torture or other mistreatment in violation of international law. Neither the U.S. Department of Defense nor the CIA has adequately responded to allegations of mistreatment at U.S. detention facilities in Afghanistan.

## VI. Recommendations

**To the United States Government:**

*Detention*

- Publicly identify all places in Afghanistan where the United States, including the CIA, is holding persons in detention. The CIA should transfer all detainees under its control to U.S. military or Afghan detention facilities or release them. In the event that the International Committee of the Red Cross does not have access to all detainees under U.S. control, permit full access immediately.

- Ensure that all detainees are treated in accordance with international human rights law and international humanitarian law applicable to non-international armed conflicts. As the sovereign authority, the Afghan government is ultimately responsible for protecting the legal rights of those detained by the United States. The United States must take immediate measures in conjunction with the Afghan Ministry of the Interior to ensure that detainees at Bagram airbase and other U.S. detention sites are charged and prosecuted, or released, in accordance with international due process standards. This includes access to counsel, and the right to a fair and public trial before a competent, impartial, and independent court.

- Permit families of detainees, and those providing legal assistance, to visit detainees.

- Abide fully with U.S. obligations as a party to the Convention against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment. Prohibit all interrogation techniques that cause physical or mental suffering. Cease practices, such as shackling and sleep deprivation, if they rise to the level of mistreatment. End incommunicado detention practices that facilitate mistreatment.

- Fully and impartially investigation allegations of mistreatment of detainees in detention at all U.S. facilities in Afghanistan and make public the results of those investigations.

- In particular, release the results of investigations into detainee deaths at Bagram and Asadabad military bases. Take disciplinary or criminal action as appropriate against all personnel responsible for mistreating or otherwise violating the rights of detainees.

*Military Operations and Law Enforcement*

- In all circumstances comply with international humanitarian law standards to protect civilians against the dangers arising from military operations. These include prohibitions on attacks against civilians and civilian objects, indiscriminate attacks, and attacks that cause harm to civilians or civilian objects that are excessive in relation to the anticipated military advantage.

- Take all precautionary measures during military operations, including: taking all feasible steps to verify that objectives to be attacked are not civilian but military; taking all feasible precautions in the choice of means and methods of attack to avoid or minimize harm to civilians and civilian objects; and canceling or postponing an attack where it becomes apparent the objective or target is not a military one or where civilian loss would be disproportionate. The United States must give particular attention to these standards during operations carried out in residential areas that have not been the scene of military action.

- Revise as necessary standing Rules of Engagement for Afghanistan to ensure that in law enforcement situations, the U.S. armed forces and CIA forces abide by international standards on the use of force by law enforcement officials. For instance, indiscriminate suppressing fire should not be used in law-enforcement type operations.

- In law enforcement situations, military forces should abide by the standards set forth in the United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the U.N. Code of Conduct for Law Enforcement Officials. U.S. forces deployed in such situations must be provided with the equipment and training necessary for this purpose. It is also necessary to have sufficient and appropriate interpreters to communicate with the local population. Applicable standards provide in part:

  o In law enforcement operations, non-violent means shall be applied, as far as possible, before resorting to the use of force and firearms. Force and firearms may only be used if other means remain ineffective or without any promise of achieving the intended result.

  o Whenever the lawful use of force and firearms is unavoidable, restraint must be exercised in their use and in proportion to the seriousness of the offence and the legitimate objective to be achieved. Force used

must minimize damage and injury, and respect and preserve human life. Injured persons must receive medical aid and have their family notified at the earliest possible moment.

o   Firearms shall not be used against persons except: in self-defense or defense of others against the imminent threat of death or serious injury, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger and resisting their authority, or to prevent escape, and only when less extreme means are insufficient to achieve these objectives. In any event, intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life.

o   It must be ensured that firearms are used only in appropriate circumstances and in a manner likely to decrease the risk of unnecessary harm. Prohibited are the use of those firearms and ammunition that cause unwarranted injury or present an unwarranted risk.

