# EXHIBIT K

4 of 100 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

May 20, 2005 Friday
Late Edition - Final

**SECTION:** Section A; Column 1; Foreign Desk; Pg. 1

**LENGTH:** 6143 words

**HEADLINE:** In U.S. Report, Brutal Details Of 2 Afghan Inmates' Deaths

**SERIES:** THE BAGRAM FILE: First of two articles.

**BYLINE:** By TIM GOLDEN; Ruhallah Khapalwak, Carlotta Gall and David Rohde contributed reporting for this article, and Alain Delaqueriere assisted with research.

**BODY:**

Even as the young Afghan man was dying before them, his American jailers continued to torment him.

The prisoner, a slight, 22-year-old taxi driver known only as Dilawar, was hauled from his cell at the detention center in Bagram, Afghanistan, at around 2 a.m. to answer questions about a rocket attack on an American base. When he arrived in the interrogation room, an interpreter who was present said, his legs were bouncing uncontrollably in the plastic chair and his hands were numb. He had been chained by the wrists to the top of his cell for much of the previous four days.

Mr. Dilawar asked for a drink of water, and one of the two interrogators, Specialist Joshua R. Claus, 21, picked up a large plastic bottle. But first he punched a hole in the bottom, the interpreter said, so as the prisoner fumbled weakly with the cap, the water poured out over his orange prison scrubs. The soldier then grabbed the bottle back and began squirting the water forcefully into Mr. Dilawar's face.

"Come on, drink!" the interpreter said Specialist Claus had shouted, as the prisoner gagged on the spray. "Drink!"

At the interrogators' behest, a guard tried to force the young man to his knees. But his legs, which had been pummeled by guards for several days, could no longer bend. An interrogator told Mr. Dilawar that he could see a doctor after they finished with him. When he was finally sent back to his cell, though, the guards were instructed only to chain the prisoner back to the ceiling.

"Leave him up," one of the guards quoted Specialist Claus as saying.

Several hours passed before an emergency room doctor finally saw Mr. Dilawar. By then he was dead, his body beginning to stiffen. It would be many months before Army investigators learned a final horrific detail: Most of the interrogators had believed Mr. Dilawar was an innocent man who simply drove his taxi past the American base at the wrong time.

The story of Mr. Dilawar's brutal death at the Bagram Collection Point -- and that of another detainee, Habibullah, who died there six days earlier in December 2002 -- emerge from a nearly 2,000-page confidential file of the Army's criminal investigation into the case, a copy of which was obtained by The New York Times.

Like a narrative counterpart to the digital images from Abu Ghraib, the Bagram file depicts young, poorly trained soldiers in repeated incidents of abuse. The harsh treatment, which has resulted in criminal charges against seven soldiers, went well beyond the two deaths.

The New York Times May 20, 2005 Friday

In some instances, testimony shows, it was directed or carried out by interrogators to extract information. In others, it was punishment meted out by military police guards. Sometimes, the torment seems to have been driven by little more than boredom or cruelty, or both.

In sworn statements to Army investigators, soldiers describe one female interrogator with a taste for humiliation stepping on the neck of one prostrate detainee and kicking another in the genitals. They tell of a shackled prisoner being forced to roll back and forth on the floor of a cell, kissing the boots of his two interrogators as he went. Yet another prisoner is made to pick plastic bottle caps out of a drum mixed with excrement and water as part of a strategy to soften him up for questioning.

The Times obtained a copy of the file from a person involved in the investigation who was critical of the methods used at Bagram and the military's response to the deaths.

Although incidents of prisoner abuse at Bagram in 2002, including some details of the two men's deaths, have been previously reported, American officials have characterized them as isolated problems that were thoroughly investigated. And many of the officers and soldiers interviewed in the Dilawar investigation said the large majority of detainees at Bagram were compliant and reasonably well treated.

"What we have learned through the course of all these investigations is that there were people who clearly violated anyone's standard for humane treatment," said the Pentagon's chief spokesman, Larry Di Rita. "We're finding some cases that were not close calls."

Yet the Bagram file includes ample testimony that harsh treatment by some interrogators was routine and that guards could strike shackled detainees with virtual impunity. Prisoners considered important or troublesome were also handcuffed and chained to the ceilings and doors of their cells, sometimes for long periods, an action Army prosecutors recently classified as criminal assault.

