**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ABDULKADR ABDULKHALIK DAD,

      Petitioner,

v.

GEORGE W. BUSH, et al.,

      Respondents.

Civil Action No. 05-2083 (JDB)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO
PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION
<u>REQUIRING ADVANCE NOTICE OF TRANSFER OR REPATRIATION</u>**

Respondents hereby respond to petitioner's motion for a preliminary injunction requiring respondents to provide the Court and petitioners' counsel with 30 days' advance written notice of any transfer of petitioner from Guantanamo for purposes other than release (dkt. no. 2).

Preliminarily, there is a significant practical problem with petitioner's motion and potentially with this case in general: respondents so far have not been able to identify any detainee at Guantanamo as the individual on whose behalf this petition purportedly has been brought. Counsel apparently have not been in touch with their own putative client, but rather filed this petition through alleged authorization provided by a putative "next friend" who is another Guantanamo detainee with his own habeas case, who identifies this petitioner as "Abdulkadr Abdulkhalik Dad (Afghani) #753."[1]  <u>See</u> Exhibit A, undated "Next Friend

---

[1] As the Court may be aware, respondents have challenged the jurisdictional validity of Guantanamo detainee habeas cases that are brought through putative next friends who are other detainees who have no apparent relationship to the individual on whose behalf the case is brought other than their common detention at Guantanamo and the putative next friend's knowledge of that individual's name. Many of these motions have been transferred to Judge Oberdorfer for adjudication. Respondents intend to file a similar motion in this case shortly.

*(continued...)*

Authorization," to Declaration of Clive Stafford Smith (Attachment 2 to Petr's Mot.).  However, respondents are not aware of any detainee with the name "Abdulkadr Abdulkhalik Dad"; the detainee with ISN (internment serial number) 753 does not have that name or anything close to it; and to the extent this petition was intended to be brought on behalf of the detainee with ISN 753, it would be duplicative of two other prior habeas petitions that are already pending (and already duplicative of each other) on behalf of that individual.  See Zahir v. Bush, Civ. A. No. 05-1623 (CKK); Abdulzaher, Civ. A. No. 05-1236 (RWR); Notice of Multiple Petitions Filed by Guantanamo Bay Detainee, filed on Aug. 24, 2005 in both of the foregoing cases.  Obviously, it is problematic to be litigating an issue pertaining to a petitioner who has not been identified as a particular actual detainee, because if this Court were to issue an order, respondents would be unable to discern to what individual in their custody, if any, that order applied.  Moreover, to the extent this petition is intended to be brought on behalf of the detainee with ISN 753, it would be a needless waste of resources for the Court to take any action in this case other than to dismiss it without prejudice to petitioner's claims going forward in one of his already-pending habeas cases.

In any event, regardless of petitioner's identity, petitioner's motion fails to establish a valid factual or legal basis for the relief sought.  In particular, petitioner presents no theories or arguments that this Court has not already disposed of in adjudicating virtually identical motions in Al-Anazi v. Bush, 370 F. Supp. 2d 188, 193-99 (D.D.C. 2005), and O.K. v. Bush, 377 F.

---

[1](...continued)
Indeed, the confusion presently surrounding petitioner's identity aptly illustrates why the courts should treat with due skepticism the propriety of petitions like this where counsel apparently have no authorization from or knowledge of their client other than the fact that another detainee recited his name and ISN (here, inaccurately or inconsistently) as part of a list of other detainees.

Supp. 2d 102, 115-18 (D.D.C. 2005).  Accordingly, the Court should deny the present motion, as

it recently did in Zaid v. Bush, Civ. A. No. 05-1646 (JDB) (dkt. no. 12, filed Oct. 25, 2005).

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.    Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of then Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[2]  The Department of Defense

---

[2] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ.
A. No. 04-1254 (HHK), and Ambassador Prosper left office on or about October 11, 2005, but
the policies and practices set forth in his March 8 declaration remain in effect and are applicable
to the instant case.  Certain numerical information in the declarations is subject to updating.  See
infra note 4.

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether

continued detention is warranted based on factors such as whether the detainee continues to pose

a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those

annual reviews include those currently being conducted through Administrative Review Boards.

See Waxman Decl. ¶¶ 3, 7.[3]  As part of the Administrative Review Board process, counsel who

represent detainees have been invited to make written submissions concerning whether further

detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised,

any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official

grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another

government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Almost 250 Guantanamo detainees

have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl.