• U.S. forces should, in all instances, take all appropriate steps to prevent or stop Afghan forces deployed with or under the command of U.S. forces from committing violations of international human rights and humanitarian law. Those who do should be turned over to the proper Afghan authorities for disciplinary action or criminal prosecution.

### To President Hamid Karzai and the Afghan Government:

• Ensure, through the Ministry of the Interior, that the Afghan justice system applies to all persons detained in the country, including those held by U.S. forces at Bagram airbase and other detention facilities. Work with the United States to ensure that the fundamental rights of all detainees are respected.

• Thoroughly and impartially investigate all allegations of criminal offenses and violations of the laws of war by Afghan military forces and militias, and take appropriate disciplinary and criminal action against those responsible.

• Pressure the United States government to ensure that all forces operating in Afghanistan uphold international humanitarian law and human rights law.

## Appendix: U.S. Criticisms of Mistreatment and Torture Practices

The U.S. State Department has condemned as torture or other inhuman treatment many of the treatments and techniques described in this report and used by U.S. personnel in Afghanistan. Listed below are reports from 2000, 2001, and 2002 in the U.S. State Department's annual "Country Reports on Human Rights Practices."

| Country | Methods Used: |
|---------|---------------|
| **Burma** | According to a State Department country report, the Burmese military "routinely subjected detainees to harsh interrogation techniques designed to intimidate and disorient."[131] Techniques listed include being forced to squat or remain in uncomfortable periods for long periods of time, sleep and food deprivation, confinement in leg clamps, and prolonged questioning under bright lights.[132] |
| **Cambodia** | The State Department reported that "torture, beatings, and other forms of physical mistreatment of persons held in police or military custody continued to be a serious problem throughout the country."[133] In particular, the State Department noted that "there were credible reports that both military police and police officials used physical and psychological torture and severely beat criminal detainees, particularly during interrogation."[134] It also noted reports of shackling of prisoners. |
| **Cameroon** | The State Department reported that "security forces continued to subject prisoners and detainees to degrading treatment," which included stripping of inmates.[135] |
| **China** | The State Department reported that "police and other elements of the security apparatus employed torture and degrading treatment in dealing with some detainees and prisoners" including prolonged periods of solitary confinement, incommunicado detention, beatings, and shackling.[136] Reports noted that the practice of shackling hands and feet constituted torture.[137] |

---

[131] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Burma), Sect. 1(c).

[132] Ibid.

[133] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Cambodia), Sect. 1(c).

[134] Ibid.

[135] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Cameroon), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Cameroon), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Cameroon), Sect. 1(c).

[136] U.S. State Department, *2002 Country Reports on Human Rights Practices* (China (including Tibet, Macau and Hong Kong), Sect. 1(c).

| Country | Methods Used: |
|---------|---------------|
| Egypt | The State Department noted that "there were numerous, credible reports that security forces tortured and mistreated citizens."[138]  The country reports cite the stripping, handcuffing, being doused with cold water, and blindfolding of prisoners among the principal methods of torture used by Egyptian authorities.[139] |
| Greece | In a 2002 report, the State Department described kicks, blows the hands, fists, batons or other objects and excessive force at the time of arrest as "ill treatment."[140] |
| Iran | According to the State Department "there were numerous credible reports that security forces and prison personnel continued to torture detainees and prisoners."[141] Common methods of torture include sleep deprivation and "suspension for long periods in contorted positions."[142]  The State Department further noted that systematic abuses included "prolonged and incommunicado detention."[143] |
| Iraq | Iraqi security services used extended solitary confinement in small dark compartments as a form of torture, according to 2001 and 2002 reports.[144]  Reports from 2000, 2001, and 2002 also cite the use of prolonged and incommunicado detention and the continual denial of citizens' "basic right to due process."[145] |

[137] Ibid.

[138] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Egypt), Sect. 1(c).

[139] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Egypt), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Egypt), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Egypt), Sect. 1(c).

[140] U.S State Department, *2002 Country Reports on Human Rights Practices* (Greece), Sect. 1(c).

[141] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Iran), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Iran), Sect. 1(c).