Some of the mistreatment was quite obvious, the file suggests. Senior officers frequently toured the detention center, and several of them acknowledged seeing prisoners chained up for punishment or to deprive them of sleep. Shortly before the two deaths, observers from the International Committee of the Red Cross specifically complained to the military authorities at Bagram about the shackling of prisoners in "fixed positions," documents show.

Even though military investigators learned soon after Mr. Dilawar's death that he had been abused by at least two interrogators, the Army's criminal inquiry moved slowly. Meanwhile, many of the Bagram interrogators, led by the same operations officer, Capt. Carolyn A. Wood, were redeployed to Iraq and in July 2003 took charge of interrogations at the Abu Ghraib prison. According to a high-level Army inquiry last year, Captain Wood applied techniques there that were "remarkably similar" to those used at Bagram.

Last October, the Army's Criminal Investigation Command concluded that there was probable cause to charge 27 officers and enlisted personnel with criminal offenses in the Dilawar case ranging from dereliction of duty to maiming and involuntary manslaughter. Fifteen of the same soldiers were also cited for probable criminal responsibility in the Habibullah case.

So far, only the seven soldiers have been charged, including four last week. No one has been convicted in either death. Two Army interrogators were also reprimanded, a military spokesman said. Most of those who could still face legal action have denied wrongdoing, either in statements to investigators or in comments to a reporter.

"The whole situation is unfair," Sgt. Selena M. Salcedo, a former Bagram interrogator who was charged with assaulting Mr. Dilawar, dereliction of duty and lying to investigators, said in a telephone interview. "It's all going to come out when everything is said and done."

With most of the legal action pending, the story of abuses at Bagram remains incomplete. But documents and interviews reveal a striking disparity between the findings of Army investigators and what military officials said in the aftermath of the deaths.

Military spokesmen maintained that both men had died of natural causes, even after military coroners had ruled the deaths homicides. Two months after those autopsies, the American commander in Afghanistan, then-Lt. Gen. Daniel K. McNeill, said he had no indication that abuse by soldiers had contributed to the two deaths. The methods used at Bagram, he said, were "in accordance with what is generally accepted as interrogation techniques."

The New York Times May 20, 2005 Friday

The Interrogators

In the summer of 2002, the military detention center at Bagram, about 40 miles north of Kabul, stood as a hulking reminder of the Americans' improvised hold over Afghanistan.

Built by the Soviets as an aircraft machine shop for the operations base they established after their intervention in the country in 1979, the building had survived the ensuing wars as a battered relic -- a long, squat, concrete block with rusted metal sheets where the windows had once been.

Retrofitted with five large wire pens and a half dozen plywood isolation cells, the building became the Bagram Collection Point, a clearinghouse for prisoners captured in Afghanistan and elsewhere. The B.C.P., as soldiers called it, typically held between 40 and 80 detainees while they were interrogated and screened for possible shipment to the Pentagon's longer-term detention center at Guantanamo Bay, Cuba.

The new interrogation unit that arrived in July 2002 had been improvised as well. Captain Wood, then a 32-year-old lieutenant, came with 13 soldiers from the 525th Military Intelligence Brigade at Fort Bragg, N.C.; six Arabic-speaking reservists were added from the Utah National Guard.

Part of the new group, which was consolidated under Company A of the 519th Military Intelligence Battalion, was made up of counterintelligence specialists with no background in interrogation. Only two of the soldiers had ever questioned actual prisoners.

What specialized training the unit received came on the job, in sessions with two interrogators who had worked in the prison for a few months. "There was nothing that prepared us for running an interrogation operation" like the one at Bagram, the noncommissioned officer in charge of the interrogators, Staff Sgt. Steven W. Loring, later told investigators.

Nor were the rules of engagement very clear. The platoon had the standard interrogations guide, Army Field Manual 34-52, and an order from the secretary of defense, Donald H. Rumsfeld, to treat prisoners "humanely," and when possible, in accordance with the Geneva Conventions. But with President Bush's final determination in February 2002 that the Conventions did not apply to the conflict with Al Qaeda and that Taliban fighters would not be accorded the rights of prisoners of war, the interrogators believed they "could deviate slightly from the rules," said one of the Utah reservists, Sgt. James A. Leahy.

"There was the Geneva Conventions for enemy prisoners of war, but nothing for terrorists," Sergeant Leahy told Army investigators. And the detainees, senior intelligence officers said, were to be considered terrorists until proved otherwise.