¶ 2.[4]

Where continued detention by the United States is not warranted, a detainee may be

transferred to the control of another government, typically the government of his country of

---

[3]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,
re: Administrative Review Procedures for Enemy Combatants in the Control of the Department
of Defense at Guantanamo Bay Naval Base, Cuba, available at
<<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum
dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy
Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at
<<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

[4]  As an update to certain information provided in the attached declarations, at last count,
247 detainees have been transferred by the Defense Department from Guantanamo, of which 179
were transferred for release.  See Department of Defense Press Release, "Detainee Transfer
Announced," Oct. 1, 2005, available at <<http://www.defenselink.mil/news/
detainees.html>>.

citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  Id.  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer.  Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Waxman Decl. ¶ 6; Prosper Decl. ¶ 5. Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. Waxman Decl. ¶ 6; Prosper Decl. ¶ 6. Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer. Id. Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant. Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8. In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8. Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of mistreatment concerns. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially

other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[5]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

<u>**ARGUMENT**</u>

**I.    PRELIMINARY INJUNCTION STANDARD**

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997); <u>Cobell v. Norton</u>,

391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would

---

[5] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  <u>Id.</u>

suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).[6]

## II.    PETITIONER FAILS TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and

---

[6] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals. As this Court previously concluded, however, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)). Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that

these decisions rest on faulty logic.  Any right to challenge the legality of one's detention through

a habeas proceeding cannot reasonably extend so far as to require that detention be continued,

after the Executive determines that the military rationales for enemy combatant detention no

longer warrant such custody, for no reason other than to be able to test the legitimacy of

detention the Executive no longer is interested in maintaining.[7]  "The ultimate objective of a

habeas petition is release from custody."  Almurbati, 366 F. Supp. 2d at 78.  As Judge Walton

found, "once the respondents release the petitioners from United States custody . . . they will

have obtained the result requested and at that point there will be no further need for this Court to

maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas

petition, including this one, is ultimately about obtaining release from detention, and where, as

here, the United States will relinquish custody of the detainee to the home government there is

nothing more the Court could provide to petitioners." (citation omitted)).

    That release from United States custody will give petitioner all the relief he can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

---

[7] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction
of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October
2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of
detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As this Court
previously noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three
months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that
DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-
Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani
Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/
nr20040315-0462.htm); see also supra note 3 (citing documents showing that administrative
review process for considering transfers and repatriations predates Rasul and the filing of this
and most other detainee habeas petitions).

States, a former detainee may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations.  As respondents' declarations make

clear, when the Department of Defense transfers detainees to the control of other governments,

the detainees are no longer subject to the custody or control of the United States, and any

subsequent confinement in the receiving country is based on the receiving government's

independent decision, based on its domestic laws, that the individual should be detained.

Waxman Decl. ¶ 5.[8]  The Court should therefore reject petitioner's suggestion that the possibility

of future detention in an individual's home or another country based on that country's

independent interests and determinations constitutes irreparable injury warranting an injunction.

> **B.**    **Speculation that the United States Will Defy its Own
> Policy by Transferring Detainees to Countries in
> Circumstances Where it is Believed They Will be Tortured
> Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by

unhinged speculation that, contrary to the policies and processes attested to in the sworn

declarations of high-level Executive Branch officials, the United States has designs to send

petitioner to a country in circumstances where he will be tortured.  Those declarations, after all,

make clear that it is the policy of the United States not to repatriate or transfer a detainee to a

country when the United States believes, based on a number of factors and considerations, it is

---

[8] Indeed, while petitioner apparently does not oppose transfer "for purposes of release only," Petr's Mem. at 4, it must be recognized that even if the United States transfers a detainee to another country with the understanding that, from the United States' perspective, he can be released, the receiving country is not, and could not be, prevented from subsequently taking any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.

more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl.

¶ 6.  This policy is implemented through a process that contains several levels of precautions and

safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to

assume, without any evidence, that the United States' policy and practice is somehow a sham or

pretext.  As this Court has previously determined, there is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the

petitioners' allegations of their potential torture, mistreatment and indefinite detention to which

the United States will in some way be complicit."  <u>Almurbati</u>, 366 F. Supp. 2d at 78.  Moreover,

this Court previously found that an assortment of magazine and newspaper stories much the same

as that which is relied upon by this petitioner failed to form a factual predicate justifying an

injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in

that case] concede that none of these incidents involve the transfer of detainees out of

Guantanamo."  <u>Al-Anazi</u>, 370 F. Supp. 2d at 190-91; <u>see also</u> <u>id.</u> at 196.  Thus, petitioner has

failed to show that either the prospect of relinquishment from United States custody or

unfounded speculation about possible torture in a foreign country constitute irreparable harm that

must be remedied by a preliminary injunction.

### III.    PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed, following notice, in preventing a transfer

from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), and of petitioner's claim that he is being wrongfully detained, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motion for preliminary injunction.  As this Court previously held, and another Judge has agreed, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an order preventing termination of detention by the United States in the manner described in the declarations submitted herewith.  See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's detention does not at all imply that there exists a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their transfer from Guantanamo, not to their detention at Guantanamo (emphasis in original)); Abdah, 2005 WL 711814, at *4 ("if there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted" (emphasis in original)).