[142] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Iran), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Iran), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Iran), Sect. 1(c).

[143] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Iran), Sect. 1(d).  The practice of incommunicado detentions was continued in 2001 and 2002.  U.S. State Department, *2001 Country Reports on Human Rights Practices* (Iran), Sect. 1(d); *2002 Country Reports on Human Rights Practices* (Iran), Sect. 1(d).

[144] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Iraq), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Iraq), Sect. 1(c).

[145] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Iraq), Sect. 1(d). The practice of incommunicado detentions was continued in 2001 and 2002. U.S. State Department, *2001 Country Reports on Human Rights Practices* (Iraq), Sect. 1(d); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Iraq), Sect. 1(d).

| Country | Methods Used: |
|---------|---------------|
| Jordan | The State Department reports that Jordanian police and security forces were alleged to engage in acts of torture, including the use of sleep deprivation, solitary confinement, and prolonged suspension with ropes in contorted positions.[146] |
| North Korea | The State Department stated that methods of torture "routinely" employed in North Korea include "severe beatings . . . prolonged periods of exposure, humiliations such as public nakedness, and confinement to small 'punishment cells', in which prisoners were unable to stand upright or lie down, where they could be held for several weeks."[147]  The State Department characterized the use of leg irons, metal collars, and shackles as "harsh".[148] |
| Kuwait | According to the State Department reports, "there continued to be credible reports that some police and members of the security forces abused detainees during interrogation."[149]  Abusive treatment included blindfolding and verbal threats.[150] |
| Laos | The State Department reported that prisoners were subjected to "torture and other abuses" including "beatings, long-term solitary confinement in completely darkened rooms . . . .  In some cases detainees were held in leg chains or wooden stocks".[151] |
| Libya | According to the State Department, Libyan authorities commonly chain detainees to a wall or hang them by their wrists for hours and deprive them of food and water.[152]  The State Department stated that "[t]he Government's human rights record remained poor, and it continued to commit numerous serious abuses," examples of which included holding prisoners incommunicado.[153] |

[146] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Jordan), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Jordan), Sect. 1(c).

[147] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Democratic People's Republic of Korea), Sect. 1(c).

[148] Ibid.

[149] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Kuwait), Sect. 1(c).U.S. State Department, *2001 Country Reports on Human Rights Practices* (Kuwait), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Kuwait), Sect. 1(c);

[150] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Kuwait), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Kuwait), Sect. 1(c).

[151] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Laos), Sect. 1(c).

[152] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Libya), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Libya), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Libya), Sect. 1(c).

[153] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Libya), Sect. 1(d).  The practice of incommunicado detentions was continued in 2001 and 2002. U.S. State Department, *2001*

| Country | Methods Used: |
|---------|---------------|
| **Pakistan** | The State Department reports that prolonged isolation, being chained to a cell wall, and denial of food or sleep are common torture methods.[154] |
| **Philippines** | The State Department reported that "members of the security forces and police continued to use torture and to abuse suspects and detainees." The State Department cited reports by a non-governmental organization stating that "torture remained an ingrained part of the arrest and detention process." The State Department noted that common forms of torture and abuse reported during the arrest and detention process included striking detainees and threatening them with guns. The State Department also cited reports of detainees being tied up, blindfolded and punched during interrogations as cases of torture.[155] |
| **Russia** | The State Department described forms of "torture" by police officers including beating with fists, batons or other objects.[156] |
| **Saudi Arabia** | The State Department noted that Ministry of Interior officials use sleep deprivation and suspension from bars with handcuffs as interrogation tactics.[157] |
| **Sri Lanka** | According to State Department reports, "torture continues with relative impunity."[158] Reported methods of torture include suspension by the wrists or feet in contorted positions and being forced to remain in unnatural positions for extended periods.[159] |

---

*Country Reports on Human Rights Practices* (Libya), Sect. 1(d); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Libya), Sect. 1(d).

[154] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Pakistan), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Pakistan) Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Pakistan), Sect. 1(c).

[155] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Philippines), Sect. 1(c).

[156] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Russia), Sect. 1(c).

[157] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Saudi Arabia), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Saudi Arabia), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Saudi Arabia), Sect. 1(c).

[158] U.S. State Department, *2000 Country Reports on Human Rights Practices* (Sri Lanka), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Sri Lanka), Sect. 1(c).

[159]U.S. State Department, *2001 Country Reports on Human Rights Practices* (Sri Lanka), Sect. 1(c); U.S. State Department, *2001 Country Reports on Human Rights Practices* (Sri Lanka), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Sri Lanka), Sect. 1(c).

| Country | Methods Used: |
|---------|---------------|
| Tunisia | Tactics such as food and sleep deprivation or confinement to a tiny, unlit cell are commonly used in Tunisia.[160]  In addition, the State Department notes that despite the shortening by Tunisian government of the maximum allowable period of pre-arraignment incommunicado detention from 10 to 6 days, "credible sources claimed that the Government rarely enforces the new provisions and that appeals to the court for enforcement are routinely denied."[161] |
| Turkey | According to the 2001 and 2002 country reports, some of the many methods of torture employed by Turkish security forces and recognized by the State Department included repeated beatings; forced prolonged standing; isolation; exposure to loud music; stripping and blindfolding; food and sleep deprivation; and psychological torture including verbal threats and deception of a detainee, for example, instilling a false belief that the detainee is to be killed.[162] |
| Yemen | According to the State Department, detainees in Yemen have been confined in leg irons and shackles despite a 1998 law banning the practice.[163] |

---

[160] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Tunisia), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Tunisia), Sect. 1(c).

[161] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Tunisia), Sect. 1(c), (d).  The practice of incommunicado detentions was continued in 2002. U.S. State Department, *2002 Country Reports on Human Rights Practices* (Tunisia), Sect. 1(c), (d).

[162] U.S. State Department, *2001 Country Reports on Human Rights Practices* (Turkey), Sect. 1(c); U.S. State Department, *2002 Country Reports on Human Rights Practices* (Turkey), Sect. 1(c).

[163] U.S. State Department, *2002 Country Reports on Human Rights Practices* (Yemen), Sect. 1(c).

## Acknowledgments

This report was written by John Sifton, a researcher in the Asia Division of Human Rights Watch. It is based on research conducted Human Rights Watch researchers in 2003 and 2004 in Afghanistan and Pakistan and from New York. Brad Adams, Executive Director of the Asia Division, and Joe Saunders, Deputy Program Director, edited the report. James Ross, Senior Legal Advisor, provided legal review. Saman Zia-Zarifi and Marc Garlasco also reviewed the report and provided comments. Ami Evangelista, Liz Weiss, Angelina Fisher, and Jane Stratton provided research assistance. Production assistance was provided by Ami Evangelista, Veronica Matushaj, Andrea Holley, Fitzroy Hepkins, Jose Martinez, John Emerson, and Jagdish Parikh.

Human Rights Watch would like to thank the Afghan women and men whom we interviewed for this report and who assisted us in our investigation. For security reasons, many of them cannot be named here.

We would also like to thank the countless staff and officials of non-governmental organizations and U.N. agencies in Afghanistan who have assisted us with our work. We also want to specially thank the numerous international and Afghan television, radio, and print journalists in Kabul who have provided information for this report.

We would especially like to thank Ahmed Rashid for his support and encouragement. Human Rights Watch also thanks Barnett R. Rubin and Patricia Gossman for their ongoing assistance.

Our work on Afghanistan has required significant financial resources. We thank the Ford Foundation, the John D. and Catherine T. MacArthur Foundation, the Carnegie Corporation of New York, Stichting Doen, and Rockefeller Brothers Fund for their generous contributions to our emergency work in Afghanistan in 2002 and 2003.

More recently, we wish to acknowledge the generous support of the Annenberg Foundation, which has enabled Human Rights Watch to sustain our monitoring of Afghanistan.

*Human Rights Watch*
*Asia Division*

Human Rights Watch is dedicated to protecting the human rights of people around the world.

We stand with victims and activists to bring offenders to justice, to prevent discrimination, to uphold political freedom and to protect people from inhumane conduct in wartime.

We investigate and expose human rights violations and hold abusers accountable.

We challenge governments and those holding power to end abusive practices and respect international human rights law.

We enlist the public and the international community to support the cause of human rights for all.

The staff includes Kenneth Roth, executive director; Carroll Bogert, associate director; Michele Alexander, development director; Rory Mungoven, advocacy director; Barbara Guglielmo, finance director; Lotte Leicht, Brussels office director; Steve Crawshaw, London office director; Maria Pignataro Nielsen, human resources director; Iain Levine, program director; Wilder Tayler, legal and policy director; and Joanna Weschler, United Nations representative. Jonathan Fanton is the chair of the board. Robert L. Bernstein is the founding chair.

Its Asia division was established in 1985 to monitor and promote the observance of internationally recognized human rights in Asia. Brad Adams is executive director; Saman Zia-Zarifi is deputy director; Sara Colm and Mickey Spiegel are senior researchers; Meg Davis, Meenakshi Ganguly, Ali Hasan, Charmain Mohamed, John Sifton, and Tejshree Thapa are researchers; Thomas Kellogg is Orville Schell Fellow; Liz Weiss is coordinator; and Ami Evangelista is associate. Joanne Leedom-Ackerman is chairperson of the advisory committee.

Web Site Address: http://www.hrw.org
Listserv address: To subscribe to the list, send a blank e-mail message to
hrw-news-asia-subscribe@topica.email-publisher.com.

# EXHIBIT J

1 of 100 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

March 12, 2005 Saturday
Late Edition - Final

**SECTION:** Section A; Column 5; Foreign Desk; Pg. 1

**LENGTH:** 1216 words

**HEADLINE:** Army Details Scale of Abuse In Afghan Jail

**BYLINE:** By DOUGLAS JEHL

**DATELINE:** WASHINGTON, March 11

**BODY:**

Two Afghan prisoners who died in American custody in Afghanistan in December 2002 were chained to the ceiling, kicked and beaten by American soldiers in sustained assaults that caused their deaths, according to Army criminal investigative reports that have not yet been made public.

One soldier, Pfc. Willie V. Brand, was charged with manslaughter in a closed hearing last month in Texas in connection with one of the deaths, another Army document shows. Private Brand, who acknowledged striking a detainee named Dilawar 37 times, was accused of having maimed and killed him over a five-day period by "destroying his leg muscle tissue with repeated unlawful knee strikes."

The attacks on Mr. Dilawar were so severe that "even if he had survived, both legs would have had to be amputated," the Army report said, citing a medical examiner.

The reports, obtained by Human Rights Watch, provide the first official account of events that led to the deaths of the detainees, Mullah Habibullah and Mr. Dilawar, at the Bagram Control Point, about 40 miles north of Kabul. The deaths took place nearly a year before the abuses at Abu Ghraib prison in Iraq.

Among those implicated in the killings at Bagram were members of Company A of the 519th Military Intelligence Battalion, from Fort Bragg, N.C. The battalion went on to Iraq, where some members established the interrogation unit at Abu Ghraib and have been implicated in some abuses there.

The reports, from the Army Criminal Investigation Command, also make clear that the abuse at Bagram went far beyond the two killings. Among those recommended for prosecution is an Army military interrogator from the 519th Battalion who is said to have "placed his penis along the face" of one Afghan detainee and later to have "simulated anally sodomizing him (over his clothes)."

The Army reports cited "credible information" that four military interrogators assaulted Mr. Dilawar and another Afghan prisoner with "kicks to the groin and leg, shoving or slamming him into walls/table, forcing the detainee to maintain painful, contorted body positions during interview and forcing water into his mouth until he could not breathe."

American military officials in Afghanistan initially said the deaths of Mr. Habibullah, in an isolation cell on Dec. 4, 2002, and Mr. Dilawar, in another such cell six days later, were from natural causes. Lt. Gen. Daniel K. McNeill, the American commander of allied forces in Afghanistan at the time, denied then that prisoners had been chained to the ceiling or that conditions at Bagram endangered the lives of prisoners.

But after an investigation by The New York Times, the Army acknowledged that the deaths were homicides. Last fall, Army investigators implicated 28 soldiers and reservists and recommended that they face criminal charges, including negligent homicide.

But so far only Private Brand, a military policeman from the 377th Military Police Company, an Army Reserve unit based in Cincinnati, and Sgt. James P. Boland, from the same unit, have been charged.

The charges against Sergeant Boland for assault and other crimes were announced last summer, and those against Private Brand are spelled out in Army charge sheets from hearings on Jan. 4 and Feb. 3 in Fort Bliss, Tex.

The names of other officers and soldiers liable to criminal charges had not previously been made public.

But among those mentioned in the new reports is Capt. Carolyn A. Wood, the chief military intelligence officer at Bagram. The reports conclude that Captain Wood lied to investigators by saying that shackling prisoners in standing positions was intended to protect interrogators from harm. In fact, the report says, the technique was used to inflict pain and sleep deprivation.

An Army report dated June 1, 2004, about Mr. Habibullah's death identifies Capt. Christopher Beiring of the 377th Military Police Company as having been "culpably inefficient in the performance of his duties, which allowed a number of his soldiers to mistreat detainees, ultimately leading to Habibullah's death, thus constituting negligent homicide."

Captain Wood, who commanded Company A in Afghanistan, later helped to establish the interrogation and debriefing center at Abu Ghraib. Two Defense Department reports have said that a list of interrogation procedures she drew up there, which went beyond those approved by Army commanders, may have contributed to abuses at Abu Ghraib.

Past efforts to contact Captain Wood, Captain Beiring and Sergeant Boland, who were mentioned in passing in earlier reports, and to learn the identity of their lawyers, have been unsuccessful. All have been named in previous Pentagon reports and news accounts about the incidents in Afghanistan; none have commented publicly. The name of Private Brand's lawyer did not appear on the Army charge sheet, and military officials said neither the soldier nor the lawyer would likely comment.

John Sifton, a researcher on Afghanistan for Human Rights Watch, said the documents substantiated the group's own investigations showing that beatings and stress positions were widely used, and that "far from a few isolated cases, abuse at sites in Afghanistan was common in 2002, the rule more than the exception."

"Human Rights Watch has previously documented, through interviews with former detainees, that scores of other detainees were beaten at Bagram and Kandahar bases from early 2002 on," Mr. Sifton said in an e-mail message.

In his own report, made public this week, Vice Adm. Albert T. Church III cited the deaths of Mr. Habibullah and Mr. Dilawar as examples of abuse that had occurred during interrogations. Admiral Church said his review of the Army investigation had found that the abuse "was unrelated to approved interrogation techniques."

But Admiral Church also said there were indications in both cases "that medical personnel may have attempted to misrepresent the circumstances of the death, possibly in an effort to disguise detainee abuse," and noted that the Army's surgeon general was reviewing "the specific medical handling" of those cases and one other.

The most specific previous description of the cause of deaths of the two men had come from Pentagon officials, who said last fall that both had suffered "blunt force trauma to the legs," and that investigators had determined that they had been beaten by "multiple soldiers" who, for the most part, had used their knees. Pentagon officials said at the time that it was likely that the beatings had been confined to the legs of the detainees so the injuries would be less visible.

Both men had been chained to the ceiling, one at the waist and one by the wrists, although their feet remained on the ground. Both men had been captured by Afghan forces and turned over to the American military for interrogation.

Mr. Habibullah, a brother of a former Taliban commander, died of a pulmonary embolism apparently caused by blood clots formed in his legs from the beatings, according to the report of June 1, 2004. Mr. Dilawar, who suffered from a heart condition, is described in an Army report dated July 6, 2004, as having died from "blunt force trauma to the lower extremities complicating coronary artery disease."

**URL:** http://www.nytimes.com

**LOAD-DATE:** March 12, 2005