The deviations included the use of "safety positions" or "stress positions" that would make the detainees uncomfortable but not necessarily hurt them -- kneeling on the ground, for instance, or sitting in a "chair" position against the wall. The new platoon was also trained in sleep deprivation, which the previous unit had generally limited to 24 hours or less, insisting that the interrogator remain awake with the prisoner to avoid pushing the limits of humane treatment.

But as the 519th interrogators settled into their jobs, they set their own procedures for sleep deprivation. They decided on 32 to 36 hours as the optimal time to keep prisoners awake and eliminated the practice of staying up themselves, one former interrogator, Eric LaHammer, said in an interview.

The interrogators worked from a menu of basic tactics to gain a prisoner's cooperation, from the "friendly" approach, to good cop-bad cop routines, to the threat of long-term imprisonment. But some less-experienced interrogators came to rely on the method known in the military as "Fear Up Harsh," or what one soldier referred to as "the screaming technique."

Sergeant Loring, then 27, tried with limited success to wean those interrogators off that approach, which typically involved yelling and throwing chairs. Mr. Leahy said the sergeant "put the brakes on when certain approaches got out of hand." But he could also be dismissive of tactics he considered too soft, several soldiers told investigators, and gave some of the most aggressive interrogators wide latitude. (Efforts to locate Mr. Loring, who has left the military, were unsuccessful.)

"We sometimes developed a rapport with detainees, and Sergeant Loring would sit us down and remind us that these were evil people and talk about 9/11 and they weren't our friends and could not be trusted," Mr. Leahy said.

The New York Times May 20, 2005 Friday

Specialist Damien M. Corsetti, a tall, bearded interrogator sometimes called "Monster" --he had the nickname tattooed in Italian across his stomach, other soldiers said -- was often chosen to intimidate new detainees. Specialist Corsetti, they said, would glower and yell at the arrivals as they stood chained to an overhead pole or lay face down on the floor of a holding room. (A military police K-9 unit often brought growling dogs to walk among the new prisoners for similar effect, documents show.)

"The other interrogators would use his reputation," said one interrogator, Specialist Eric H. Barclais. "They would tell the detainee, 'If you don't cooperate, we'll have to get Monster, and he won't be as nice.'" Another soldier told investigators that Sergeant Loring lightheartedly referred to Specialist Corsetti, then 23, as "the King of Torture."

A Saudi detainee who was interviewed by Army investigators last June at Guantanamo said Specialist Corsetti had pulled out his penis during an interrogation at Bagram, held it against the prisoner's face and threatened to rape him, excerpts from the man's statement show.

Last fall, the investigators cited probable cause to charge Specialist Corsetti with assault, maltreatment of a prisoner and indecent acts in the incident; he has not been charged. At Abu Ghraib, he was also one of three members of the 519th who were fined and demoted for forcing an Iraqi woman to strip during questioning, another interrogator said. A spokesman at Fort Bragg said Specialist Corsetti would not comment.

In late August of 2002, the Bagram interrogators were joined by a new military police unit that was assigned to guard the detainees. The soldiers, mostly reservists from the 377th Military Police Company based in Cincinnati and Bloomington, Ind., were similarly unprepared for their mission, members of the unit said.

The company received basic lessons in handling prisoners at Fort Dix, N.J., and some police and corrections officers in its ranks provided further training. That instruction included an overview of "pressure-point control tactics" and notably the "common peroneal strike" -- a potentially disabling blow to the side of the leg, just above the knee.

The M.P.'s said they were never told that peroneal strikes were not part of Army doctrine. Nor did most of them hear one of the former police officers tell a fellow soldier during the training that he would never use such strikes because they would "tear up" a prisoner's legs.

But once in Afghanistan, members of the 377th found that the usual rules did not seem to apply. The peroneal strike quickly became a basic weapon of the M.P. arsenal. "That was kind of like an accepted thing; you could knee somebody in the leg," former Sgt. Thomas V. Curtis told the investigators.

A few weeks into the company's tour, Specialist Jeremy M. Callaway overheard another guard boasting about having beaten a detainee who had spit on him. Specialist Callaway also told investigators that other soldiers had congratulated the guard "for not taking any" from a detainee.

One captain nicknamed members of the Third Platoon "the Testosterone Gang." Several were devout bodybuilders. Upon arriving in Afghanistan, a group of the soldiers decorated their tent with a Confederate flag, one soldier said.

Some of the same M.P.'s took a particular interest in an emotionally disturbed Afghan detainee who was known to eat his feces and mutilate himself with concertina wire. The soldiers kneed the man repeatedly in the legs and, at one point, chained him with his arms straight up in the air, Specialist Callaway told investigators. They also nicknamed him "Timmy," after a disabled child in the animated television series "South Park." One of the guards who beat the prisoner also taught him to screech like the cartoon character, Specialist Callaway said.

Eventually, the man was sent home.

The Defiant Detainee

The detainee known as Person Under Control No. 412 was a portly, well-groomed Afghan named Habibullah. Some American officials identified him as "Mullah" Habibullah, a brother of a former Taliban commander from the southern Afghan province of Oruzgan.

He stood out from the scraggly guerrillas and villagers whom the Bagram interrogators typically saw. "He had a piercing gaze and was very confident," the provost marshal in charge of the M.P.'s, Maj. Bobby R. Atwell, recalled.

Documents from the investigation suggest that Mr. Habibullah was captured by an Afghan warlord on Nov. 28, 2002, and delivered to Bagram by C.I.A. operatives two days later. His well-being at that point is a matter of dispute.

The New York Times May 20, 2005 Friday

The doctor who examined him on arrival at Bagram reported him in good health. But the intelligence operations chief, Lt. Col. John W. Loffert Jr., later told Army investigators, "He was already in bad condition when he arrived."

What is clear is that Mr. Habibullah was identified at Bagram as an important prisoner and an unusually sharp-tongued and insubordinate one.

One of the 377th's Third Platoon sergeants, Alan J. Driver Jr., told investigators that Mr. Habibullah rose up after a rectal examination and kneed him in the groin. The guard said he grabbed the prisoner by the head and yelled in his face. Mr. Habibullah then "became combative," Sergeant Driver said, and had to be subdued by three guards and led away in an armlock.

He was then confined in one of the 9-foot by 7-foot isolation cells, which the M.P. commander, Capt. Christopher M. Beiring, later described as a standard procedure. "There was a policy that detainees were hooded, shackled and isolated for at least the first 24 hours, sometimes 72 hours of captivity," he told investigators.

While the guards kept some prisoners awake by yelling or poking at them or banging on their cell doors, Mr. Habibullah was shackled by the wrists to the wire ceiling over his cell, soldiers said.

On his second day, Dec. 1, the prisoner was "uncooperative" again, this time with Specialist Willie V. Brand. The guard, who has since been charged with assault and other crimes, told investigators he had delivered three peroneal strikes in response. The next day, Specialist Brand said, he had to knee the prisoner again. Other blows followed.

A lawyer for Specialist Brand, John P. Galligan, said there was no criminal intent by his client to hurt any detainee. "At the time, my client was acting consistently with the standard operating procedure that was in place at the Bagram facility."

The communication between Mr. Habibullah and his jailers appears to have been almost exclusively physical. Despite repeated requests, the M.P.'s were assigned no interpreters of their own. Instead, they borrowed from the interrogators when they could and relied on prisoners who spoke even a little English to translate for them.

When the detainees were beaten or kicked for "noncompliance," one of the interpreters, Ali M. Baryalai said, it was often "because they have no idea what the M.P. is saying."

By the morning of Dec. 2, witnesses told the investigators, Mr. Habibullah was coughing and complaining of chest pains. He limped into the interrogation room in shackles, his right leg stiff and his right foot swollen. The lead interrogator, Sergeant Leahy, let him sit on the floor because he could not bend his knees and sit in a chair.

The interpreter who was on hand, Ebrahim Baerde, said the interrogators had kept their distance that day "because he was spitting up a lot of phlegm."

"They were laughing and making fun of him, saying it was 'gross' or 'nasty,'" Mr. Baerde said.

Though battered, Mr. Habibullah was unbowed.

"Once they asked him if he wanted to spend the rest of his life in handcuffs," Mr. Baerde said. "His response was, 'Yes, don't they look good on me?'"

By Dec. 3, Mr. Habibullah's reputation for defiance seemed to make him an open target. One M.P. said he had given him five peroneal strikes for being "noncompliant and combative." Another gave him three or four more for being "combative and noncompliant." Some guards later asserted that he had been hurt trying to escape.

When Sgt. James P. Boland saw Mr. Habibullah on Dec. 3, he was in one of the isolation cells, tethered to the ceiling by two sets of handcuffs and a chain around his waist. His body was slumped forward, held up by the chains.

Sergeant Boland told the investigators he had entered the cell with two other guards, Specialists Anthony M. Morden and Brian E. Cammack. (All three have been charged with assault and other crimes.) One of them pulled off the prisoner's black hood. His head was slumped to one side, his tongue sticking out. Specialist Cammack said he had put some bread on Mr. Habibullah's tongue. Another soldier put an apple in the prisoner's hand; it fell to the floor.

When Specialist Cammack turned back toward the prisoner, he said in one statement, Mr. Habibullah's spit hit his chest. Later, Specialist Cammack acknowledged, "I'm not sure if he spit at me." But at the time, he exploded, yelling, "Don't ever spit on me again!" and kneeing the prisoner sharply in the thigh, "maybe a couple" of times. Mr. Habibullah's limp body swayed back and forth in the chains.

The New York Times May 20, 2005 Friday

When Sergeant Boland returned to the cell some 20 minutes later, he said, Mr. Habibullah was not moving and had no pulse. Finally, the prisoner was unchained and laid out on the floor of his cell.

The guard who Specialist Cammack said had counseled him back in New Jersey about the dangers of peroneal strikes found him in the room where Mr. Habibullah lay, his body already cold.

"Specialist Cammack appeared very distraught," Specialist William Bohl told an investigator. The soldier "was running about the room hysterically."

An M.P. was sent to wake one of the medics.

"What are you getting me for?" the medic, Specialist Robert S. Melone, responded, telling him to call an ambulance instead.

When another medic finally arrived, he found Mr. Habibullah on the floor, his arms outstretched, his eyes and mouth open.

"It looked like he had been dead for a while, and it looked like nobody cared," the medic, Staff Sgt. Rodney D. Glass, recalled.

Not all of the guards were indifferent, their statements show. But if Mr. Habibullah's death shocked some of them, it did not lead to major changes in the detention center's operation.

Military police guards were assigned to be present during interrogations to help prevent mistreatment. The provost marshal, Major Atwell, told investigators he had already instructed the commander of the M.P. company, Captain Beiring, to stop chaining prisoners to the ceiling. Others said they never received such an order.

Senior officers later told investigators that they had been unaware of any serious abuses at the B.C.P. But the first sergeant of the 377th, Betty J. Jones, told investigators that the use of standing restraints, sleep deprivation and peroneal strikes was readily apparent.

"Everyone that is anyone went through the facility at one time or another," she said.

Major Atwell said the death "did not cause an enormous amount of concern 'cause it appeared natural."

In fact, Mr. Habibullah's autopsy, completed on Dec. 8, showed bruises or abrasions on his chest, arms and head. There were deep contusions on his calves, knees and thighs. His left calf was marked by what appeared to have been the sole of a boot.

His death was attributed to a blood clot, probably caused by the severe injuries to his legs, which traveled to his heart and blocked the blood flow to his lungs.

The Shy Detainee

On Dec. 5, one day after Mr. Habibullah died, Mr. Dilawar arrived at Bagram.

Four days before, on the eve of the Muslim holiday of Id al-Fitr, Mr. Dilawar set out from his tiny village of Yakubi in a prized new possession, a used Toyota sedan that his family bought for him a few weeks earlier to drive as a taxi.

Mr. Dilawar was not an adventurous man. He rarely went far from the stone farmhouse he shared with his wife, young daughter and extended family. He never attended school, relatives said, and had only one friend, Bacha Khel, with whom he would sit in the wheat fields surrounding the village and talk.

"He was a shy man, a very simple man," his eldest brother, Shahpoor, said in an interview.

On the day he disappeared, Mr. Dilawar's mother had asked him to gather his three sisters from their nearby villages and bring them home for the holiday. But he needed gas money and decided instead to drive to the provincial capital, Khost, about 45 minutes away, to look for fares.

At a taxi stand there, he found three men headed back toward Yakubi. On the way, they passed a base used by American troops, Camp Salerno, which had been the target of a rocket attack that morning.

The New York Times May 20, 2005 Friday

Militiamen loyal to the guerrilla commander guarding the base, Jan Baz Khan, stopped the Toyota at a checkpoint. They confiscated a broken walkie-talkie from one of Mr. Dilawar's passengers. In the trunk, they found an electric stabilizer used to regulate current from a generator. (Mr. Dilawar's family said the stabilizer was not theirs; at the time, they said, they had no electricity at all.)

The four men were detained and turned over to American soldiers at the base as suspects in the attack. Mr. Dilawar and his passengers spent their first night there handcuffed to a fence, so they would be unable to sleep. When a doctor examined them the next morning, he said later, he found Mr. Dilawar tired and suffering from headaches but otherwise fine.

Mr. Dilawar's three passengers were eventually flown to Guantanamo and held for more than a year before being sent home without charge. In interviews after their release, the men described their treatment at Bagram as far worse than at Guantanamo. While all of them said they had been beaten, they complained most bitterly of being stripped naked in front of female soldiers for showers and medical examinations, which they said included the first of several painful and humiliating rectal exams.

"They did lots and lots of bad things to me," said Abdur Rahim, a 26-year-old baker from Khost. "I was shouting and crying, and no one was listening. When I was shouting, the soldiers were slamming my head against the desk."

For Mr. Dilawar, his fellow prisoners said, the most difficult thing seemed to be the black cloth hood that was pulled over his head. "He could not breathe," said a man called Parkhudin, who had been one of Mr. Dilawar's passengers.

Mr. Dilawar was a frail man, standing only 5 feet 9 inches and weighing 122 pounds. But at Bagram, he was quickly labeled one of the "noncompliant" ones.

When one of the First Platoon M.P.'s, Specialist Corey E. Jones, was sent to Mr. Dilawar's cell to give him some water, he said the prisoner spit in his face and started kicking him. Specialist Jones responded, he said, with a couple of knee strikes to the leg of the shackled man.

"He screamed out, 'Allah! Allah! Allah!' and my first reaction was that he was crying out to his god," Specialist Jones said to investigators. "Everybody heard him cry out and thought it was funny."

Other Third Platoon M.P.'s later came by the detention center and stopped at the isolation cells to see for themselves, Specialist Jones said.

It became a kind of running joke, and people kept showing up to give this detainee a common peroneal strike just to hear him scream out 'Allah,'" he said. "It went on over a 24-hour period, and I would think that it was over 100 strikes."

In a subsequent statement, Specialist Jones was vague about which M.P.'s had delivered the blows. His estimate was never confirmed, but other guards eventually admitted striking Mr. Dilawar repeatedly.

Many M.P.'s would eventually deny that they had any idea of Mr. Dilawar's injuries, explaining that they never saw his legs beneath his jumpsuit. But Specialist Jones recalled that the drawstring pants of Mr. Dilawar's orange prison suit fell down again and again while he was shackled.

"I saw the bruise because his pants kept falling down while he was in standing restraints," the soldier told investigators. "Over a certain time period, I noticed it was the size of a fist."

As Mr. Dilawar grew desperate, he began crying out more loudly to be released. But even the interpreters had trouble understanding his Pashto dialect; the annoyed guards heard only noise.

"He had constantly been screaming, 'Release me; I don't want to be here,' and things like that," said the one linguist who could decipher his distress, Abdul Ahad Wardak.

The Interrogation

On Dec. 8, Mr. Dilawar was taken for his fourth interrogation. It quickly turned hostile.

The 21-year-old lead interrogator, Specialist Glendale C. Walls II, later contended that Mr. Dilawar was evasive. "Some holes came up, and we wanted him to answer us truthfully," he said. The other interrogator, Sergeant Salcedo,

complained that the prisoner was smiling, not answering questions, and refusing to stay kneeling on the ground or sitting against the wall.

The interpreter who was present, Ahmad Ahmadzai, recalled the encounter differently to investigators.

The interrogators, Mr. Ahmadzai said, accused Mr. Dilawar of launching the rockets that had hit the American base. He denied that. While kneeling on the ground, he was unable to hold his cuffed hands above his head as instructed, prompting Sergeant Salcedo to slap them back up whenever they began to drop.

"Selena berated him for being weak and questioned him about being a man, which was very insulting because of his heritage," Mr. Ahmadzai said.

When Mr. Dilawar was unable to sit in the chair position against the wall because of his battered legs, the two interrogators grabbed him by the shirt and repeatedly shoved him back against the wall.

"This went on for 10 or 15 minutes," the interpreter said. "He was so tired he couldn't get up."

"They stood him up, and at one point Selena stepped on his bare foot with her boot and grabbed him by his beard and pulled him towards her," he went on. "Once Selena kicked Dilawar in the groin, private areas, with her right foot. She was standing some distance from him, and she stepped back and kicked him.

"About the first 10 minutes, I think, they were actually questioning him, after that it was pushing, shoving, kicking and shouting at him," Mr. Ahmadzai said. "There was no interrogation going on."

The session ended, he said, with Sergeant Salcedo instructing the M.P.'s to keep Mr. Dilawar chained to the ceiling until the next shift came on.

The next morning, Mr. Dilawar began yelling again. At around noon, the M.P.'s called over another of the interpreters, Mr. Baerde, to try to quiet Mr. Dilawar down.

"I told him, 'Look, please, if you want to be able to sit down and be released from shackles, you just need to be quiet for one more hour."

"He told me that if he was in shackles another hour, he would die," Mr. Baerde said.

Half an hour later, Mr. Baerde returned to the cell. Mr. Dilawar's hands hung limply from the cuffs, and his head, covered by the black hood, slumped forward.

"He wanted me to get a doctor, and said that he needed 'a shot,'" Mr. Baerde recalled. "He said that he didn't feel good. He said that his legs were hurting."

Mr. Baerde translated Mr. Dilawar's plea to one of the guards. The soldier took the prisoner's hand and pressed down on his fingernails to check his circulation.

"He's O.K.," Mr. Baerde quoted the M.P. as saying. "He's just trying to get out of his restraints."

By the time Mr. Dilawar was brought in for his final interrogation in the first hours of the next day, Dec. 10, he appeared exhausted and was babbling that his wife had died. He also told the interrogators that he had been beaten by the guards.

"But we didn't pursue that," said Mr. Baryalai, the interpreter.

Specialist Walls was again the lead interrogator. But his more aggressive partner, Specialist Claus, quickly took over, Mr. Baryalai said.

"Josh had a rule that the detainee had to look at him, not me," the interpreter told investigators. "He gave him three chances, and then he grabbed him by the shirt and pulled him towards him, across the table, slamming his chest into the table front."

When Mr. Dilawar was unable to kneel, the interpreter said, the interrogators pulled him to his feet and pushed him against the wall. Told to assume a stress position, the prisoner leaned his head against the wall and began to fall asleep.

"It looked to me like Dilawar was trying to cooperate, but he couldn't physically perform the tasks," Mr. Baryalai said.

The New York Times May 20, 2005 Friday

Finally, Specialist Walls grabbed the prisoner and "shook him harshly," the interpreter said, telling him that if he failed to cooperate, he would be shipped to a prison in the United States, where he would be "treated like a woman, by the other men" and face the wrath of criminals who "would be very angry with anyone involved in the 9/11 attacks." (Specialist Walls was charged last week with assault, maltreatment and failure to obey a lawful order; Specialist Claus was charged with assault, maltreatment and lying to investigators. Each man declined to comment.)

A third military intelligence specialist who spoke some Pashto, Staff Sgt. W. Christopher Yonushonis, had questioned Mr. Dilawar earlier and had arranged with Specialist Claus to take over when he was done. Instead, the sergeant arrived at the interrogation room to find a large puddle of water on the floor, a wet spot on Mr. Dilawar's shirt and Specialist Claus standing behind the detainee, twisting up the back of the hood that covered the prisoner's head.

"I had the impression that Josh was actually holding the detainee upright by pulling on the hood," he said. "I was furious at this point because I had seen Josh tighten the hood of another detainee the week before. This behavior seemed completely gratuitous and unrelated to intelligence collection."

"What the hell happened with that water?" Sergeant Yonushonis said he had demanded.

"We had to make sure he stayed hydrated," he said Specialist Claus had responded.

The next morning, Sergeant Yonushonis went to the noncommissioned officer in charge of the interrogators, Sergeant Loring, to report the incident. Mr. Dilawar, however, was already dead.

The Post-Mortem

The findings of Mr. Dilawar's autopsy were succinct. He had had some coronary artery disease, the medical examiner reported, but what caused his heart to fail was "blunt force injuries to the lower extremities." Similar injuries contributed to Mr. Habibullah's death.

One of the coroners later translated the assessment at a pre-trial hearing for Specialist Brand, saying the tissue in the young man's legs "had basically been pulpified."

"I've seen similar injuries in an individual run over by a bus," added Lt. Col. Elizabeth Rouse, the coroner, and a major at that time.

After the second death, several of the 519th Battalion's interrogators were temporarily removed from their posts. A medic was assigned to the detention center to work night shifts. On orders from the Bagram intelligence chief, interrogators were prohibited from any physical contact with the detainees. Chaining prisoners to any fixed object was also banned, and the use of stress positions was curtailed.

In February, an American military official disclosed that the Afghan guerrilla commander whose men had arrested Mr. Dilawar and his passengers had himself been detained. The commander, Jan Baz Khan, was suspected of attacking Camp Salerno himself and then turning over innocent "suspects" to the Americans in a ploy to win their trust, the military official said.

The three passengers in Mr. Dilawar's taxi were sent home from Guantanamo in March 2004, 15 months after their capture, with letters saying they posed "no threat" to American forces.

They were later visited by Mr. Dilawar's parents, who begged them to explain what had happened to their son. But the men said they could not bring themselves to recount the details.

"I told them he had a bed," said Mr. Parkhudin. "I said the Americans were very nice because he had a heart problem."

In late August of last year, shortly before the Army completed its inquiry into the deaths, Sergeant Yonushonis, who was stationed in Germany, went at his own initiative to see an agent of the Criminal Investigation Command. Until then, he had never been interviewed.

"I expected to be contacted at some point by investigators in this case," he said. "I was living a few doors down from the interrogation room, and I had been one of the last to see this detainee alive."

Sergeant Yonushonis described what he had witnessed of the detainee's last interrogation. "I remember being so mad that I had trouble speaking," he said.

The New York Times May 20, 2005 Friday

He also added a detail that had been overlooked in the investigative file. By the time Mr. Dilawar was taken into his final interrogations, he said, "most of us were convinced that the detainee was innocent."

**URL:** http://www.nytimes.com

**GRAPHIC:** Photos: Dilawar, at left, was an Afghan farmer and taxi driver who died while in custody of American troops. Below, a sketch by Thomas V. Curtis, a former Reserve M.P. sergeant, showing how Dilawar was chained to the ceiling of his cell. (pg. A1)
Shahpoor visiting the grave of his brother Dilawar, who died in 2002 after mistreatment by soldiers at the Bagram detention facility. Most of his interrogators were said to believe he was innocent of any insurgent activity. (Photographs by Keith Bedford for The New York Times)(pg. A12)
Asaldin holding Bibi Rashida, 3, daughter of his son Dilawar, at home in Yakubi. Army coroners ruled Dilawar's death a homicide.
 Troops at the American base in Bagram, which houses a prison for suspected Taliban and Qaeda fighters. Photo directly above shows part of a copy of the death certificate for Dilawar, the 22-year-old farmer and part-time taxi driver who died there. (pg. A13)Chart: "Along the Chain of Command, Confusion and Contradiction"Statements below show differing perceptions of permissible conduct toward detainees.Gen. Daniel K. McNeillCommander of allied forces in AfghanistanINTERVIEW WITH THE NEW YORK TIMES, FEB. 7, 2003"We are not chaining people to the ceilings . . . I will say that our interrogation techniques are adapted, they are in accordance with what is generally accepted as interrogation techniques."Col. Theodore C. Nicholas IIDirector of intelligence for the American task force in AfghanistanSTATEMENT TO ARMY INVESTIGATORS, JUNE 11, 2004"I did not put pressure on the interrogation cell to violate standards to gain information. I would rather not receive the information than harm an individual to produce it."Capt. Britton T. HopperCompany commander 519th Military Intelligence Battalion, Bagram, Aug. 2002-Jan. 2003STATEMENT TO ARMY INVESTIGATORS, AUG. 2, 2004"There was a lot of pressure to get more intelligence . . . coming from top down, and probably the perception, on occasion, was that we weren't being as aggressive as we should have been."Capt. Carolyn A. WoodOperations officer in charge of interrogations at Bagram Control Point, July 2002-Jan. 2003STATEMENT IN COMMANDERS CLASSIFIED INVESTIGATION, JAN. 17, 2004"Would like to get additional legal guidance. We would like to know what our left and right limits are in respect to stress positions and sleep adjustment, for instance."Former Sgt. James A. (Alex) LeahyInterrogation team leaderSTATEMENT TO ARMY INVESTIGATORS, JAN. 15, 2004"Due to the lack of clear policy concerning the legality of safety positions and the sleep adjustment schedules, we did not keep records of it."(pg. A12)

**LOAD-DATE:** May 20, 2005