Petitioner insists that he is "likely to succeed on the merits of his habeas corpus claims," Petr's Mem. at 15; see also id. at 13 ("Petitioner is likely to succeed on the claim that his detention is illegal and unconstitutional" (emphasis added)), but that is exactly the mis-focused analysis this Court rejected in Al-Anazi.  He further argues that for the United States to terminate its custody of petitioner would "defeat the Court's jurisdiction."  Id.  However, as discussed

13

above in the context of irreparable harm, see supra Section II.A, protection of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo, because relinquishment from United States custody (which occurs in every such transfer or repatriation) represents the full extent of relief that petitioner could obtain in habeas. See Almurbati, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[9]  Indeed, as this Court previously concluded, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now – with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to an 'undesirable' country." Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not enjoy a likelihood of success in obtaining an order barring a transfer in order simply to perpetuate an issue for the Court to rule on.

---

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody." Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioner may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute individuals who are transferred to it.

In a footnote, petitioner argues that "[b]ecause Respondents have moved to stay this case pending resolution of the appeals in In re Guantanamo Detainees Cases and Khalid v. Bush, the Court should also grant the requested injunction to prevent the harm that Federal Rule of Appellate Procedure 23(a) seeks to avoid."  Petr's Mem. at 17 n.6.  Respondents actually have not yet filed a motion to stay, although they expect to do so if the case is not obviated for other reasons, see supra pp. 1-2 (noting various threshold problems with this case, e.g., potential duplicativeness).  In any event, even if and when respondents move for a stay of proceedings, such a motion would not trigger application of Fed. R. App. P. 23(a) because, as petitioner forthrightly admits, "Petitioner's case is not on appeal."  Petr's Mem. at 17 n.6; see Fed. R. App. 1(a)(1) ("These rules govern procedure in the United States courts of appeals."); cf. Al-Anazi, 370 F. Supp. 2d at 199 n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas petition is not presently on appeal.").  Moreover, even if this case in its present procedural posture were somehow be deemed to have a decision on appeal for purposes of Fed. R. App. 23(a), that provision simply does not apply to transfers of wartime detainees entirely out of the custody of the United States government, as this Court previously held in O.K. v. Bush, 377 F. Supp. 2d at 116-17.[10]

Further, even if some valid claim or other legal basis existed for judicial involvement in transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice requirement to support and facilitate such involvement, the separation of powers

---

[10] Petitioner does not rely on any international treaties as a basis for enjoining a transfer or likelihood of success in doing so.

would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383 (1959)).[11]  If the Court were to entertain petitioner's claims to a right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign

---

[11] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459 F.2d at 1225.

government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference").  This principle is sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack.  While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."  Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to

17

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch" (internal quotation marks omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. May 25, 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioners seek judicial review not only of any extradition, but of any kind of transfer, repatriation or removal from Guantanamo other than for release. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[12] See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

_____

[12] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. Kin-Hong, 110 F.3d at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to transfer
(continued...)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a judicial order blocking it. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of

---

[12](...continued)
him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of transfer or repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question.  See Petr's Mem. at 18 (purpose of advance notice is so that petitioner will "be provided with a meaningful opportunity to contest [his] transfer").  Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and Ambassador Prosper submitted herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm.  See supra pp. 15-19 (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak

with one voice in its dealings with foreign nations.  See Crosby v. Nat'l Foreign Trade Council,

530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of

the President to speak for the nation with one voice in dealing with other governments").  An

advance notice requirement, after all, would make the results of diplomatic dialogue between the

Executive Branch and a foreign government regarding repatriations or transfers inherently

contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be

required for a transfer or repatriation to go forward, and such a requirement would also inject

delays into future transfers.  These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.  Petitioner simply invokes generalizations such

as that "[i]t is always in the public interest to prevent the violation of a party's constitutional

rights."  G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir.

1994).[13]  As this Court previously held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.

---

[13] Such a truism merely begs the question what violations of constitutional rights
(assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United
States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are
present or imminent here and stand to be prevented by an injunction.  As discussed above,
respondents' policy and practices governing transfer and repatriation of Guantanamo detainees
plainly do not violate any rights petitioner may have, constitutional or otherwise.  The public
interest surely does not support assuming without any foundation that Executive Branch officials
are wont to engage in constitutional violations unless supervised by the courts.

21

Where the conduct of the Executive conforms to law, there is simply no benefit –
and quite a bit of detriment – to the public interest from the Court nonetheless
assuming for itself the role of a guardian ad litem for the disposition of these
detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
judicial function for a court to review foreign policy decisions of the Executive
Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

## **CONCLUSION**

For the reasons stated above, respondents respectfully request that petitioner's motion for

a preliminary injunction be denied.

Dated: October 31, 2005                         Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                KENNETH L. WAINSTEIN
                                                United States Attorney

                                                DOUGLAS N. LETTER
                                                Terrorism Litigation Counsel

                                                [*signature block continued on next page*]

22

_/s/_ Robert J. Katerberg
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
EDWARD H. WHITE
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents